James E. Cecchi
Donald A. Ecklund
Kevin G. Cooper
CARELLA, BYRNE, CECCHI,
   BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com
decklund@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NICHOLAS MILLER, Individually and On Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>  v.<br><br>EAGLE PHARMACEUTICALS, INC., SCOTT TARRIFF, and BRIAN CAHILL,<br><br>          Defendants. | Case No. 2:23-CV-23011-JKS-MAH<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

## **TABLE OF CONTENTS**

I.    NATURE OF THE ACTION AND OVERVIEW ........................................ 1

II.   JURISDICTION AND VENUE ..................................................... 5

III.  PARTIES ......................................................................... 6

IV.   BACKGROUND ................................................................. 8

      A.   Since Its February 2022 Launch Pemfexy Was Critically
           Important To Eagle's Business ...........................................8

      B.   Demand For Pemfexy Plummeted As Initial Stocking Ceased
           And Generic Competitors Entered The Market ..................................12

V.    DEFENDANTS SECRETLY IMPLEMENTED A CHANNEL
      STUFFING SCHEME FOR PEMFEXY AND FALSIFIED EAGLE'S
      FINANCIAL STATEMENTS ...................................................... 14

      A.   In Q2 2022 Defendants Began Their "Buy And Hold" Program
           To Deceptively Boost Pemfexy Revenue ...........................................15

      B.   Eagle Admits That Its Financial Reporting For Pemfexy Sales
           Did Not Comply With GAAP And Must Be Restated.......................20

      C.   GAAP Accounting Rules Prohibited Recognition Of Revenue
           From The Pemfexy Channel Stuffing ...................................24

VI.   MATERIALLY FALSE AND MISLEADING STATEMENTS
      ISSUED DURING THE CLASS PERIOD .................................................. 29

      A.   August 9, 2022, Eagle Q2 2022 Results ...........................................29

      B.   November 7-9, 2022, Eagle Q3 2022 Results.....................................33

      C.   March 13-23, 2023, Eagle Q4 And Full Year 2022 Results ..............38

      D.   May 9, 2023, Eagle Q1 2023 Results...................................43

      E.   August 8, 2023, Eagle Q2 2023 Results ...........................................45

VII.  THE TRUTH IS REVEALED, CAUSING LARGE DECLINES IN
      EAGLE'S STOCK PRICE ........................................................ 50

i

A.    Eagle's Q1 2023 Results Revealed Dwindling Cash And Growing Debt, Exacerbated By The Sham Pemfexy Sales ...............50

B.    On November 9, 2023, Eagle Announced Delayed Q3 2023 Results To Review Its Accounting For Pemfexy Sales .....................53

C.    On November 29, 2023, Eagle Announced The "Resignation" Of Defendant Tarriff................................................................55

D.    Eagle's Business Languished As New Management Spent Months Evaluating The Falsified Financial Statements ....................55

E.    On October 2, 2024, Eagle Revealed That Its Financial Statements From Q2 2022 Forward Should Not Be Relied Upon......61

VIII.   POST-CLASS PERIOD EVENTS ............................................... 63

A.    Defendant Tarriff's Court Filings Reveal The SEC's Investigation ....................................................................63

B.    Eagle Dismisses Its External Auditor Ernst & Young LLP...............66

C.    Eagle Delists Its Stock From The NASDAQ And Ceases SEC Reporting ........................................................................67

IX.    ADDITIONAL SCIENTER ALLEGATIONS ............................................ 68

A.    Defendant Tarriff Directly Carried Out The Channel Stuffing Scheme And Ignored Repeated Warnings Not To ..............................68

B.    Defendants Tarriff And Cahill Had In-Depth Knowledge Of Eagle's Pemfexy Accounting And Customer Inventories .................69

C.    Defendant Tarriff Sold At Least $1.8 Million Of Eagle Stock During The Class Period ....................................................71

D.    Material Amounts Of Defendants' Incentive Compensation Depended On Pemfexy Sales And Eagle's Stock Price.....................75

E.    Defendants Had A Motive To Reduce The Deficit From Tarriff's Aggressive 2Q 2022 Financial Guidance............................................77

F.    Defendant Tarriff Was Desperate To Increase Pemfexy Sales, Even Resorting To Illegal And Unethical Conduct ...........................79

G.    Defendants Tarriff And Cahill Both "Resigned" Under Suspect Circumstances ................................................................81

H.    The Allegations In The Moran Complaint Are Highly Reliable ........82

X.    CLASS ACTION ALLEGATIONS ............................................. 87

XI.   LOSS CAUSATION .................................................................. 89

XII.  APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ............................................. 89

XIII. NO SAFE HARBOR ................................................................. 92

XIV.  FIRST CLAIM ......................................................................... 92

XV.   SECOND CLAIM ..................................................................... 93

XVI.  PRAYER FOR RELIEF ............................................................ 94

XVII. JURY TRIAL DEMANDED ...................................................... 94

## EXHIBIT LIST

Exhibit 1 –  Certification of Lead Plaintiff Evans Associates I, LLC

Exhibit 2 –  Certification of Additional Named Plaintiff Nicholas Miller

Exhibit 3 –  Certification of Additional Named Plaintiff Liyu Wang

Exhibit 4 –  Certification of Additional Named Plaintiff Joanna Pluta

Exhibit 5 –  Complaint And Demand For Jury Trial, *Moran v. Eagle Pharmaceuticals, Inc.*, D.N.J. Case No. 2:23-cv-03761, Dkt No. 1 (the "Moran Complaint")

Lead plaintiff Evans Associates I, LLC ("Lead Plaintiff") and additional named plaintiffs Nicholas Miller, Liyu Wang, and Joanna Pluta (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following based upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Defendant Eagle Pharmaceuticals, Inc. ("Eagle" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, media reports, presentations, and conference calls issued and disseminated by Eagle; (c) review and analysis of documents filed in other legal actions involving Eagle and/or Defendant Scott Tarriff; (d) consultation with an accounting expert; (e) interviews with former employees of Eagle; and (f) review of other information concerning Eagle.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased the publicly traded common stock of Eagle between August 9, 2022 and October 1, 2024, both dates inclusive (the "Class Period"), and who were damaged thereby. Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to

pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.     Eagle has failed its most basic duties to investors, and is a company mired in the after-effects of an accounting fraud directly conceived and implemented by its former CEO, Defendant Scott Tarriff. Eagle's board carried out an internal investigation into Tarriff's fraud, forced him to resign, and reserved the right to terminate him with cause if he did not resign. Eagle has admitted that its financial statements do not comply with GAAP and has told investors and the SEC not to rely on its financial statements. Eagle has likewise admitted to material weaknesses in its internal controls over financial reporting, and that such controls were ineffective. Despite repeated promises that it would correct the falsified financial statements Eagle has failed to do so, though it is now more than 18 months since the Company forced Tarriff's departure following its internal investigation.

3.     Since pressuring Tarriff to resign, Eagle has fired at least 36% of its employees, dismissed its external auditors, delisted its stock from the NASDAQ, and deregistered its securities with the SEC to avoid providing *any* disclosures to shareholders (*i.e.* "going dark"). Eagle's stock has lost over 90% of its value from its Class Period highs. Evidently, Eagle is a company with deep-rooted problems, and Tarriff's fraud has proven difficult to unravel. While Eagle has thus far avoided disclosing the full truth of the fraud, the Company's former third highest-ranking

officer, whom Tarriff himself called an "exceptional sales leader with a lengthy record of success in this industry," has come forward to correct the record in a whistleblower lawsuit that credibly recounts Tarriff's scheme in vivid detail.

4.    During the Class Period, Eagle was a pharmaceutical company engaged in research and development, clinical, manufacturing and commercial operations. Eagle had eight FDA-approved products including Pemfexy. Pemfexy is Eagle's brand name for its pemetrexed (the medication's generic name) for intravenous injection product. Pemfexy, and pemetrexed more generally, is a chemotherapy medication used to treat certain cancers.

5.    Eagle began selling Pemfexy in February 2022, and it quickly became one of the Company's most important products, if not the most important product. In the first quarter of 2022 ("Q1 2022") Eagle reported $37.2 million in Pemfexy revenue, constituting 41.3% of Eagle's total product sales and 32.1% of total revenue reported for the quarter, and making Pemfexy Eagle's best-selling product. As such, Eagle's Pemfexy sales were of critical importance to the Company and its investors.

6.    However, much of the Q1 2022 Pemfexy sales were from customers' initial stocking orders, which ceased in Q2 2022. Making matters worse, in May 2022 the original FDA-approved pemetrexed product, Eli Lilly & Company's ("Eli Lilly") Alimta, lost regulatory exclusivity, allowing cheaper generic pemetrexed products into the market, and exacerbating the decline in Eagle's Pemfexy sales.

7.    To boost Eagle's rapidly falling Pemfexy sales, Defendants secretly carried out a fraudulent "channel stuffing" scheme to inflate Eagle's reported Pemfexy revenue. Channel stuffing is a well-known practice in which a company reports inflated sales by sending a distribution channel (such as a wholesaler or retailer) more products than it wants to purchase or is able to sell.

8.    As was later revealed in a lawsuit by Eagle's former Chief Commercial Officer, Michael Moran, against the Company and Defendant Tarriff, in Q2 2022 Eagle paid drug wholesalers to accept large shipments of Pemfexy that were unlikely to be sold to end users before the medicine's expiration, and which the wholesalers were entitled to return to Eagle free of charge. Defendants internally referred to this scheme as the "Inventory Guarantee Supply Program" or the "Buy and Hold" program. According to Moran's complaint, based on his first-hand knowledge of the relevant events, this Pemfexy channel stuffing scheme was conceived and implemented directly by Defendant Tarriff.

9.    Eagle has now admitted that in Q2 2022 it improperly "recognized revenue upon delivery to a wholesale customer," and that all of its published financial statements from Q2 2022 forward "were not prepared in accordance with GAAP" and "should no longer be relied upon and should be restated." According to Defendant Tarriff's counsel, "Eagle . . . conducted an internal investigation into the PEMFEXY inventory issue, and as a result the Company pressured Mr. Tarriff to

resign," and according to Eagle its board of directors was considering terminating Tarriff with cause. A few months after Defendant Tarriff's forced resignation, Defendant Cahill, then Eagle's CFO, also suddenly "resigned," with no permanent successor in place.

10.    Eagle's stock price reached highs over $40 per share during the Class Period, and Defendant Tarriff sold at least $1.8 million of his Eagle stock at prices of $13.87 to $21.52 per share. In the months following Eagle's October 2, 2024 admission that its financial statements from Q2 2022 forward cannot be relied upon, Eagle's stock traded for less than $1.00 per share.

11.    As a result of Defendants' misleading statements and omissions, and the resulting precipitous decline in the market value of Eagle's common stock, Plaintiffs and other Class members have suffered significant damages.

## II.    JURISDICTION AND VENUE

12.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The alleged misstatements

entered and subsequent damages took place within this judicial district. Eagle's principal executive offices are located in this District at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

15.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

16.    Lead Plaintiff Evans Associates I, LLC, as set forth in the attached certification (**Exhibit 1**), purchased publicly traded Eagle common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.    Plaintiff Nicholas Miller, as set forth in the attached certification (**Exhibit 2**), purchased publicly traded Eagle common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18.    Plaintiff Liyu Wang, as set forth in the attached certification (**Exhibit 3**), purchased publicly traded Eagle common stock during the Class Period, and

suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19.    Plaintiff Joanna Pluta, as set forth in the attached certification (**Exhibit 4**), purchased publicly traded Eagle common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

20.    Defendant Eagle Pharmaceuticals, Inc. is incorporated in Delaware and maintains its principal executive offices at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey. During the Class Period, Eagle's common stock was listed and traded on the NASDAQ under the ticker symbol "EGRX".

21.    Defendant Scott Tarriff founded Eagle in January 2007, serving as its Chief Executive Officer and a member of its board of directors ("Board") from that time until his forced resignation in November 2023. Prior to joining Eagle, Defendant Tarriff served as CEO of Par Pharmaceutical Companies, Inc. ("Par Pharmaceutical"), where he was also sued for securities fraud relating to manipulation of that company's financial statements. *See* D.N.J. Case No. 06-cv-3226 (PGS). Defendant Tarriff previously served as a board member at other pharmaceutical industry companies including Synthetic Biologics, Inc., Ziopharm Oncology, Inc., and Clinical Data, Inc. Defendant Tarriff holds a B.S. in marketing and an M.B.A.

22.    Defendant Brian Cahill was Eagle's Chief Financial Officer during the Class Period until his purported resignation in March 2024. Defendant Cahill joined Eagle in October 2016 as Corporate Controller, became Vice President of Finance in January 2018, and became CFO in October 2020. Prior to joining Eagle Defendant Cahill served as Corporate Controller at Aralez Pharmaceutical Companies, Inc. and at Par Pharmaceutical, where he had broad responsibility for matters including technical accounting, management and SEC reporting, and revenue controls. Before joining Par Pharmaceutical, Defendant Cahill worked at PricewaterhouseCoopers LLP. Defendant Cahill holds a B.S. in Accounting and is a Certified Public Accountant.

23.    Defendant Tarriff and Defendant Cahill are together referred to as the "Individual Defendants."

## IV.    BACKGROUND

### A.    Since Its February 2022 Launch Pemfexy Was Critically Important To Eagle's Business

24.    Pemfexy is a form of pemetrexed, an intravenously-administered cancer agent indicated for locally advanced or metastatic non-small cell lung cancer and mesothelioma. Pemfexy is a branded competitor to the original FDA-approved pemetrexed product, Eli Lilly's Alimta. Alimta is sold in powder form and must be reconstituted into a liquid before use, whereas Pemfexy is sold as a ready-to-dilute liquid.

25.    Eagle submitted a New Drug Application to the FDA for Pemfexy in December 2016, and Eli Lilly sued Eagle for patent infringement in August 2017. In December 2019 Eli Lilly and Eagle reached a settlement agreement which allowed for a limited-quantity initial entry of Pemfexy into the market on February 1, 2022, and subsequent uncapped entry on April 1, 2022. In February 2020 Eagle received final approval from the FDA for Pemfexy. Eli Lilly's period of regulatory exclusivity for Alimta, based on its patents and appliable laws and regulations, was due to expire on or about May 24, 2022. During the period of regulatory exclusivity no other pemetrexed products could be sold without Eli Lilly's consent.

26.    Leading up to and after Pemfexy's launch, Defendants set high expectations for its commercial success and importance to Eagle's business. For example, at the JP Morgan Healthcare Conference on January 12, 2022, Defendant Tarriff stated that the launch of Pemfexy, combined with the launch of Eagle's vasopressin product (a generic version of Par Pharmaceutical's Vasostrict, indicated to increase blood pressure in adults with vasodilatory shock), was expected to double Eagle's revenue and profitability in 2022. Referring to the 2022 sales figures for the competing vasopressin and pemetrexed products, Defendant Tarriff stated:

> between vasopressin, which was about $800 million last 12 months and PEMFEXY, which is $1.3 billion last 12 months, we're launching now into more than $2 billion of exclusivity. And when Brian [Cahill] and I say that we believe that our revenue is going to double or more than double and that our profitability is going to then more than double, if we look at the consensus from the analysts, our earnings should be more

9

like a triple that we've taken into account all of these unknowns, right? There's quite a bit of probably in our numbers upside in PEMFEXY.

27.    On February 1, 2022, Eagle issued a press release announcing the commercial availability of Pemfexy, stating that the "ALIMTA® U.S. market totaled $1.2 billion for the twelve months ended September 30, 2021" and that the Pemfexy "[l]aunch [is] expected to drive significant revenue growth in 2022."

28.    In Eagle's March 7, 2022 investor call to report Q4 2021 results, Defendant Tarriff stated regarding vasopressin and Pemfexy that "[l]eading up to these launches, we have been guiding that we expect to double our revenue and more than double our earnings in '22. And we believe that we are comfortably well ahead of that run rate." Defendant Tarriff also stated that "I think PEMFEXY, as you look out over a number of years is probably going to be the stronger of the 2 products because of the way the drugs [*sic*] reimbursed. And so we're pretty confident that PEMFEXY will be a significant part of the company."

29.    Defendants set and maintained very high prices for Pemfexy. Medicine information website Drugs.com listed a retail price of $4,657.67 per 20 mL vial of Pemfexy in early 2025, which was corroborated by similar prices listed on the website GoodRx.com. Defendants appear to have marketed Pemfexy with similarly high retail prices throughout the Class Period.

30.    As alleged in the complaint filed by Eagle Chief Commercial Officer Michael Moran against Eagle and Defendant Tarriff (**Exhibit 5**, the "Moran

10

Complaint"), Eagle's settlement agreement with Eli Lilly allowed Eagle to sell "19,200 vials of PEMFEXY between February 1, 2020 and March 31, 2022," and "[i]n the first two months of eligibility, Defendant Eagle sold all 19,200 vials of PEMFEXY." Moran Complaint ¶¶33-34.

31.    When Eagle reported its Q1 2022 results on May 9, 2022, it disclosed that Pemfexy was the Company's top-selling product, with $37.2 million of revenue for the quarter, accounting for 41.3% of reported product sales and 32.1% of total reported revenue.

32.    Pemfexy remained important to Eagle's business throughout the Class Period. Since its launch in February 2022, Pemfexy accounted for $109.8 million of Eagle's reported revenue over the Q1 2022 through Q2 2023 period (as of the date of filing of the instant complaint, Eagle has not disclosed financial results for any periods after Q2 2023). This represents 36.2% of Eagle's reported product sales, and 24.5% of Eagle's total reported revenue for that period. The following table presents certain information relating to Eagle's Pemfexy sales and other financial metrics, as reported in Eagle's consolidated statements of operations (all numbers in thousands):

|  | Q1 2022 | Q2 2022 | Q3 2022 | Q4 2022 | Q1 2023 | Q2 2023 |
|---|---|---|---|---|---|---|
| Net income | $44,058 | -$9,450 | -$7,131 | $8,165 | $5,750 | $5,164 |
| Total revenue | $115,874 | $74,136 | $65,901 | $60,699 | $66,305 | $64,646 |
| Product sales revenue, net | $90,088 | $49,201 | $38,036 | $37,161 | $46,221 | $42,993 |
| Pemfexy net product sales | $37,182 | $16,504 | $1,700 | $12,100 | $22,948 | $19,400 |

33.     The large reported Pemfexy sales were all the more important given Eagle's deteriorating financial position over that period, with a substantial decrease in cash and increase in debt. The following table presents certain information as reported in Eagle's consolidated balance sheets (all numbers in thousands):

|  | 3/31/2022 | 6/30/2022 | 9/30/2022 | 12/31/2022 | 3/31/2023 | 6/30/2023 |
|---|---|---|---|---|---|---|
| **Cash and cash equivalents** | $69,522 | $36,562 | $15,384 | $55,321 | $21,897 | $15,354 |
| **Total debt** | $23,725 | $49,861 | $61,392 | $62,466 | $76,329 | $70,193 |

## B.     Demand For Pemfexy Plummeted As Initial Stocking Ceased And Generic Competitors Entered The Market

34.     As shown above, Pemfexy sales fell from $37.2 million in Q1 2022 to $16.5 million in Q2 2022, and even further to $1.7 million in Q3 2022.

35.     With the expiration of Alimta's regulatory exclusivity on or about May 24, 2022, multiple generic pemetrexed products soon entered the market. The FDA's website lists a dozen pemetrexed products with Abbreviated New Drug Application approval dates of May 25, 2022, from companies such as Dr. Reddy's Laboratories Limited, Hospira Inc., and Qilu Pharmaceutical Corporation Ltd.

36.     Further decreasing demand for Pemfexy was that wholesalers and other customers had made large initial stocking purchases of Pemfexy in Q1 2022 shortly following its launch, and still had substantial inventory on hand in Q2 2022. During the Class Period, information available on Eagle's website listed four "wholesalers"

of Pemfexy: AmeriSource Bergen (now known as Cencora), Cardinal Health, McKesson, and Morris & Dickson.

37.    On Eagle's May 9, 2022 earnings call an analyst asked "on PEMFEXY . . . thinking about sort of the second quarter, how much of the demand in the first quarter was the sort of stocking versus actual patient demand?" Defendant Tarriff acknowledged the first quarter stocking, while also touting "pretty good pull-through," *i.e.* sales from wholesalers or other distribution channels to end users, stating "[s]o as typical, you spend the first period of time in a launch in stocking. We've had some pretty good pull-through, and that pull-through will continue to build and sales will continue to build."

38.    As alleged in the Moran Complaint, in April 2022 Moran "explained to Defendant Tarriff and [Eagle's Executive Vice President for Marketing, John] Kimmet that Defendant Eagle customers had advised him and/or his sales team that they already had months' worth of non-moving inventory of PEMFEXY product on hand, and therefore, could not purchase any more product." Moran Complaint ¶76.

39.    With respect to generic competition, by May 9, 2022, Moran and others had advised Tarriff that once the exclusivity period ended, Eagle's "customers would not be purchasing more PEMFEXY for the foreseeable future." *Id.* ¶135.

40.    The rapid decline in demand for Pemfexy is confirmed by court filings in a breach of contract lawsuit brought against Eagle by the company that it hired to

manufacture Pemfexy, Curia Global Inc. ("Curia"). As alleged in Curia's complaint, in March 2022 Eagle submitted a Firm Period Forecast committing to purchase 18 batches of Pemfexy from April through September 2022. However, Eagle submitted purchase orders for only seven batches during that period, resulting in a deficit of 11 batch orders. With the batch orders priced at $365,575 each, Curia claimed over $4 million in damages. As Eagle admitted in its memorandum in support of its partial motion to dismiss, "Eagle needed less product due to changes in market demand."

41.    Defendants acknowledged currently declining demand for Pemfexy, while touting a future rebound, when reporting Eagle's Q2 2022 results. In Eagle's August 9, 2022 conference call to discuss Q2 2022 results, Defendant Tarriff stated:

> As this market matures, we believe many of our customers are highly likely to use a generic form of ALIMTA through the end of this year. This is due to the way that generics are reimbursed in the first 6 months of their life cycle. Thereafter, we expect the dynamics in the market will allow many of these customers to transition their demand back to PEMFEXY, starting in the first quarter of '23. As of today, we believe that we will sell more PEMFEXY in 2023 than we had in 2022.

## V.    DEFENDANTS SECRETLY IMPLEMENTED A CHANNEL STUFFING SCHEME FOR PEMFEXY AND FALSIFIED EAGLE'S FINANCIAL STATEMENTS

42.    Throughout the Class Period Defendants knew, but concealed from investors, that they had carried out a channel stuffing scheme to create illusory "sales" of Pemfexy that was likely to be returned to Eagle without payment. Due to

this scheme, Eagle's reported financial results violated Generally Accepted Accounting Principles and were materially false and misleading.

**A.    In Q2 2022 Defendants Began Their "Buy And Hold" Program To Deceptively Boost Pemfexy Revenue**

43.    As revealed by Eagle's former Chief Commercial Officer, Michael Moran, in 2Q 2022 Defendants carried out a Pemfexy channel stuffing scheme to inflate Eagle's revenue. As shown *infra*, Moran's allegations are highly reliable— he was an executive officer at Eagle reporting directly to Defendant Tarriff, he has first-hand knowledge of key facts, and Eagle's own subsequent admissions corroborate his claims of falsified accounting for purported Pemfexy sales.

44.    As summarized by Moran:

> Starting in and around the second quarter of its fiscal year 2022, Defendant Eagle dramatically inflated its financial results to the market and investors by stuffing the channel with excess inventory at the end of the quarter by making purported "sales" to wholesalers far exceeding any demand. Defendants then reported these "sales" as "revenue" for product that had not been paid for, likely would never be paid for, but rather returned to Defendant Eagle the following year. Defendants further agreed to pay the wholesalers for these purported "sales" even though all they did was hold their product and then return it. Thus, these reported "sales" and "revenue" were a complete sham.

Moran Complaint ¶2.

45.    "This scheme by Defendant Eagle, led by its President, CEO and Founder Defendant Tarriff, was referred to as the Company's '*Buy and Hold*' or '*Inventory Guarantee Purchase Program*' i.e., channel stuffing program." *Id.* ¶3.

46.    In early 2022, "cognizant of the impending displacement of PEMFEXY and desperate to increase the Company's revenues, Defendant Tarriff began exerting pressure on the Company's sales team to force more product into the channel when it was already full." *Id.* ¶40. "[Moran] voiced his concerns, telling Defendant Tarriff that the Company needed to be careful not to 'stuff the channel'." *Id.*

47.    The scheme began to take shape when, "[o]n or about April 8, 2022, Defendant Tarriff held a meeting with [Moran] and Kimmet." *Id.* ¶73. According to the Moran Complaint:

> Defendant Tarriff and Kimmet discussed the concept of implementing a "Buy and Hold" or "Inventory Guarantee Supply Program", i.e., an unlawful channel stuffing program. The basis of these agreements would be to highly incentivize customers to "buy and hold" the product by improper means, which included, *inter alia*, Defendant Eagle offering that the customers: (i) simply accept shipment of the product(s) from Defendant Eagle without ever paying for it; (ii) hold onto the product; (iii) then return the product to Defendant Eagle the following year; AND (iv) be paid by Defendant Eagle for merely "holding" the product in their distribution centers for nine (9) months or longer. Defendants then intended to report these as purported "sales" and "revenue" to Defendant Eagle in its public filings.

*Id.* ¶75.

48.    "In response, [Moran] explained to Defendant Tarriff and Kimmet that Defendant Eagle customers had advised him and/or his sales team that they already had months' worth of non-moving inventory of PEMFEXY product on hand, and therefore, could not purchase any more product." *Id.* ¶76. "[Moran] voiced serious concerns that such a 'Buy and Hold' or 'Inventory Guarantee Purchase Program'

would constitute an illegal form of channel stuffing." *Id.* ¶77. "Defendant Tarriff ignored [Moran] and instead directed that he and his sales team stuff the channel with PEMFEXY." *Id.* ¶78. Moran, "however, refused to do so." *Id.* ¶79.

49.    "On or about April 21, 2022, Defendant Tarriff demanded a Teams meeting with [Moran's] direct reports to hear directly from them what customers were saying to them." *Id.* ¶80. "[Moran's] team corroborated all the points [Moran] had provided to Defendant Tarriff for the last several weeks." *Id.* ¶81. "Enraged, Defendant Tarriff decided that he was going to do it himself." *Id.* ¶82. "Defendant Tarriff instructed [Moran] and his team to stand down with ALL Community Oncology companies." *Id.* ¶83. "Defendant Tarriff and Kimmet would work with the Community Oncology customers to sell PEMFEXY," while "[Moran] and his team's sales of PEMFEXY would be limited to 340b Hospital businesses (where Medicaid rates would apply and the price of PEMFEXY was less than one-third the cost as compared to the Community Oncology rate per vial)." *Id.*

50.    "Defendant Tarriff directed each Regional Director to send to Kimmet the TOP five Community Oncology customers in their regions for review by Defendant Tarriff and Kimmet," and "[o]n or about April 23, 2022, [Moran's] Regional Directors provided them with their top five customers." *Id.* ¶¶84-85. "On or about April 25, 2022, a tracker was created and was to be updated with any progress Kimmet and Defendant Tarriff had in their sales of PEMFEXY." *Id.* ¶86.

51.    "Defendant Tarriff created a list of Defendant Eagle's largest customers and his close personal friends who were industry leaders at the largest U.S. wholesalers to convince them to 'Buy and Hold' Defendants' non-moving PEMFEXY so that Defendant Eagle could make the numbers they had projected to the Street." *Id.* ¶100. "[Moran] was advised that Defendant Tarriff and Kimmet would pitch to the customers that they should 'buy and hold' the product for several months." *Id.* ¶102. "[Moran] was further advised that Defendant Tarriff began talks with wholesalers to try and convince them to 'buy and hold' the product because most customers won't buy direct from a manufacturer; instead, they use wholesalers." *Id.* ¶103. "But wholesalers are likewise VERY careful not to buy 'too much' product, i.e., unlawfully 'stuffing the channel'," and "[i]n fact, in response to Defendants' efforts to 'channel stuff', Defendants received communications from some of their wholesaler employees raising such concerns." *Id.* ¶104.

52.    "By June 2022, desperate to inflate the Company's 'sales' and 'revenue' for the quarter, Defendant Tarriff called upon his largest customers and close personal friends, at least two of whom were industry leaders at two of the largest U.S. wholesalers, including Wholesaler A and Wholesaler B, to facilitate stuffing the channel with Defendants' non-moving PEMFEXY." *Id.* ¶116. As detailed in the Moran Complaint:

> As part of Defendant Eagle's Buy and Hold or Inventory Guarantee Purchase Program, on June 30, 2022, the last day of Q2 2022,

Defendant Eagle entered into a "sale" (signed 3½ months later and backdated to June 29, 2022) with Wholesaler A with whom Defendant Tarriff had a close personal relationship, where in exchange for agreeing to purchase AND accept thousands of vials of PEMFEXY at the Wholesaler A distribution center before midnight that night, Defendant Eagle provided them with terms that indicated that no bona fide sale had occurred; in reality, Defendant Eagle was effectively paying Wholesaler A to merely hold product so that Defendant Eagle could report false, inflated revenue numbers to the Street, i.e., channel stuffing.

*Id.* ¶117. Under the terms of the purported sale, "(i) Wholesaler A could return the product later without ever paying for it, (ii) Defendant Eagle would pay Wholesaler A for merely 'Buying and Holding' the product, and (iii) the product could be returned to Defendant Eagle without ever being paid for and the product would then likely be destroyed." *Id.* ¶118.

53.    Additional facts revealed by Moran likewise show the sham nature of the purported sale. "Wholesaler A already had a HUGE, non-moving, aging inventory of PEMFEXY because the competing generic products had come into the market and displaced the Company's far more expensive branded product, PEMFEXY, which sold for thousands of dollars (WAC) per single dose vial." *Id.* ¶119. "At its current 'Run Rate' (the rate at which the product was selling) at the time of the purported sale, it would have taken Wholesaler A YEARS to use up the supply of PEMFEXY it had already purchased from Defendant Eagle – FAR beyond PEMFEXY's shelf-life." *Id.* ¶120.

54.      Defendants also implemented their channel stuffing scheme through a second wholesaler in Q2 2022. "Another wholesaler who engaged in this 'Buy and Hold' scheme with Defendant Eagle included Wholesaler B, whose Chairman, President and CEO is also Defendant Tarriff's close personal friend." *Id.* ¶121. Defendant Tarriff initially encountered resistance from the wholesaler for this second sham sale:

> Defendant Tarriff was asking Wholesaler B to buy millions of dollars' worth of inventory even though Wholesaler B's inventory was NOT moving. One of Wholesaler B's executives stated, "*it would NOT be compliant if we purchased more PEMFEXY because we still have many months of non-moving inventory on hand.*" Thus, Wholesaler B made it clear to the Defendants that it could not purchase more PEMFEXY at that time because it would constitute unlawful channel stuffing.

*Id.* ¶122. "Nevertheless, Defendants got Wholesaler B to buy more PEMFEXY" under the "'Buy and Hold' program terms." *Id.* ¶123.

55.      "In the second quarter of 2022 alone, using their 'Buy and Hold' scheme, Defendants 'sold' millions of dollars of non-moving inventory to its customers, including Wholesalers A and B, totaling at least $28.8 million dollars." *Id.* ¶124.

### B.      Eagle Admits That Its Financial Reporting For Pemfexy Sales Did Not Comply With GAAP And Must Be Restated

56.      In a November 9, 2023 SEC filing, Eagle stated that it would be delayed in reporting Q3 2023 results, that "the Company is reviewing and expects potential adjustments to reserves for returns and price adjustments of approximately $15.0

million to \$20.0 million," and that "[t]hese potential adjustments primarily relate to returns and a price adjustment for PEMFEXY® substantially stemming from slower-than-anticipated pull-through from one wholesale customer predominantly due to expiry of inventory."

57.    In a subsequent SEC filing on December 15, 2023, Eagle admitted that its Q2 2023 financial statements did not comply with GAAP, should not be relied on, and must be restated, and that it had material weaknesses in its internal controls over financial reporting and that such controls were ineffective, stating in relevant part:

> On December 12, 2023, the Audit Committee (the "Audit Committee") of the Board of Directors of Eagle Pharmaceuticals, Inc. (the "Company"), based on the recommendation of, and after consultation with, the Company's management concluded that the Company's previously issued unaudited interim condensed consolidated financial statements for the quarter ended June 30, 2023 (the "Non-Reliance Period"), as previously filed with the SEC, should no longer be relied upon and should be restated due to the matters described below.

> *    *    *

> During its review, the Company discovered that reserves recorded in its financial statements for the quarter ended June 30, 2023 primarily relating to returns and price adjustments for PEMFEXY® did not reflect certain information that should have been considered at the time the Company prepared its financial statements for the quarter ended June 30, 2023. Had that information been considered, such reserves for the quarter ended June 30, 2023 would have increased, which would have reduced the Company's net product sales for the quarter ended June 30, 2023 by a corresponding amount.

> *    *    *

21

As a result of the foregoing, the Company has identified material weaknesses in its internal control over financial reporting that existed as of June 30, 2023 and has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of June 30, 2023. Based on this assessment, the Company's disclosure controls and procedures were ineffective as of June 30, 2023.

\*    \*    \*

Further, in connection with the restatement of the financial statements for the quarter ended June 30, 2023 (the "June 2023 Financials"), the Company has concluded that the June 2023 Financials previously delivered to the Administrative Agent and lenders did not present fairly in all material respects the financial condition and results of operations of the Company and its consolidated subsidiaries for the reasons described above and were not prepared in accordance with generally accepted accounting principles, which gave rise to an event of default under the Credit Agreement.

58.    Finally, after almost a year of further review, in an October 2, 2024 SEC filing, Eagle admitted that its financial statements for Q2 2022 through Q1 2023 also did not comply with GAAP, should not be relied on, and must be restated, and that it had material weaknesses in its internal controls over financial reporting and that such controls were ineffective, stating in relevant part:

On September 27, 2024, the Audit Committee (the "Audit Committee") of the Board of Directors of the Company, based on the recommendation of, and after consultation with, the Company's management, concluded that revenue previously recognized related to a sale of PEMFEXY in the second quarter of 2022 did not meet certain criteria of Financial Accounting Standards Board Accounting Standards Codification Topic 606 – *Revenue from Contracts with Customers,* when originally recorded. The Company previously recognized revenue upon delivery to a wholesale customer but has now determined that revenue from this transaction should be deferred and

recognized in later periods to the extent certain criteria have been achieved. As a result, the Audit Committee determined that the Company's audited financial statements for the fiscal year ended December 31, 2022, and unaudited financial statements for the quarters ended June 30, 2022, September 30, 2022, and March 31, 2023 (collectively, the "Non-Reliance Period"), as previously filed with the SEC, should no longer be relied upon and should be restated.

*    *    *

As a result of the foregoing, the Company expects to conclude that one or more material weaknesses related to the foregoing matters existed in the Company's internal control over financial reporting and that the Company's disclosure controls and procedures were not effective for each of the fiscal periods within the Non-Reliance Period, and as of September 30, 2023 and December 31, 2023. In addition, as previously disclosed, the Company has identified material weaknesses in its internal control over financial reporting that existed as of June 30, 2023 and concluded that the Company's disclosure controls and procedures were ineffective as of June 30, 2023.

*    *    *

Further, in connection with the non-reliance determination described in Item 4.02, the Company has concluded that the financial statements for the fiscal periods within the Non-Reliance Period previously delivered to the Administrative Agent and the Lenders did not present fairly in all material respects the financial condition and results of operations of the Company and its consolidated subsidiaries for the reasons described above and were not prepared in accordance with GAAP, which gave rise to an event of default under the Credit Agreement.

59.    As of the date of this complaint, not only has Eagle yet to publicly disclose any restated financial results for the periods Q2 2022 through Q2 2023, it has also failed to publish financial results for any subsequent period, leaving the

Company's investors in the dark as to the true state of its business over the last three years.

**C.    GAAP Accounting Rules Prohibited Recognition Of Revenue From The Pemfexy Channel Stuffing**

60.    Defendants' recognition of revenue from the Pemfexy channel stuffing scheme violated Generally Accepted Accounting Principles ("GAAP") designed to ensure that a company only recognizes revenue "in an amount that reflects the consideration to which the entity expects to be entitled." This analysis takes into account "all relevant facts and circumstances," including the existence and terms of any right by the customer to return the product without payment. Where the facts indicate it is likely the customer will return the product without payment, GAAP prohibits recognition of revenue.

61.    Eagle generally recognized revenue from sales of Pemfexy upon product shipment or delivery to customers, which in many cases were wholesalers and not the drug's end user. Eagle's reported revenue did not equal the amount of cash it received from product sales, but rather depended on assumptions that Defendants chose to use concerning the consideration to which Eagle would eventually be entitled. Eagle did not recognize as revenue the full retail list price of the Pemfexy it shipped or delivered. As stated in Eagle's 2Q 2022 Form 10-Q, "revenue on sales to end users for . . . Pemfexy . . . are recorded net of chargebacks, rebates, returns, prompt pay discounts, wholesaler fees and other deductions."

62.    SEC Regulation S-X (17 C.F.R. § 210.1-01 *et seq.*) governs "the form and content of and requirements for financial statements." 17 C.F.R. § 210.1-01(a)(1). Annual reports on SEC Form 10-K and quarterly reports on SEC Form 10-Q are required to include financial statements meeting the requirements of Regulation S-X. Under Regulation S-X, financial statements must comply with GAAP, and "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading." 17 C.F.R. § 210.4-01(a)(1).

63.    The Financial Accounting Standards Board maintains the Accounting Standards Codification ("ASC"), which organizes and codifies U.S. GAAP. ASC 606, titled Revenue from Contracts with Customers, "specifies the accounting for revenue from contracts with customers," and "establishes principles for reporting useful information to users of financial statements about the nature, amount, timing, and uncertainty of revenue and cash flows arising from the entity's contracts with customers." ASC 606-10-05-1; ASC 606-10-05-2.

64.    The "core principle" of ASC 606 "is that an entity recognizes revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services." ASC 606-10-05-3. "An entity shall consider the terms of

the contract and all relevant facts and circumstances when applying this guidance."
ASC 606-10-10-3.

65.    Under ASC 606-10-32-1, "When (or as) a performance obligation is satisfied, an entity shall recognize as revenue the amount of the transaction price (which excludes estimates of variable consideration that are constrained in accordance with paragraphs 606-10-32-11 through 32-13) that is allocated to that performance obligation."

66.    Under ASC 606-10-32-2:

An entity shall consider the terms of the contract and its customary business practices to determine the transaction price. The transaction price is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer, excluding amounts collected on behalf of third parties (for example, some sales taxes). The consideration promised in a contract with a customer may include fixed amounts, variable amounts, or both.

67.    "If the consideration promised in a contract includes a variable amount, an entity shall estimate the amount of consideration to which the entity will be entitled in exchange for transferring the promised goods or services to a customer." ASC 606-10-32-5.

68.    "An amount of consideration can vary because of discounts, rebates, refunds, credits, price concessions, incentives, performance bonuses, penalties, or other similar items. The promised consideration also can vary if an entity's entitlement to the consideration is contingent on the occurrence or nonoccurrence of

a future event. For example, an amount of consideration would be variable if . . . a product was sold with a right of return." ASC 606-10-32-6.

69.    Under ASC 606-10-32-11:

An entity shall include in the transaction price some or all of an amount of variable consideration estimated in accordance with paragraph 606-10-32-8 only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved.

70.    Probable means that the future event or events are likely to occur. ASC 606-10-20.

71.    Under ASC 606-10-32-12:

In assessing whether it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur once the uncertainty related to the variable consideration is subsequently resolved, an entity shall consider both the likelihood and the magnitude of the revenue reversal. Factors that could increase the likelihood or the magnitude of a revenue reversal include, but are not limited to, any of the following:

a. The amount of consideration is highly susceptible to factors outside the entity's influence. Those factors may include volatility in a market, the judgment or actions of third parties, weather conditions, and a high risk of obsolescence of the promised good or service.

b. The uncertainty about the amount of consideration is not expected to be resolved for a long period of time.

c. The entity's experience (or other evidence) with similar types of contracts is limited, or that experience (or other evidence) has limited predictive value.

27

d. The entity has a practice of either offering a broad range of price concessions or changing the payment terms and conditions of similar contracts in similar circumstances.

e. The contract has a large number and broad range of possible consideration amounts.

72.    ASC 606-10-55-23 provides:

To account for the transfer of products with a right of return (and for some services that are provided subject to a refund), an entity should recognize all of the following:

a. Revenue for the transferred products in the amount of consideration to which the entity expects to be entitled (therefore, revenue would not be recognized for the products expected to be returned)

b. A refund liability

c. An asset (and corresponding adjustment to cost of sales) for its right to recover products from customers on settling the refund liability.

73.    Similarly, ASC 606-10-55-25 provides in relevant part, "For any amounts received (or receivable) for which an entity does not expect to be entitled, the entity should not recognize revenue when it transfers products to customers but should recognize those amounts received (or receivable) as a refund liability."

74.    Under these GAAP provisions, Eagle was prohibited from recognizing revenue from the Pemfexy channel stuffing scheme because the facts strongly indicated that most or all of the Pemfexy "sold" in this manner would be returned without payment. As revealed by Eagle's former Chief Commercial Officer: (i)

28

Eagle's wholesaler customers did not want the additional Pemfexy but were pressured into accepting it by Defendant Tarriff; (ii) the sale terms provided that the customers did not have to pay, that Eagle would in fact pay the customers, and that the customers could simply return the Pemfexy free of charge; and (iii) the customers already had large inventories of Pemfexy that was not being sold to end users at a rate fast enough to justify additional purchases—at the then-present rate of sales the additional Pemfexy would expire before Wholesaler A could sell its existing inventory.

## VI.  MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.  August 9, 2022, Eagle Q2 2022 Results

75.     The Class Period begins on August 9, 2022. That morning, Eagle published a press release titled "Eagle Pharmaceuticals Reports Second Quarter 2022 Results." Eagle also filed a copy of the press release with the SEC as an exhibit to a Form 8-K signed by Defendant Tarriff. The press release contained false and misleading financial metrics, including "Q2 2022 PEMFEXY product sales were $16.5 million."

76.     Under the heading "Financial Highlights," the press release stated:

- Total revenue for Q2 2022 was $74.1 million, compared to $48.1 million in Q2 2021, primarily reflecting product sales of vasopressin and PEMFEXY.

- Q2 2022 net loss was $(9.5) million, or $(0.74) per basic and diluted share, compared to net income of $3.6 million, or $0.28 per basic and $0.27 diluted share, in Q2 2021.
- Q2 2022 adjusted non-GAAP net income was $20.3 million, or $1.58 per basic and $1.56 per diluted share, compared to adjusted non-GAAP net income of $12.4 million, or $0.95 per basic and $0.93 diluted share, in Q2 2021.

77.    The press release contained the following financial statement information:

**EAGLE PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**
**(In thousands, except share and per share amounts)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| **Revenue:** | | | | |
| Product sales, net | $ 49,201 | $ 19,621 | $ 139,289 | $ 36,741 |
| Royalty revenue | 24,935 | 28,503 | 50,721 | 52,632 |
| Total revenue | 74,136 | 48,124 | 190,010 | 89,373 |
| **Operating expenses:** | | | | |
| Cost of product sales | 21,171 | 7,907 | 46,347 | 16,349 |
| Cost of royalty revenue | 2,493 | 2,850 | 5,072 | 5,263 |
| Research and development | 11,437 | 9,911 | 17,545 | 24,199 |
| Selling, general and administrative | 36,832 | 16,636 | 59,014 | 36,515 |
| Total operating expenses | 71,933 | 37,304 | 127,978 | 82,326 |
| Income from operations | 2,203 | 10,820 | 62,032 | 7,047 |
| Interest income | 244 | 163 | 398 | 198 |
| Interest expense | (552) | (422) | (918) | (844) |
| Other (expense) income | (7,763) | (5,013) | (9,720) | 487 |
| Total other (expense) income, net | (8,071) | (5,272) | (10,240) | (159) |
| **(Loss) income before income tax provision** | (5,868) | 5,548 | 51,792 | 6,888 |
| Income tax provision | (3,582) | (1,936) | (17,184) | (3,697) |
| **Net (loss) income** | $ (9,450) | $ 3,612 | $ 34,608 | $ 3,191 |
| (Loss) earnings per share attributable to common stockholders: | | | | |
| Basic | $ (0.74) | $ 0.28 | $ 2.71 | $ 0.24 |
| Diluted | $ (0.74) | $ 0.27 | $ 2.67 | $ 0.24 |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 12,836,116 | 13,108,998 | 12,773,727 | 13,116,370 |
| Diluted | 12,836,116 | 13,262,164 | 12,951,788 | 13,293,920 |

78.    Also on the morning of August 9, 2022, Eagle held its earnings call to present Q2 2022 results. On that call Defendants presented false and misleading

financial metrics, including Defendant Tarriff's statement that "[o]ur customers have

embraced PEMFEXY, as evidenced from our first half sales of $54 million."

79.    On the earnings call Defendant Cahill stated:

In the second quarter of 2022, total revenue was $74.1 million
compared to $48.1 million in 2Q of 2021, primarily reflecting
continued revenue from sales of vasopressin and PEMFEXY. Product
sales during the second quarter were $49.2 million compared to $19.6
million in 2Q of 2021. Vasopressin sales were $11.3 million and
PEMFEXY sales were $16.5 million in the second quarter of 2022.

80.    Defendant Cahill also stated on the earnings call:

Net loss for the second quarter of 2022 was $9.5 million or $0.74 per
basic and diluted shares compared to net income of $3.6 million or
$0.28 per basic and $0.27 per diluted share in the prior year period.
Adjusted non-GAAP net income for the second quarter of 2022 was
$20.3 million or $1.58 and per basic and $1.56 per diluted share
compared to adjusted non-GAAP net income of $12.4 million or $0.95
per basic and $0.93 per diluted share in the prior year period.

81.    Later on August 9, 2022, Eagle filed its quarterly report on SEC Form

10-Q for Q2 2022, which was signed by Defendants Tarriff and Cahill. The Form 10-

Q contained false and misleading financial metrics. For example, under the heading

"Revenues," the Form 10-Q stated:

Our product sales increased $29.6 million during the three months
ended June 30, 2022 as compared to the three months ended June 30,
2021.The increase was primarily attributable to product sales of $16.5
million for Pemfexy and $11.3 million for vasopressin during the
during the three months ended June 30, 2022, which launched in the
first quarter of 2022.

82.    The Form 10-Q presented the following financial statement information:

| EAGLE PHARMACEUTICALS, INC. CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED) (In thousands, except share and per share amounts) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | |
| | 2022 | | 2021 | | 2022 | | 2021 |
| **Revenue:** | | | | | | | |
| Product sales, net | $ | 49,201 | $ | 19,621 | $ | 139,289 | $ | 36,741 |
| Royalty revenue | | 24,935 | | 28,503 | | 50,721 | | 52,632 |
| Total revenue | | 74,136 | | 48,124 | | 190,010 | | 89,373 |
| **Operating expenses:** | | | | | | | |
| Cost of product sales | | 21,171 | | 7,907 | | 46,347 | | 16,349 |
| Cost of royalty revenue | | 2,493 | | 2,850 | | 5,072 | | 5,263 |
| Research and development | | 11,437 | | 9,911 | | 17,545 | | 24,199 |
| Selling, general and administrative | | 36,832 | | 16,636 | | 59,014 | | 36,515 |
| Total operating expenses | | 71,933 | | 37,304 | | 127,978 | | 82,326 |
| Income from operations | | 2,203 | | 10,820 | | 62,032 | | 7,047 |
| Interest income | | 244 | | 163 | | 398 | | 198 |
| Interest expense | | (552) | | (422) | | (918) | | (844) |
| Other (expense) income | | (7,763) | | (5,013) | | (9,720) | | 487 |
| Total other (expense) income, net | | (8,071) | | (5,272) | | (10,240) | | (159) |
| **(Loss) income before income tax provision** | | (5,868) | | 5,548 | | 51,792 | | 6,888 |
| Income tax provision | | (3,582) | | (1,936) | | (17,184) | | (3,697) |
| **Net (loss) income** | $ | (9,450) | $ | 3,612 | $ | 34,608 | $ | 3,191 |
| (Loss) earnings per share attributable to common stockholders: | | | | | | | |
| Basic | $ | (0.74) | $ | 0.28 | $ | 2.71 | $ | 0.24 |
| Diluted | $ | (0.74) | $ | 0.27 | $ | 2.67 | $ | 0.24 |
| Weighted average number of common shares outstanding: | | | | | | | |
| Basic | | 12,836,116 | | 13,108,998 | | 12,773,727 | | 13,116,370 |
| Diluted | | 12,836,116 | | 13,262,164 | | 12,951,788 | | 13,293,920 |

83.    The 10-Q also stated under the heading "Changes in Internal Control over Financial Reporting" that:

On June 9, 2022, Eagle completed the acquisition of Acacia. Eagle has extended its oversight and monitoring processes that support our internal control over financial reporting, as well as its disclosure controls and procedures, to include Acacia's operations. Eagle is continuing to integrate the acquired operations of Acacia. There were no other changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended June 30, 2022 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

84.    The statements identified in ¶¶75-83 were materially false and misleading because, as Defendants knew or recklessly disregarded, Eagle lacked effective internal control over financial reporting, and due to the financial results' inclusion of "revenue" from the Pemfexy channel stuffing scheme in violation of GAAP, for Q2 2022 and for the first half of 2022 revenue from Pemfexy sales was materially overstated, causing corresponding misstatements in related metrics including product sales revenue, total revenue, net (loss) income, and (loss) earnings per share.

**B.    November 7-9, 2022, Eagle Q3 2022 Results**

85.    On the morning of November 7, 2022, Eagle published a press release titled "Eagle Pharmaceuticals Reports Third Quarter 2022 Results." Eagle also filed a copy of the press release with the SEC as an exhibit to a Form 8-K signed by Defendant Tarriff. The press release contained false and misleading financial metrics, including:

- Nine-month 2022 net income was $2.41 per basic and $2.38 per diluted share
- Nine-month 2022 adjusted non-GAAP earnings per diluted share1 more than doubled to $6.69 from full year 2021 adjusted non-GAAP earnings per diluted share, outperforming any full year in the Company's history
- Nine-month 2022 revenue of $255.9 million exceeds full year 2021 revenue of $171.5 million
- Nine-month 2022 net sales of vasopressin and PEMFEXY combined totaled $114.9 million

86.    The press release contained the following financial statement information:

| EAGLE PHARMACEUTICALS, INC. CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED) (In thousands, except share and per share amounts) | | | | |
| --- | --- | --- | --- | --- |
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2022 | 2021 | 2022 | 2021 |
| **Revenue:** | | | | |
| Product sales, net | $ 38,086 | $ 12,124 | $ 177,375 | $ 48,865 |
| Royalty revenue | 24,007 | 27,729 | 74,728 | 80,361 |
| License and other revenue | 3,808 | — | 3,808 | — |
| Total revenue | 65,901 | 39,853 | 255,911 | 129,226 |
| **Operating expenses:** | | | | |
| Cost of product sales | 20,869 | 5,486 | 67,216 | 21,835 |
| Cost of royalty revenue | 2,782 | 2,773 | 7,854 | 8,036 |
| Research and development | 9,326 | 23,289 | 26,871 | 47,488 |
| Selling, general and administrative | 23,462 | 18,482 | 82,476 | 54,997 |
| Total operating expenses | 56,439 | 50,030 | 184,417 | 132,356 |
| Income (loss) from operations | 9,462 | (10,177) | 71,494 | (3,130) |
| Interest income | (444) | 197 | (46) | 395 |
| Interest expense | (1,147) | (396) | (2,065) | (1,240) |
| Other expense | (7,916) | (2,284) | (17,636) | (1,797) |
| Total other expense, net | (9,507) | (2,483) | (19,747) | (2,642) |
| **(Loss) income before income tax (provision) benefit** | (45) | (12,660) | 51,747 | (5,772) |
| Income tax (provision) benefit | (3,468) | 7,038 | (20,652) | 3,341 |
| **Net (loss) income** | $ (3,513) | $ (5,622) | $ 31,095 | $ (2,431) |
| (Loss) earnings per share attributable to common stockholders: | | | | |
| Basic | $ (0.27) | $ (0.43) | $ 2.41 | $ (0.19) |
| Diluted | $ (0.27) | $ (0.43) | $ 2.38 | $ (0.19) |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 13,166,931 | 13,077,298 | 12,906,235 | 13,103,203 |
| Diluted | 13,166,931 | 13,077,298 | 13,051,311 | 13,103,203 |

87.    Also on the morning of November 7, 2022, Eagle held its earnings call to present Q3 2022 results. On that call Defendants presented false and misleading financial metrics, including Defendant Tarriff's statement that "[f]or the year-to-date, we have sold $114.9 million of vasopressin and PEMFEXY combined."

34

88.    On the morning of November 9, 2022, Eagle published a press release titled "Correcting & Replacing: Eagle Pharmaceuticals Reports Third Quarter 2022 Results." Eagle also filed a copy of the press release with the SEC as an exhibit to a Form 8-K signed by Defendant Tarriff. As explained in the Form 8-K, the November 9 press release was issued "to correct errors" contained in the November 7 press release financial information including "references to third quarter GAAP net loss (updated from $(3.5) million to $(7.1) million), third quarter GAAP net loss per basic and diluted share (updated from $(0.27) to $(0.54)), and nine-month 2022 GAAP net income per basic share (updated from $2.41 to $2.13) and per diluted share (updated from $2.38 to $2.11)."

89.    The updated press release contained false and misleading financial metrics, including:

- Nine-month 2022 net income was $2.13 per basic and $2.11 per diluted share
- Nine-month 2022 adjusted non-GAAP earnings per diluted share more than doubled to $6.69 from full year 2021 adjusted non-GAAP earnings per diluted share, outperforming any full year in the Company's history
- Nine-month 2022 revenue of $255.9 million exceeds full year 2021 revenue of $171.5 million
- Nine-month 2022 net sales of vasopressin and PEMFEXY combined totaled $114.9 million

90.    The press release contained the following financial statement information:

**EAGLE PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**
**(In thousands, except share and per share amounts)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| **Revenue:** | | | | |
| Product sales, net | $ 38,086 | $ 12,124 | $ 177,375 | $ 48,865 |
| Royalty revenue | 24,007 | 27,729 | 74,728 | 80,361 |
| License and other revenue | 3,808 | — | 3,808 | — |
| Total revenue | 65,901 | 39,853 | 255,911 | 129,226 |
| **Operating expenses:** | | | | |
| Cost of product sales | 20,869 | 5,486 | 67,216 | 21,835 |
| Cost of royalty revenue | 2,782 | 2,773 | 7,854 | 8,036 |
| Research and development | 9,326 | 23,289 | 26,871 | 47,488 |
| Selling, general and administrative | 23,462 | 18,482 | 82,476 | 54,997 |
| Total operating expenses | 56,439 | 50,030 | 184,417 | 132,356 |
| Income (loss) from operations | 9,462 | (10,177) | 71,494 | (3,130) |
| Interest income | (444) | 197 | (46) | 395 |
| Interest expense | (1,147) | (396) | (2,065) | (1,240) |
| Other expense | (11,534) | (2,284) | (21,254) | (1,797) |
| Total other expense, net | (13,125) | (2,483) | (23,365) | (2,642) |
| **(Loss) income before income tax (provision) benefit** | (3,663) | (12,660) | 48,129 | (5,772) |
| Income tax (provision) benefit | (3,468) | 7,038 | (20,652) | 3,341 |
| **Net (loss) income** | $ (7,131) | $ (5,622) | $ 27,477 | $ (2,431) |
| (Loss) earnings per share attributable to common stockholders: | | | | |
| Basic | $ (0.54) | $ (0.43) | $ 2.13 | $ (0.19) |
| Diluted | $ (0.54) | $ (0.43) | $ 2.11 | $ (0.19) |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 13,166,931 | 13,077,298 | 12,906,235 | 13,103,203 |
| Diluted | 13,166,931 | 13,077,298 | 13,051,311 | 13,103,203 |

91.    Later on November 9, 2022, Eagle filed its quarterly report on SEC Form 10-Q for Q3 2022, which was signed by Defendants Tarriff and Cahill. The Form 10-Q contained false and misleading financial metrics. For example, under the heading "Revenues," the Form 10-Q stated:

> Our product sales increased $128.5 million in the nine months ended September 30, 2022 as compared to the nine months ended September 30, 2021. The increase was primarily attributable to product sales of Pemfexy and vasopressin, which each launched in the first quarter of 2022, which combined for $114.9 million of product sales, net.

92.     The Form 10-Q presented the following financial statement information:

| EAGLE PHARMACEUTICALS, INC. CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED) (In thousands, except share and per share amounts) | | | | |
|---|---|---|---|---|
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2022 | 2021 | 2022 | 2021 |
| **Revenue:** | | | | |
| Product sales, net | $ 38,086 | $ 12,124 | $ 177,375 | $ 48,865 |
| Royalty revenue | 24,007 | 27,729 | 74,728 | 80,361 |
| License and other revenue | 3,808 | — | 3,808 | — |
| Total revenue | 65,901 | 39,853 | 255,911 | 129,226 |
| **Operating expenses:** | | | | |
| Cost of product sales | 20,869 | 5,486 | 67,216 | 21,835 |
| Cost of royalty revenue | 2,782 | 2,773 | 7,854 | 8,036 |
| Research and development | 9,326 | 23,289 | 26,871 | 47,488 |
| Selling, general and administrative | 23,462 | 18,482 | 82,476 | 54,997 |
| Total operating expenses | 56,439 | 50,030 | 184,417 | 132,356 |
| Income (loss) from operations | 9,462 | (10,177) | 71,494 | (3,130) |
| Interest income | (444) | 197 | (46) | 395 |
| Interest expense | (1,147) | (396) | (2,065) | (1,240) |
| Other expense | (11,534) | (2,284) | (21,254) | (1,797) |
| Total other expense, net | (13,125) | (2,483) | (23,365) | (2,642) |
| **(Loss) income before income tax (provision) benefit** | (3,663) | (12,660) | 48,129 | (5,772) |
| Income tax (provision) benefit | (3,468) | 7,038 | (20,652) | 3,341 |
| **Net (loss) income** | $ (7,131) | $ (5,622) | $ 27,477 | $ (2,431) |
| (Loss) earnings per share attributable to common stockholders: | | | | |
| Basic | $ (0.54) | $ (0.43) | $ 2.13 | $ (0.19) |
| Diluted | $ (0.54) | $ (0.43) | $ 2.11 | $ (0.19) |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 13,166,931 | 13,077,298 | 12,906,235 | 13,103,203 |
| Diluted | 13,166,931 | 13,077,298 | 13,051,311 | 13,103,203 |

93.     The 10-Q also stated under the heading "Changes in Internal Control over Financial Reporting" that:

On June 9, 2022, we completed the acquisition of Acacia. We have extended our oversight and monitoring processes that support our internal control over financial reporting, as well as our disclosure controls and procedures, to include Acacia's operations. We continue

to integrate the acquired operations of Acacia. There were no other changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended September 30, 2022 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

94.    The statements identified in ¶¶85-93 were materially false and misleading because, as Defendants knew or recklessly disregarded, Eagle lacked effective internal control over financial reporting, and due to the financial results' inclusion of "revenue" from the Pemfexy channel stuffing scheme in violation of GAAP, for the nine months ended September 30, 2022 revenue from Pemfexy sales was materially overstated, causing corresponding misstatements in related metrics including product sales revenue, total revenue, net (loss) income, and (loss) earnings per share.

**C.    March 13-23, 2023, Eagle Q4 And Full Year 2022 Results**

95.    On March 13, 2023, Eagle published a press release titled "Eagle Pharmaceuticals Reports Fourth Quarter and Full Year 2022 Results." Eagle also filed a copy of the press release with the SEC as an exhibit to a Form 8-K signed by Defendant Tarriff. The press release contained false and misleading financial metrics, including "FY 2022 net sales of PEMFEXY® totaled $67.5 million."

96.    Under the heading "Financial Highlights," the press release stated:

- Total revenue for the 12 months ended December 31, 2022 was $316.6 million, compared to $171.5 million, in 2021, an increase of 84.6%.

- Net income for the 12 months ended December 31, 2022 was $35.6 million, or $2.76 per basic and $2.73 per diluted share, compared to net loss of $(8.6) million, or $(0.66) per basic and diluted share, in 2021.
- Adjusted non-GAAP net income for the 12 months ended December 31, 2022 was $101.8 million, or $7.87 per basic and $7.79 per diluted share, compared to $22.3 million, or $1.71 per basic and $1.68 per diluted share, in 2021.

97.    The press release contained the following financial statement information:

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except share and per share amounts)**

| | Three Months Ended December 31, | | Year Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2022 (unaudited) | 2021 (unaudited) | 2022 | 2021 |
| **Revenue:** | | | | |
| Product sales, net | $ 37,161 | $ 16,158 | $ 214,536 | $ 65,023 |
| Royalty revenue | 23,538 | 26,162 | 98,266 | 106,523 |
| License and other revenue | — | — | 3,808 | — |
| Total revenue | 60,699 | 42,320 | 316,610 | 171,546 |
| **Operating expenses:** | | | | |
| Cost of product sales | 18,242 | 9,693 | 85,458 | 31,528 |
| Cost of royalty revenue | 1,624 | 2,616 | 9,478 | 10,652 |
| Research and development | 7,217 | 3,787 | 34,088 | 51,275 |
| Selling, general and administrative | 24,150 | 20,325 | 106,626 | 75,322 |
| Total operating expenses | 51,233 | 36,421 | 235,650 | 168,777 |
| Income from operations | 9,466 | 5,899 | 80,960 | 2,769 |
| Interest income | 317 | 165 | 271 | 560 |
| Interest expense | (1,980) | (395) | (4,045) | (1,635) |
| Other income (expense) | 5,501 | (4,445) | (15,753) | (6,242) |
| Total other income (expense), net | 3,838 | (4,675) | (19,527) | (7,317) |
| **Income (loss) before income tax provision** | 13,304 | 1,224 | 61,433 | (4,548) |
| Income tax provision | (5,139) | (7,420) | (25,791) | (4,079) |
| **Net income (loss)** | $ 8,165 | $ (6,196) | $ 35,642 | $ (8,627) |
| Earnings (loss) per common share: | | | | |
| Basic | $ 0.63 | $ (0.48) | $ 2.76 | $ (0.66) |
| Diluted | $ 0.62 | $ (0.48) | $ 2.73 | $ (0.66) |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 13,015,976 | 12,896,471 | 12,933,896 | 13,051,095 |
| Diluted | 13,124,218 | 12,896,471 | 13,065,494 | 13,051,095 |

98.    Also on the morning of March 13, 2023, Eagle held its earnings call to present full year 2022 and Q4 2022 results. On that call Defendants presented false and misleading financial metrics, including Defendant Tarriff's statement that "[i]n '22, PEMFEXY net sales reached $67 million."

99.    On the earnings call Defendant Cahill stated:

Full year 2022 revenue was $316.6 million, compared to $171.5 million in 2021. Net product sales during the fourth quarter of 2022 were $37.2 million compared to $16.2 million in Q4 of 2021. Full year 2022 net product sales were $214.5 million compared to $65 million in '21. Vasopressin net product sales were $3.6 million and PEMFEXY net product sales were $12.1 million in the fourth quarter of '22. For the full year '22, vasopressin net product sales were $63.2 million and PEMFEXY sales were $67.5 million.

100.    Defendant Cahill also stated on the earnings call:

For the full year 2022, net income totaled $35.6 million or $2.76 per basic and $2.73 per diluted share compared to a net loss of $8.6 million or $0.66 per basic and diluted share in 2021. Adjusted non-GAAP net income for the fourth quarter of 2022 was $14.4 million or $1.11 per basic and $1.10 per diluted share, compared to adjusted non-GAAP net income of $11 million or $0.85 per basic and $0.83 per diluted share in the prior year quarter. For the full year 2022, adjusted non-GAAP net income totaled $101.8 million or $7.87 per basic and $7.79 per diluted share compared to adjusted non-GAAP net income of $22.3 million or $1.71 per basic and $1.68 per diluted share in 2021.

101.    On March 17, 2023, Eagle filed with the SEC a Notification of Late Filing, signed by Defendant Tarriff, stating that:

Eagle Pharmaceuticals, Inc. (the "Company") is filing this Notification of Late Filing on Form 12b-25 with respect to its Annual Report on Form 10-K for the year ended December 31, 2022 (the "Form 10-K"). The Company is unable to file its Form 10-K within the prescribed time

period without unreasonable effort or expense because it requires additional time to complete the preparation of its financial statements and assessment of the Company's internal control over financial reporting, including as it relates to a business combination that occurred during 2022. As a result of the foregoing, Ernst & Young, LLP, the Company's independent registered public accounting firm, has not yet completed its audit procedures.

102.    On March 23, 2023, Eagle filed its annual report on SEC Form 10-K for 2022, which was signed by Defendants Tarriff and Cahill. The Form 10-K contained false and misleading financial metrics. For example, under the heading "Revenues," the Form 10-K stated:

Product sales increased $149.5 million in the year ended December 31, 2022. The increase was primarily attributable to product sales of PEMFEXY and vasopressin, which each launched in the first quarter of 2022, which combined for $130.6 million of product sales, net.

103.    The Form 10-K stated "[t]he Company recorded product sales, net as follows:"

| The Company recorded product sales, net as follows: | | | | | | |
|---|---|---|---|---|---|---|
| | | Year Ended December 31, | | | | |
| | | 2022 | | 2021 | | 2020 |
| | | (in thousands) | | | | |
| PEMFEXY | $ | 67,479 | $ | — | $ | — |
| Vasopressin | | 63,159 | | — | | — |
| Bendeka | | 12,992 | | 11,167 | | 15,439 |
| Belrapzo | | 33,667 | | 23,728 | | 27,527 |
| Ryanodex | | 30,164 | | 25,271 | | 28,268 |
| Other | | 7,075 | | 4,857 | | 1,089 |
| Product sales, net | $ | 214,536 | $ | 65,023 | $ | 72,323 |

104.    The Form 10-K presented the following financial statement information:

**EAGLE PHARMACEUTICALS, INC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
(In thousands, except share and per share amounts)

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| **Revenue:** | | | |
| Product sales, net | $ 214,536 | $ 65,023 | $ 72,323 |
| Royalty revenue | 98,266 | 106,523 | 110,479 |
| License and other revenue | 3,808 | — | 5,000 |
| Total revenue | 316,610 | 171,546 | 187,802 |
| **Operating expenses:** | | | |
| Cost of product sales | 85,458 | 31,528 | 33,647 |
| Cost of royalty revenue | 9,478 | 10,652 | 11,818 |
| Research and development | 34,088 | 51,275 | 30,785 |
| Selling, general and administrative | 106,626 | 75,322 | 78,598 |
| Total operating expenses | 235,650 | 168,777 | 154,848 |
| Income from operations | 80,960 | 2,769 | 32,954 |
| Interest income | 271 | 560 | 562 |
| Interest expense | (4,045) | (1,635) | (2,577) |
| Other expense | (15,753) | (6,242) | (8,262) |
| Total other expense, net | (19,527) | (7,317) | (10,277) |
| **Income (loss) before income tax provision** | 61,433 | (4,548) | 22,677 |
| Income tax provision | (25,791) | (4,079) | (10,688) |
| **Net income (loss)** | $ 35,642 | $ (8,627) | $ 11,989 |
| Earnings (Loss) per common share: | | | |
| Basic | $ 2.76 | $ (0.66) | $ 0.89 |
| Diluted | $ 2.73 | $ (0.66) | $ 0.87 |
| Weighted average number of common shares outstanding: | | | |
| Basic | 12,933,896 | 13,051,095 | 13,481,525 |
| Diluted | 13,065,494 | 13,051,095 | 13,771,393 |

105.   Under the heading "Management's Annual Report on Internal Control Over Financial Reporting," the Form 10-K stated "[t]he management of Eagle Pharmaceuticals, Inc. ('Eagle') has prepared, and is responsible for, Eagle's financial statements and related footnotes. These financial statements have been prepared in conformity with U.S. generally accepted accounting principles." Under the same heading, the Form 10-K continued:

Management (with the participation of the principal executive officer and principal accounting and financial officer) conducted an evaluation of the effectiveness of the Company's internal control over financial reporting as of December 31, 2022 based on the framework in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

\*    \*    \*

Based on this evaluation, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2022.

The "Management's Annual Report on Internal Control Over Financial Reporting" section was signed by Defendant Tarriff in his capacity as Eagle's Principal Executive Officer, and by Defendant Cahill in his capacity as Eagle's Principal Accounting and Financial Officer.

106.    The statements identified in ¶¶95-100 and 102-105 were materially false and misleading because, as Defendants knew or recklessly disregarded, Eagle lacked effective internal control over financial reporting, and due to the financial results' inclusion of "revenue" from the Pemfexy channel stuffing scheme in violation of GAAP, for 2022 revenue from Pemfexy sales was materially overstated, causing corresponding misstatements in related metrics including product sales revenue, total revenue, net (loss) income, and (loss) earnings per share.

**D.    May 9, 2023, Eagle Q1 2023 Results**

107.    On May 9, 2023, Eagle published a press release titled "Eagle Pharmaceuticals Reports First Quarter 2023 Results." Eagle also filed a copy of the

press release with the SEC as an exhibit to a Form 8-K signed by Defendant Tarriff.

The press release contained the following financial statement information:

| | **Three Months Ended March 31,** | | **Twelve Months Ended March 31,** | **Twelve Months Ended December 31,** |
|---|---|---|---|---|
| **EAGLE PHARMACEUTICALS, INC.** | | | | |
| **RECONCILIATION OF GAAP NET INCOME (LOSS) TO ADJUSTED NON-GAAP EBITDA (UNAUDITED)** | | | | |
| **(In thousands)** | | | | |
| | **2023** | **2022** | **2023** | **2022** |
| Net income (loss) - GAAP | $    5,750 | $    44,058 | $    (2,666) | $    35,642 |
| | | | | |
| Add back: | | | | |
| Interest expense, net of interest income | 1,304 | 212 | 4,866 | 3,774 |
| Income tax provision | 4,481 | 13,602 | 16,670 | 25,791 |
| Depreciation and amortization expense | 5,552 | 908 | 16,668 | 12,024 |
| | | | | |
| Add back: | | | | |
| Stock-based compensation expense | 4,639 | 4,295 | 16,795 | 16,451 |
| Fair value adjustments on equity investment | 403 | 2,530 | 2,330 | 4,457 |
| Convertible promissory note related adjustments | — | 36 | 4,206 | 4,242 |
| Fair value adjustments related to derivative instruments | (77) | (608) | 8,496 | 7,965 |
| Foreign currency exchange gain | (90) | — | (737) | (647) |
| Gain on euro debt | — | — | (264) | (264) |
| Legal Settlement | — | 300 | — | 300 |
| Acquisition related costs | — | 1,490 | 11,632 | 13,122 |
| Inventory step-up | 320 | — | 866 | 546 |
| Debt issuance cost | — | — | 258 | 258 |
| Severance | 43 | 49 | 8,445 | 8,451 |
| Adjusted Non-GAAP EBITDA | $    22,325 | $    66,872 | $    87,565 | $    132,112 |

108.    Also on May 9, 2023, Eagle held its earnings call to present Q1 2023 results. On that call Defendants presented false and misleading financial metrics, including Defendant Tarriff's statement that "[d]uring the first quarter of '23, PEMFEXY net product sales totaled $22.9 million, and we believe we are well on our way to surpassing the $67 million recorded for the full year of 2022." Discussing Pemfexy later in the call, Defendant Tarriff similarly referred to "the $67 million that we sold in all of last year."

109.    Later on May 9, 2023, Eagle filed its quarterly report on SEC Form 10-Q for Q1 2023, which was signed by Defendants Tarriff and Cahill. The 10-Q stated under the heading "Changes in Internal Control over Financial Reporting" that:

> No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the three months ended March 31, 2023 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

110.    The statements identified in ¶¶107-109 were materially false and misleading because, as Defendants knew or recklessly disregarded, Eagle lacked effective internal control over financial reporting, and due to the financial results' inclusion of "revenue" from the Pemfexy channel stuffing scheme in violation of GAAP, for the twelve months ended March 31, 2023 and for full year 2022 Pemfexy sales were materially overstated, causing corresponding misstatements in related metrics including net income (loss).

## E.    August 8, 2023, Eagle Q2 2023 Results

111.    On August 8, 2023, Eagle published a press release titled "Eagle Pharmaceuticals Reports Second Quarter 2023 Results." Eagle also filed a copy of the press release with the SEC as an exhibit to a Form 8-K signed by Defendant Tarriff. The press release contained false and misleading financial metrics, including the following:

**EAGLE PHARMACEUTICALS, INC.**
**RECONCILIATION OF GAAP ONCOLOGY GROSS PROFIT TO**
**ADJUSTED ONCOLOGY NON-GAAP GROSS PROFIT (UNAUDITED)**
**(In thousands)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| **Revenue:** | | | | |
| PEMFEXY™ | $ 19,400 | $ 16,504 | $ 42,348 | $ 53,686 |
| BELRAPZO® | 6,848 | 8,131 | 13,198 | 14,080 |
| BENDEKA® | 3,780 | 3,497 | 6,174 | 8,050 |
| TREAKISYM | 728 | 812 | 2,083 | 2,266 |
| Oncology product sales, net | $ 30,756 | $ 28,944 | $ 63,803 | $ 78,082 |
| | | | | |
| BENDEKA® | 20,485 | 22,969 | 39,380 | 46,792 |
| TREAKISYM | 1,168 | 1,966 | 2,357 | 3,929 |
| Oncology royalty revenue | $ 21,653 | $ 24,935 | $ 41,737 | $ 50,721 |
| | | | | |
| Oncology Total Revenue | $ 52,409 | $ 53,879 | $ 105,540 | $ 128,803 |
| | | | | |
| Oncology cost of product sales | 10,466 | 12,653 | 20,146 | 25,340 |
| Oncology cost of royalty revenue | — | 2,493 | — | 5,072 |
| Oncology Gross Profit | $ 41,943 | $ 38,733 | $ 85,394 | $ 98,391 |
| **Adjustments:** | | | | |
| Oncology cost of product revenues: | | | | |
| Oncology amortization expense | 1,867 | — | 3,714 | — |
| Adjusted Oncology Non-GAAP Gross Profit | $ 43,810 | $ 38,733 | $ 89,108 | $ 98,391 |

112. The press release contained the following financial statement information:

**EAGLE PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**
**(In thousands, except share and per share amounts)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| **Revenue:** | | | | |
| Product sales, net | $ 42,993 | $ 49,201 | $ 89,214 | $ 139,289 |
| Royalty revenue | 21,653 | 24,935 | 41,737 | 50,721 |
| Total revenue | 64,646 | 74,136 | 130,951 | 190,010 |
| **Operating expenses:** | | | | |
| Cost of product sales | 16,858 | 21,171 | 34,158 | 46,347 |
| Cost of royalty revenue | — | 2,493 | — | 5,072 |
| Research and development | 9,833 | 11,437 | 19,105 | 17,545 |
| Selling, general and administrative | 27,651 | 36,832 | 55,611 | 59,014 |
| Total operating expenses | 54,342 | 71,933 | 108,874 | 127,978 |
| Income from operations | 10,304 | 2,203 | 22,077 | 62,032 |
| Interest income | 195 | 244 | 407 | 398 |
| Interest expense | (1,448) | (552) | (2,964) | (918) |
| Other income (expense), net | 247 | (7,763) | 9 | (9,720) |
| Total other expense, net | (1,006) | (8,071) | (2,548) | (10,240) |
| **Income (loss) before income tax provision** | 9,298 | (5,868) | 19,529 | 51,792 |
| Income tax provision | (4,134) | (3,582) | (8,615) | (17,184) |
| **Net income (loss)** | $ 5,164 | $ (9,450) | $ 10,914 | $ 34,608 |
| Earnings (loss) per share attributable to common stockholders: | | | | |
| Basic | $ 0.39 | $ (0.74) | $ 0.83 | $ 2.71 |
| Diluted | $ 0.39 | $ (0.74) | $ 0.83 | $ 2.67 |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 13,090,852 | 12,836,116 | 13,075,090 | 12,773,727 |
| Diluted | 13,154,599 | 12,836,116 | 13,151,107 | 12,951,788 |

113.   Also on August 8, 2023, Eagle held its earnings call to present Q2 2023 results. On that call Defendants presented false and misleading financial metrics, including Defendant Tarriff's statement that "[f]or fiscal year '22, we more than tripled non-GAAP earnings to just shy of $8 per share compared to '21, which was driven by approximately $230 million of gross profit in '22, excluding amortization expense. Adjusted non-GAAP EBITDA grew more than 350% to $132 million for the fiscal year '22 compared to '21."

47

114.   Defendant Tarriff also stated on the earnings call, "[g]ross profit, excluding amortization expense in our oncology business was $43.8 million in the second quarter of '23, up from $38.7 million in the second quarter of last year, representing an impressive gross margin of 84% and 72%, respectively."

115.   On the earnings call Defendant Cahill stated:

In the second quarter of 2023, total revenue was $64.6 million compared to $74.1 million in Q2 of 2022. Net product sales during the second quarter of '23 totaled $43 million compared to $49.2 million in Q2 of '22. PEMFEXY net product sales were $19.4 million in the second quarter of 2023 compared to $16.5 million in the second quarter of 2022.

116.   Defendant Cahill also stated on the earnings call that "[n]et income for the second quarter of '23 was $5.2 million or $0.39 per basic and diluted share compared to a net loss of $9.5 million or $0.74 loss per basic and diluted share in the prior year quarter."

117.   Later on August 8, 2023, Eagle filed its quarterly report on SEC Form 10-Q for Q2 2023, which was signed by Defendants Tarriff and Cahill. The Form 10-Q presented the following financial statement information:

**EAGLE PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**
**(In thousands, except share and per share amounts)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| **Revenue:** | | | | |
| Product sales, net | $ 42,993 | $ 49,201 | $ 89,214 | $ 139,289 |
| Royalty revenue | 21,653 | 24,935 | 41,737 | 50,721 |
| Total revenue | 64,646 | 74,136 | 130,951 | 190,010 |
| **Operating expenses:** | | | | |
| Cost of product sales | 16,858 | 21,171 | 34,158 | 46,347 |
| Cost of royalty revenue | — | 2,493 | — | 5,072 |
| Research and development | 9,833 | 11,437 | 19,105 | 17,545 |
| Selling, general and administrative | 27,651 | 36,832 | 55,611 | 59,014 |
| Total operating expenses | 54,342 | 71,933 | 108,874 | 127,978 |
| Income from operations | 10,304 | 2,203 | 22,077 | 62,032 |
| Interest income | 195 | 244 | 407 | 398 |
| Interest expense | (1,448) | (552) | (2,964) | (918) |
| Other income (expense), net | 247 | (7,763) | 9 | (9,720) |
| Total other expense, net | (1,006) | (8,071) | (2,548) | (10,240) |
| **Income (loss) before income tax provision** | 9,298 | (5,868) | 19,529 | 51,792 |
| Income tax provision | (4,134) | (3,582) | (8,615) | (17,184) |
| **Net income (loss)** | $ 5,164 | $ (9,450) | $ 10,914 | $ 34,608 |
| Earnings (loss) per share attributable to common stockholders: | | | | |
| Basic | $ 0.39 | $ (0.74) | $ 0.83 | $ 2.71 |
| Diluted | $ 0.39 | $ (0.74) | $ 0.83 | $ 2.67 |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 13,090,852 | 12,836,116 | 13,075,090 | 12,773,727 |
| Diluted | 13,154,599 | 12,836,116 | 13,151,107 | 12,951,788 |

118.   The 10-Q also stated under the heading "Changes in Internal Control over Financial Reporting" that:

> No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the three months ended June 30, 2023 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

119.   The statements identified in ¶¶111-118 were materially false and misleading because, as Defendants knew or recklessly disregarded, Eagle lacked

effective internal control over financial reporting, and due to the financial results' inclusion of "revenue" from the Pemfexy channel stuffing scheme in violation of GAAP, for the three and six months ended June 30, 2022 revenue from Pemfexy sales was materially overstated, causing corresponding misstatements in related metrics including product sales revenue, total revenue, net (loss) income, and (loss) earnings per share.

## VII.  THE TRUTH IS REVEALED, CAUSING LARGE DECLINES IN EAGLE'S STOCK PRICE

### A.    Eagle's Q1 2023 Results Revealed Dwindling Cash And Growing Debt, Exacerbated By The Sham Pemfexy Sales

120.    As discussed *supra*, Eagle published its press release reporting Q1 2023 results on the morning of May 9, 2023, before the open of the regular stock market trading session. The press release revealed that from December 31, 2022 to March 31, 2023 Eagle's cash and cash equivalents had been reduced from $55.3 million to $21.9 million, and its total debt had increased from $62.5 million to $76.3 million, signaling to investors the potential for significant near-term liquidity problems. Over the same period Eagle's accounts receivable (*i.e.*, "sales" for which it had recognized revenue but not collected cash) grew from $72.4 million to $115.0 million, as the sham Pemfexy sales had remained on Eagle's balance sheet for months.

121.    This news of Eagle's seriously deteriorating financial condition was a materialization of the risk concealed by Defendants' Pemfexy channel stuffing

scheme and falsified financial statements. Eagle's recognition of revenue from Pemfexy sales in Q2 2022 for which it did not, and was unlikely to ever, collect cash payment created heightened risks to the Company's liquidity, which Defendants had concealed from investors.

122.   On this news, Eagle's stock price fell $3.88 per share as compared to the prior day closing price, or 13.3%, to close at $25.29 per share on May 9, 2023.

123.   Also on May 9, 2023, after the close of the regular stock market trading session, Eagle filed its Form 10-Q for Q1 2023 with the SEC, which confirmed Eagle's rapidly deteriorating liquidity and the financial results reported in Eagle's press release earlier in the day. This confirmation was significant because, as discussed *supra*: (i) Eagle's most recent prior Form 10-Q, for Q3 2022, reported significantly different financial results than Eagle's original Q3 2022 earnings press release, which had to be corrected; and (ii) Eagle's most recent prior earnings release, for Q4 2022 in March 2023, was followed by a disclosure days later that Eagle could not timely file its annual report due to ongoing review of its financial statements.

124.   As the market continued to react to Eagle's Q1 2023 results, as confirmed by its Form 10-Q, Eagle's stock price fell $4.18 per share as compared to the prior day closing price, or 16.5%, to close at $21.11 per share on May 10, 2023. Over May 9-10, 2023, Eagle's stock lost 27.6% of its value, and remained at similar levels over the next few weeks.

125.    On May 24, 2023 analysts at Cantor Fitzgerald published a note about Eagle titled "Management Catch Up Reinforces Sell Off Post 1Q23 Earnings Overdone," commenting on a recent interview they had with Eagle's "management," and on the sharp decline in Eagle's share price following its release of Q1 2023 results. The note stated that "[w]ith EGRX stock down ~28.0% (vs -0.3% for the NBI [NASDAQ Biotechnology Index]) since reporting earnings on 5/8/2023, we sat down with EGRX management to take a deeper dive into the quarter and the path ahead." The note attributed the decline in Eagle's share price to "cash concerns" and "the optics of a cash crunch," while apparently accepting misleading assurances from Eagle's management that the Company would be able to collect on its accounts receivable such that the deterioration in Eagle's liquidity was "merely a timing issue."

126.    The note stated in relevant part:

The largest concern we walked away from the quarter with was around the balance sheet and cash flows during the quarter; however, a meaningful part of the 1Q23 cash flow weakness was driven by the timing of working capital flows, which are expected to reverse in the coming quarters. EGRX cash and cash equivalents were $21.9MM as of 3/31/2023, well below the very healthy balance we have come to expect from EGRX. For reference, cash and cash equivalents were ~$55.3MM as of 12/31/2022. Operating cash outflow in 1Q23 was $33.5MM, which we believe raised some concern given the $21.9MM cash balance.

We do not have a concern of EGRX running out of cash in the near term, and in 1Q23, accounts receivable grew $42.5MM, giving way to what looked like a significant cash burn. We believe that is merely a timing issue and expect EGRX to collect on those accounts receivable in the coming quarters, and thus reversing the optics of a cash crunch

at EGRX which we believe has contributed meaningfully to the sell post earnings.

*    *    *

While the sell off post earnings is overdone in our view, we fundamentally remain on the sidelines as we await better visibility on the revenue trajectory of the company in the midterm. That said, we do believe the recent stock weakness is more likely due to the cash concerns described above, which we expect to improve.

**B.    On November 9, 2023, Eagle Announced Delayed Q3 2023 Results To Review Its Accounting For Pemfexy Sales**

127.   On November 8, 2023, Eagle published a press release titled "Eagle Pharmaceuticals to Host Third Quarter 2023 Financial Results on November 9, 2023." The press release stated that "the Company will release its third quarter 2023 financial results on Thursday, November 9, 2023, before the market opens," and that "Scott Tarriff, President and Chief Executive Officer, and Brian Cahill, Chief Financial Officer, will host a conference call to discuss the results" at 8:30 a.m. ET on November 9.

128.   Only one day later, on the morning of November 9, 2023, before the open of the regular stock market trading session, Eagle published a press release titled "Eagle Delays Third Quarter 2023 Results and Conference Call." Eagle also filed a copy of the press release with the SEC as an exhibit to a Form 8-K signed by Defendant Tarriff. The press release stated that Eagle "will be delaying the release of its third quarter 2023 results and investor conference call," and that it anticipated late

53

filing its Form 10-Q for Q3 2023 by November 14, 2023. The press release further stated that "[t]he Company requires more time to review potential adjustments relating to the reporting of sales of PEMFEXY® prior to filing its Form 10-Q. In addition, the Company expects to revise its previously disclosed 2023 full year guidance downward."

129.   On this news, Eagle's share price fell $4.16 as compared to the prior day closing price, or 30.4%, to close at $9.54 per share on November 9, 2023.

130.   On November 9, 2023, after the close of the regular stock market trading session, Eagle filed with the SEC a Form 12b-25 Notification of Late Filing, signed by Defendant Tarriff, stating that "[t]he Company is unable to file its Form 10-Q within the prescribed time period without unreasonable effort or expense primarily because it requires additional time to complete its review of potential adjustments relating to the reporting of sales of PEMFEXY®." The filing further stated that "the Company is reviewing and expects potential adjustments to reserves for returns and price adjustments of approximately $15.0 million to $20.0 million. These potential adjustments primarily relate to returns and a price adjustment for PEMFEXY® substantially stemming from slower-than-anticipated pull-through from one wholesale customer predominantly due to expiry of inventory."

**C.    On November 29, 2023, Eagle Announced The "Resignation" Of Defendant Tarriff**

131.    On the morning of November 29, 2023, before the open of the regular stock market trading session, Eagle published a press release titled "Eagle Pharmaceuticals Announces Management Change." Eagle also filed a copy of the press release with the SEC as an exhibit to a Form 8-K signed by Defendant Cahill. The press release stated that:

> Effective immediately Scott Tarriff, Founder, President and Chief Executive Officer of the Company, has announced his resignation and retirement from his positions with the Company as President, Chief Executive Officer and Director on the Company's Board of Directors. Michael Graves, Eagle Pharmaceuticals' Chairman of the Board, has assumed the role of Interim Executive Chairman of the Board to lead the management team through this transition. The Company will institute a CEO search for Mr. Tarriff's successor.

132.    The Form 8-K further disclosed that "[a]fter consideration of various alternatives, including termination with or without cause, the Board accepted Mr. Tarriff's resignation."

133.    On this news, Eagle's share price fell $2.55 as compared to the prior day closing price, or 31.0%, to close at $5.68 per share on November 29, 2023.

**D.    Eagle's Business Languished As New Management Spent Months Evaluating The Falsified Financial Statements**

134.    On December 15, 2023 Eagle filed with the SEC a Form 8-K signed by Defendant Cahill. The filing revealed that Eagle's financial statements for Q2 2023 were not compliant with GAAP, should not be relied on, and need to be restated, and

that Eagle had material weaknesses in its internal controls over financial reporting and that such controls were ineffective. The filing stated:

> On December 12, 2023, the Audit Committee (the "Audit Committee") of the Board of Directors of Eagle Pharmaceuticals, Inc. (the "Company"), based on the recommendation of, and after consultation with, the Company's management concluded that the Company's previously issued unaudited interim condensed consolidated financial statements for the quarter ended June 30, 2023 (the "Non-Reliance Period"), as previously filed with the SEC, should no longer be relied upon and should be restated due to the matters described below. The Company's management and the Audit Committee have discussed the matters disclosed in this current report on Form 8-K with Ernst & Young LLP, the Company's independent registered public accounting firm.

> As previously disclosed in the Company's Form NT 10-Q filed on November 9, 2023 (the "NT 10-Q"), the Company, in the course of preparing its interim financial statements for the quarter ended September 30, 2023, determined that it was necessary to review potential adjustments primarily relating to reserves for PEMFEXY® returns and price adjustments estimated in the amount of $15.0 million to $20.0 million (the "Estimated Adjustment Amount").

> During its review, the Company discovered that reserves recorded in its financial statements for the quarter ended June 30, 2023 primarily relating to returns and price adjustments for PEMFEXY® did not reflect certain information that should have been considered at the time the Company prepared its financial statements for the quarter ended June 30, 2023. Had that information been considered, such reserves for the quarter ended June 30, 2023 would have increased, which would have reduced the Company's net product sales for the quarter ended June 30, 2023 by a corresponding amount. The expected increase in reserves for the quarter ended June 30, 2023 represents a portion of the Estimated Adjustment Amount. The Company is in the process of determining which portions of the Estimated Adjustment Amount will be allocated between the quarter ended June 30, 2023 and the quarter ended September 30, 2023. The Estimated Adjustment Amount takes

56

into account other reserve corrections in the Non-Reliance Period. At this time, the Company has not fully completed its review, and the expected financial statement impacts are preliminary and subject to change.

As a result of the foregoing, the Company has identified material weaknesses in its internal control over financial reporting that existed as of June 30, 2023 and has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of June 30, 2023. Based on this assessment, the Company's disclosure controls and procedures were ineffective as of June 30, 2023. The Company is continuing to evaluate its internal control over financial reporting and will report its remediation plan and further information regarding the material weaknesses in an amendment to its previously filed Form 10-Q for the quarter ended June 30, 2023.

The Company intends to file an amendment to its previously filed Form 10-Q for the quarter ended June 30, 2023, which will include restated unaudited condensed consolidated financial statements for the three and six months ended June 30, 2023. The Company is continuing to assess the Estimated Adjustment Amount and any other potential items for correction as needed. Any previously issued or filed reports, press releases, earnings releases, stockholder communications, investor presentations or other communications describing the Company's financial statements, financial results and other related financial information covering such period and any information related to the matters described above, should no longer be relied upon. In addition, the Company previously disclosed that it expected to revise its previously disclosed full year 2023 guidance downward and accordingly, such guidance should no longer be relied upon. The Company continues to work diligently on its review and preparation of the Form 10-Q for the quarter ended September 30, 2023.

135.    The Form 8-K further disclosed that Eagle's financial statements for Q2 2023 "did not present fairly in all material respects the financial condition and results of operations of the Company and its consolidated subsidiaries for the reasons

described above and were not prepared in accordance with generally accepted accounting principles."

136.   On February 29, 2024 Eagle filed with the SEC a Form 8-K signed by Defendant Cahill. The filing stated that Eagle's Board had approved a "Realignment Plan" that was "designed to improve operational efficiencies and realign the Company's sales and marketing expenditures" and was "expected to reduce the Company's current workforce by approximately 36%." Eagle disclosed that it was "initiating implementation of the Realignment Plan effective immediately."

137.   On March 8, 2024, Eagle filed with the SEC a Form 8-K signed by Interim Principal Executive Officer Michael Graves. The filing stated that "[o]n March 8, 2024, Brian Cahill resigned from his position as Chief Financial Officer of Eagle Pharmaceuticals, Inc. . . . , effective immediately." No permanent successor had been identified, instead "Steven Ratoff, a member of the Board and Chair of the Audit Committee of the Board . . . , was appointed Interim Chief Financial Officer, Principal Financial Officer and Principal Accounting Officer of the Company, effective immediately, to serve until such time as a new Chief Financial Officer commences employment."

138.   Shortly thereafter, on March 18, 2024, Eagle filed with the SEC a Form 12b-25 Notification of Late Filing, revealing that Eagle would be unable to timely file its Form 10-K annual report for 2023, stating that:

The Company is unable to file the 2023 Form 10-K within the prescribed time period without unreasonable effort or expense primarily due to the circumstances described below.

As previously disclosed, the Company intends to restate its financial statements for the three and six months ended June 30, 2023, the review and preparation of which is currently ongoing. In addition, the Company's review and preparation of its financial statements for the quarter ended September 30, 2023 remains ongoing. Due to the time and effort devoted to the matters relating to such prior periods, the Company is delayed in its reporting and review process for the fiscal year ended December 31, 2023. Accordingly, the Company does not expect to complete the preparation and filing of the 2023 Form 10-K by the prescribed due date or within the extended time period permitted by Rule 12b-25.

139.    On May 10, 2024, Eagle filed with the SEC another Form 12b-25 Notification of Late Filing, revealing that Eagle would be unable to timely file its Form 10-Q quarterly report for Q1 2024, stating that:

The Company is unable to file the Q1 2024 Form 10-Q within the prescribed time period without unreasonable effort or expense primarily due to the circumstances described below.

As previously disclosed, the Company intends to restate its financial statements for the three and six months ended June 30, 2023, the review and preparation of which are currently ongoing. In addition, the Company's review and preparation of its financial statements for the quarter ended September 30, 2023 and year ended December 31, 2023 remain ongoing. Due to the time and effort devoted to these matters, the Company is delayed in its reporting and review process for the quarter ended March 31, 2024. Accordingly, the Company does not expect to complete the preparation and filing of the Q1 2024 Form 10-Q by the prescribed due date or within the extended time period permitted by Rule 12b-25.

140.    On August 5, 2024, Eagle filed with the SEC a Form 8-K stating that in connection with Eagle's plan to maintain its stock's listing on the NASDAQ, "the Company is planning to file with the SEC a comprehensive Form 10-K, including restated financial statements for the period ended June 30, 2023, financial statements for the period ended September 30, 2023 and financial statements for the period ended December 31, 2023 by" September 30, 2024.

141.    On August 9, 2024, Eagle filed with the SEC yet another Form 12b-25 Notification of Late Filing, revealing that Eagle would be unable to timely file its Form 10-Q quarterly report for Q2 2024, stating that:

> The Company is unable to file the Q2 2024 Form 10-Q within the prescribed time period without unreasonable effort or expense primarily due to the circumstances described below.
>
> As previously disclosed, the Company intends to restate its financial statements for the three and six months ended June 30, 2023, the review and preparation of which are currently ongoing. In addition, the Company's review and preparation of its financial statements for the quarter ended September 30, 2023, the year ended December 31, 2023 and the quarter ended March 31, 2024 remain ongoing. Due to the time and effort devoted to these matters, the Company is delayed in its reporting and review process for the quarter ended June 30, 2024.

The filing also reiterated that "the Company is planning to file with the SEC a comprehensive Annual Report on Form 10-K, including restated unaudited condensed consolidated financial information for the period ended June 30, 2023, unaudited condensed consolidated financial information for the period ended

September 30, 2023 and audited financial statements for the period ended December 31, 2023 by" September 30, 2024.

142.  On August 27, 2024, Eagle filed with the SEC a Form 8-K reiterating that "the Company is planning to file with the SEC a comprehensive Form 10-K, including restated financial information for the period ended June 30, 2023, financial information for the period ended September 30, 2023 and financial statements for the period ended December 31, 2023 by" September 30, 2024.

143.  As of the date of filing the instant complaint (more than 18 months after Eagle first admitted that its financial statements for Q2 2023 were not compliant with GAAP, should not be relied on, and need to be restated), the Company still has not publicly disclosed any restated financial statements.

**E.    On October 2, 2024, Eagle Revealed That Its Financial Statements From Q2 2022 Forward Should Not Be Relied Upon**

144.  On the morning of October 2, 2024, before the open of the regular stock market trading session, Eagle filed with the SEC a Form 8-K signed by Interim Principal Executive Officer Michael Graves. The filing revealed that Eagle's financial statements dating all the way back to Q2 2022 were not compliant with GAAP, should not be relied on, and need to be restated, and that Eagle had material weaknesses in its internal controls over financial reporting and that such controls were ineffective. The filing stated:

On September 27, 2024, the Audit Committee (the "Audit Committee") of the Board of Directors of the Company, based on the recommendation of, and after consultation with, the Company's management, concluded that revenue previously recognized related to a sale of PEMFEXY in the second quarter of 2022 did not meet certain criteria of Financial Accounting Standards Board Accounting Standards Codification Topic 606 – *Revenue from Contracts with Customers*, when originally recorded. The Company previously recognized revenue upon delivery to a wholesale customer but has now determined that revenue from this transaction should be deferred and recognized in later periods to the extent certain criteria have been achieved. As a result, the Audit Committee determined that the Company's audited financial statements for the fiscal year ended December 31, 2022, and unaudited financial statements for the quarters ended June 30, 2022, September 30, 2022, and March 31, 2023 (collectively, the "Non-Reliance Period"), as previously filed with the SEC, should no longer be relied upon and should be restated. The Company's management and the Audit Committee have discussed the matters disclosed in this current report on Form 8-K with Ernst & Young LLP ("EY"), the Company's independent registered public accounting firm.

*    *    *

As a result of the foregoing, the Company expects to conclude that one or more material weaknesses related to the foregoing matters existed in the Company's internal control over financial reporting and that the Company's disclosure controls and procedures were not effective for each of the fiscal periods within the Non-Reliance Period, and as of September 30, 2023 and December 31, 2023. In addition, as previously disclosed, the Company has identified material weaknesses in its internal control over financial reporting that existed as of June 30, 2023 and concluded that the Company's disclosure controls and procedures were ineffective as of June 30, 2023. The Company is continuing to evaluate its internal control over financial reporting and its remediation plan with respect thereto.

The Company is completing its review of the foregoing matters and any other potential items for correction as needed. The Company has not yet determined the impact in each quarter and will re-evaluate the net

revenue recognized related to certain sales of PEMFEXY, beginning in the second quarter of 2022 and through the Non-Reliance Period. Any previously issued or filed reports, press releases, earnings releases, stockholder communications, investor presentations or other communications describing the Company's financial statements, financial results and other related financial information covering the Non-Reliance Period and any information related to the foregoing matters, should no longer be relied upon.

145.   The Form 8-K further disclosed that Eagle's financial statements dating back to Q2 2022 "did not present fairly in all material respects the financial condition and results of operations of the Company and its consolidated subsidiaries for the reasons described above and were not prepared in accordance with GAAP."

146.   On this news, Eagle's share price fell $1.42 as compared to the prior day closing price, or 39.9%, to close at $2.14 per share on October 2, 2024. Eagle's share price continued to fall over the next two trading days. On October 3, 2024, Eagle's share price fell by $0.15 (7.0%), to close at $1.99. On October 4, 2024, the stock fell by another $1.09 (54.8%), closing at $0.90. In total, over October 2-4, 2024, Eagle's share price fell by $2.66, losing 74.7% of its value, as the market reacted to Eagle's October 2, 2024 disclosures.

## VIII.  POST-CLASS PERIOD EVENTS

### A.    Defendant Tarriff's Court Filings Reveal The SEC's Investigation

147.   As revealed by court filings in litigation by Defendant Tarriff against Eagle seeking advancement of his legal expenses (*Tarriff v. Eagle Pharmaceuticals,*

*Inc.*, Delaware Chancery Court Case No. 2024-1189), for over a year the SEC has been conducting an investigation into the matters at issue in the instant action.

148.    According to Tarriff's complaint filed November 20, 2024 ("Tarriff Complaint"):

> On July 13, 2023, a former employee of the Company filed a whistleblower complaint in federal court against the Company and Mr. Tarriff alleging that the Company, under Mr. Tarriff's leadership, had engaged in accounting and financial reporting misconduct (the "Whistleblower Action"). In December 2023, a class action was filed against the Company and Mr. Tariff [sic] in federal court arising out of the same alleged misconduct. *See* Class Action Complaint, *Miller v. Eagle Pharmaceuticals, Inc., et al.*, C.A. 2:23-cv-23011 (D.N.J. Dec. 11, 2023) (the "Securities Class Action"). And in parallel, the Securities & Exchange Commission (the "SEC") commenced an investigation into the alleged issues raised in the Whistleblower Action and underlying the claims asserted in the Securities Class Action (the "SEC Investigation").

 Tarriff Complaint ¶3.

149.    "In October 2023, following the filing of the Whistleblower Action, the Company received an information request from the SEC. The ongoing SEC Investigation has focused on accounting issues similar to those alleged in the Whistleblower Action, and concerns conduct from 2022 and 2023." *Id.* ¶25. "The accounting and financial reporting issues raised in both proceedings [the SEC Investigation and the Whistleblower Action] concern Company-wide policies, practices, and activities. The accounting issues raised in the proceedings center around the revenue recognition for one of Eagle's products." *Id.* ¶28. "These

accounting matters are the subject of documents produced in the SEC Investigation," and "some of the SEC document requests directed to the Company have specifically sought information about Mr. Tarriff." *Id*.

150. As revealed in Defendant Tarriff's Motion To Compel filed on December 30, 2024, "the SEC Investigation remains ongoing. In October of this year, the SEC began interviewing individuals affiliated with the Company."

151. The Transmittal Affidavit of Joseph L. Christensen, counsel to Defendant Tarriff, filed in support of Tarriff's motion for summary judgment on January 13, 2025, lists exhibits including an October 11, 2023 "SEC Subpoena directed to Eagle Pharmaceuticals, Inc.," and a March 25, 2024 "SEC Subpoena directed to Eagle Pharmaceuticals, Inc." Those exhibits are listed as confidential on the docket and filed under seal, and so are not available to Plaintiffs in the instant action.

152. The Declaration of Jeremiah Williams filed January 13, 2025 ("Williams Decl."), states that he is "a litigation partner at Ropes & Gray LLP," and "the lead counsel for . . . Scott Tarriff in the Securities and Exchange Commission's . . . ongoing investigation of Eagle." Williams Decl. ¶1. "The SEC Investigation involved the same PEMFEXY inventory issue that was at the center of the Whistleblower Action, so the SEC Investigation exposed Mr. Tarriff to potential liability." *Id.* ¶3. "The SEC issued a document subpoena to Mr. Tarriff on January 8,

2025. The SEC staff said that they also intend to take testimony from Mr. Tarriff."
*Id.* ¶9.

153.   As stated in Defendant Tarriff's Opening Brief In Support Of Motion For Summary Judgment filed January 21, 2025, "[o]n October 11, 2023, the SEC sent the Company a subpoena targeted to the topics of the Whistleblower Action." Further, "The accounting issues raised in the proceedings center around the revenue recognition for PEMFEXY."

### B.    Eagle Dismisses Its External Auditor Ernst & Young LLP

154.   On November 27, 2024, Eagle filed with the SEC a Form 8-K stating that "[o]n November 21, 2024, Eagle . . . dismissed Ernst & Young LLP ('EY'), the Company's previous independent registered public accounting firm." The Form 8-K further stated that "as previously disclosed, the Audit Committee concluded that the Company's audited consolidated financial statements for the fiscal year ended December 31, 2022 and EY's audit report thereon . . . should no longer be relied upon and the financial statements should be restated."

155.   The 8-K further disclosed that "the Company has identified material weaknesses in its internal control over financial reporting" and that "EY notified the Company that due to those material weaknesses, EY would need to expand the scope of its audit procedures on the financial statements as of and for the years ended

December 31, 2023 and 2022 (as restated) which were not completed prior to EY's dismissal."

### C.    Eagle Delists Its Stock From The NASDAQ And Ceases SEC Reporting

156.    Although Eagle had repeatedly stated, as recently as August 27, 2024, that it intended to file with the SEC by September 30, 2024 a Form 10-K for 2023 including restated financial statements, shortly after the end of the Class Period, Eagle implemented a plan to cease making public SEC filings. This practice is referred to as "going dark."

157.    On November 15, 2024, Eagle announced that it planned to delist its publicly traded stock from the NASDAQ stock exchange, which would "also serve to deregister the Common Stock under Section 12(b) of the Securities Exchange Act of 1934, as amended, effective 90 days thereafter, which would reduce certain SEC reporting obligations." On November 26, 2024, Eagle filed with the SEC a Form 25, Notification of Removal From Listing And/Or Registration Under Section 12(b) Of The Securities Exchange Act Of 1934, to delist its shares from the NASDAQ stock exchange.

158.    On November 27, 2024, Eagle filed with the SEC multiple Post-Effective Amendments to its Registration Statements previously filed with the SEC, along with a Registration Withdrawal Request, in order to deregister its securities with the SEC. On January 24, 2025, Eagle filed with the SEC a Form 15,

Certification And Notice Of Termination Of Registration Under Section 12(b) Of The Securities Exchange Act Of 1934 Or Suspension Of Duty To File Reports Under Sections 13 And 15(d) Of The Securities Exchange Act of 1934.

159.   Eagle has not made any public SEC filings since January 24, 2025.

## IX.   ADDITIONAL SCIENTER ALLEGATIONS

### A.   Defendant Tarriff Directly Carried Out The Channel Stuffing Scheme And Ignored Repeated Warnings Not To

160.   As set forth above (*see supra* Part V.A) and in the Moran Complaint, Defendant Tarriff created and personally implemented the Pemfexy channel stuffing scheme. As further set forth above and in the Moran Complaint, Moran repeatedly warned Defendant Tarriff not to engage in channel stuffing for Pemfexy, but Tarriff ignored these warnings and did so anyway.

161.   Even when Moran made an internal whistleblower complaint regarding Tarriff's actions in June 2022, this did not cause Defendant Tarriff to cease his misconduct. As explained by Moran, "[b]y late June 2022, [Moran] made a further internal whistleblower complaint against Defendants [Eagle and Tarriff] to the Company's Head of Human Resources Tracy Straley regarding what he reasonably believed to be violations of law, rule and/or public policy." Moran Complaint ¶140. "HR Straley advised [Moran] that since she already had a meeting scheduled with Defendant Tarriff and GC Debski, she would report his complaints to them right away." *Id.* ¶148. "[Moran] never heard back from Head of HR Straley, General

Counsel/Chief Compliance Officer Debski or anyone else at Defendant Eagle regarding his complaints." *Id.* ¶149. Instead "on July 15, 2022, within just a few short weeks of having reported the additional disclosures, Defendants terminated [Moran's] employment in retaliation for his blowing the whistle on them." *Id.* ¶151.

162.   It is highly likely that Moran's termination was ordered by Defendant Tarriff. In a Form 8-K filed with the SEC on July 18, 2022 that was signed by Defendant Tarriff, Eagle announced that "[o]n July 15, 2022, Michael Moran separated as Executive Vice President, Chief Commercial Officer of Eagle Pharmaceuticals, Inc." Because Moran was a senior executive reporting directly to Defendant Tarriff, he likely could only be terminated by Defendant Tarriff or by the Board. Defendant Tarriff was one of Eagle's seven directors in 2022. It is highly unlikely that Board members other than Tarriff made the decision to fire Moran, seeing as the Board later initiated an internal investigation into Moran's allegations and as a result pressured Tarriff to resign. The strongest inference from these facts is that Defendant Tarriff terminated Moran in an attempt to conceal Tarriff's fraud.

**B.     Defendants Tarriff And Cahill Had In-Depth Knowledge Of Eagle's Pemfexy Accounting And Customer Inventories**

163.   As alleged herein, Defendants Tarriff and Cahill repeatedly held themselves out as knowledgeable regarding Eagle's Pemfexy sales, customers' Pemfexy inventory levels, and Eagle's financial reporting for Pemfexy sales, as they often discussed these issues in detail in Eagle's SEC filings, investor conference calls,

and other public statements. The following additional statements further show the Individual Defendants' knowledge of these subjects.

164.   On Eagle's November 7, 2022 conference call for Q3 2022 results, Defendant Cahill stated, "PEMFEXY sales were $1.7 million in the third quarter of 2021. PEMFEXY product sales were compressed for the quarter as we see customers working through launch order quantities. Actual PEMFEXY sales volume by customers was as much as 4x that of reported sales as trade inventory was reduced."

165.   At the JP Morgan Healthcare Conference on January 10, 2023, Defendant Tarriff stated:

> We had inventory in the system that needed to be worked out with some customers. We have other customers buying inventory in anticipation of having a strong Q1. So those 2 things need to balance out. But if you look at the out movement, the actual usage of PEMFEXY to the end customer, that equates to about $8 million in Q4, as I stated with the expectation being that number will double.

166.   On Eagle's May 9, 2023 conference call for Q1 2023 results, Defendant Cahill stated:

> PEMFEXY's net product sales were $22.9 million in the first quarter of 2023 compared to $37.2 million in the first quarter of 2022. We record revenue on delivery of our products to our direct customers, primarily wholesalers, which estimates the current and near-term needs of the wholesaler channel for our growing product. As we continue to capture more share of the pemetrexed market, customer inventory levels may be higher than for similar established products.

167.   On Eagle's August 8, 2023 conference call for Q2 2023 results, Defendant Tarriff stated:

It's important to look at our balance sheet and receivables as well. The bulk of our receivables relate to PEMFEXY at the end of the second quarter. For this product, we received the majority of our orders near the end of the quarter because contract pricing is mostly adjusted quarterly, large quantities of products are purchased near the end of the quarter producing this result. This trend is likely to continue into the near future.

### C.    Defendant Tarriff Sold At Least $1.8 Million Of Eagle Stock During The Class Period

168.    Defendant Tarriff sold substantial amounts of Eagle's publicly traded common stock while knowing the concealed facts about his Pemfexy channel stuffing scheme. These sales were out of line with Tarriff's recent trading history.

169.    Prior to the Class Period, the last time Defendant Tarriff reported selling Eagle stock was more than three years earlier, on April 1, 2019.

170.    Defendant Tarriff did not report any purchases of Eagle stock during the Class Period.

171.    Defendant Tarriff reported, in an SEC Schedule 13G/A filed February 14, 2023, beneficial ownership of Eagle stock in the following amounts as of December 31, 2022:

(i)      353,788 shares of Common Stock owned directly by him,

(ii)     176,361 shares of Common Stock held by Janney Montgomery Scott LLC CUST FBO Scott Tarriff IRA for the Benefit of Mr. Tarriff (the "IRA Trust"), of which Mr. Tarriff is a trustee and, as such, may be

deemed to share voting and dispositive power with respect to all shares held by the IRA Trust,

(iii)    options to purchase 987,410 shares of Common Stock exercisable within 60 days of December 31, 2022,

(iv)    23,275 shares of Common Stock underlying restricted stock units ("RSUs") that will vest within 60 days of December 31, 2022 and

(v)    992,623 shares of Common Stock held by the Tarriff 2016 Generation Skipping Exempt Family Trust DTD 12/28/2016 (the "Family Trust") for the benefit of Mr. Tarriff's spouse and three children, of which Mr. Graves is the trustee, and as such, while Mr. Tarriff may be deemed to share voting and dispositive power with respect to all shares held by the Family Trust, Mr. Tarriff disclaims beneficial ownership with respect to such shares in the Family Trust, except to the extent of his pecuniary interest therein.

172.    Defendant Tarriff reported the following Class Period sales of Eagle stock:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 5/11/2023 | 15,000 | $20.71 | $310,650.00 |
| 5/12/2023 | 3,131 | $19.69 | $61,649.39 |
| 5/12/2023 | 11,869 | $20.42 | $242,364.98 |
| 5/15/2023 | 14,800 | $21.06 | $311,688.00 |
| 5/15/2023 | 200 | $21.52 | $4,304.00 |
| 5/16/2023 | 15,000 | $19.98 | $299,700.00 |
| 10/2/2023 | 9,511 | $15.23 | $144,852.53 |
| 10/3/2023 | 10,024 | $14.41 | $144,445.84 |
| 10/3/2023 | 710 | $15.11 | $10,728.10 |
| 11/1/2023 | 10,925 | $13.82 | $150,983.50 |
| 11/2/2023 | 10,694 | $13.87 | $148,325.78 |
| **TOTAL** | 101,864 | | $1,829,692.12 |

173.  Defendant Tarriff reported, in an SEC Schedule 13G/A filed March 18, 2024, beneficial ownership of Eagle stock in the following amounts as of December 31, 2023:

(i)     257,511 shares of Common Stock owned directly by him,

(ii)    176,361 shares of Common Stock held by Janney Montgomery Scott LLC CUST FBO Scott Tarriff IRA for the Benefit of Mr. Tarriff (the "IRA Trust"), of which Mr. Tarriff is a trustee and, as such, may be deemed to share voting and dispositive power with respect to all shares held by the IRA Trust,

(iii)   options to purchase 1,020,800 shares of Common Stock exercisable as of December 31, 2023 or within 60 days of December 31, 2023,

(iv)   23,275 shares of Common Stock underlying restricted stock units ("RSUs") that will vest within 60 days of December 31, 2023 and

(v)   992,623 shares of Common Stock held by the Tarriff 2016 Generation Skipping Exempt Family Trust DTD 12/28/2016 (the "Family Trust"), of which Mr. Thomas is the trustee, and as such, while Mr. Tarriff may be deemed to share voting and dispositive power with respect to all shares held by the Family Trust, Mr. Tarriff disclaims beneficial ownership with respect to such shares in the Family Trust, except to the extent of his pecuniary interest therein.

174.  The only change to Defendant Tarriff's reported ownership of Eagle stock from December 31, 2022 to December 31, 2023 (as opposed to options granted to him by Eagle), was a decrease of 96,277 shares owned directly by him, roughly equivalent to the 101,864 shares he reported selling in 2023.

175.  The 101,864 shares sold represent 28.8% of his 353,788 directly held shares as of December 31, 2022, and 6.7% of the 1,522,772 total shares that were held by him directly, by his IRA Trust, and by his Family Trust.

176.  Defendant Tarriff's SEC filings reporting his Eagle stock sales in October and November of 2023 state that "[t]hese transactions were made pursuant to a Rule 10b5-1 trading plan adopted by the Reporting Person on June 15, 2023." A 10b5-1 plan is a written agreement in which a corporate insider sets forth the

timing and quantity of future stock sales. SEC Rule 10b5-1 (17 C.F.R. § 240.10b5-1) provides an affirmative defense to claims of insider trading in violation of Rule 10b-5 and Exchange Act Section 10(b) where multiple strict requirements are met. Among those requirements are that the insider adopt the plan "[b]efore becoming aware of the [material nonpublic] information" at issue. 17 C.F.R. § 240.10b5-1(c)(A). Defendant Tarriff's 10b5-1 plan was adopted on June 15, 2023, when he knew of the Pemfexy channel stuffing scheme, which was material nonpublic information, so the affirmative defense provided by Rule 10b5-1 does not apply.

### D.    Material Amounts Of Defendants' Incentive Compensation Depended On Pemfexy Sales And Eagle's Stock Price

177.    As reported in Eagle's proxy statement filed with the SEC on May 1, 2023, material amounts of the incentive compensation for Defendants Tarriff and Cahill depended on Pemfexy sales and Eagle's stock price, giving them motives to artificially inflate those metrics.

178.    In 2022 Defendant Tarriff received a base salary of $848,640 and Defendant Cahill received a base salary of $395,200, however this constituted only a small proportion of their overall compensation. Eagle reported that Tarriff's base salary was only 8% of his 2022 total direct compensation mix, with the remainder being "At-Risk" and in the form of performance-vesting stock units ("PSUs"), restricted stock units ("RSUs"), and a cash annual performance bonus. Eagle reported that Cahill's base salary was only 14% of his 2022 total direct compensation mix.

179.    Eagle paid 2022 cash annual performance bonuses to Tarriff and Cahill of $636,705 and $177,840, respectively, equivalent to 75% of their target annual performance bonuses. The criteria for awarding annual performance bonuses were weighted 10% to "Product Sales," which included as one of four goals "[o]btaining or exceeding the PEMFEXY® product sales goal for 2022 of $156.1 million." Another 10% of the criteria for awarding annual performance bonuses depended on "Earnings," with an "Adjusted Non-GAAP EPS Target" of $9.28, and an "Adjusted Non-GAAP EBITDA Target" of $160 million. "Pemfexy" separately accounted for an additional 10% weight, with the goal to "[i]nitiate commercial launch and generate revenue."

180.    The value of Eagle's stock-based compensation, consisting of RSUs and PSUs, to Defendants Tarriff and Cahill was directly dependent on Eagle's stock price. For 2022, 75% of such stock-based compensation was in the form of PSUs, the vesting of which depended in substantial part on Eagle's stock price performance. Specifically, "[t]he PSUs are eligible to vest based on [Eagle's] total shareholder return relative to the S&P 600 Biotech Select Index over the three year performance period." In February 2022 Eagle granted PSUs and RSUs to Defendants Tarriff and Cahill with total target grant date value of $7.0 million and $1.6 million, respectively.

**E.    Defendants Had A Motive To Reduce The Deficit From Tarriff's Aggressive 2Q 2022 Financial Guidance**

181.    In Eagle's investor conference calls, Defendant Tarriff repeatedly discussed Eagle's financial guidance, and the importance of meeting or exceeding that guidance. In particular, Defendant Tarriff's comments throughout early 2022 led investors to expect strong financial results for Eagle in Q2 2022, driven in substantial part by strong Pemfexy sales. In Eagle's March 7, 2022 investor call to report Q4 2021 results, Defendant Tarriff stated that:

> In terms of Q2, we have no contractual limit on PEMFEXY volume. But right now, we're expecting a little less COVID cases. So vasopressin volume would come down a bit. Based on current trends, we believe Q2 revenue and earnings should be around the same as Q1, although it's too soon to have complete certitude as pricing in these markets can be variable. We will provide an update as we have more visibility.

182.    On May 9, 2022, Eagle reported Q1 2023 revenue of $115.9 million, and non-GAAP net income of $4.04 per diluted share.

183.    Also on May 9, 2022 Eagle held a conference call to report its Q1 2022 results, with Defendant Tarriff stating that, "[w]e still have exclusivity for both vasopressin and PEMFEXY . . . we are seeing significant acceptance of PEMFEXY in the marketplace."

184.    On the May 9, 2022 call, a Willaim Blair & Company analyst asked, "You obviously have the volume limits for Q1. Is there any commentary you can

give on what you're seeing so far in Q2?" Defendant Tarriff responded in relevant

part:

> In terms of PEMFEXY, we spent the Q1 with those limited [vials] that
> we had and putting those into distribution. And now we're going
> through the process of pulling that all through, and we're getting great
> feedback. It's a great product, right? I think we invented product in
> PEMFEXY that has significant advantages in the marketplace, and it's
> being accepted well. And we think that PEMFEXY will probably have
> a good life cycle over a couple of years here. So we're very excited
> about both as the PEMFEXY market builds.

185.    As discussed *supra*, Pemfexy sales promptly and substantially declined

after Q1 2022 as wholesalers ceased making initial stocking orders, and as generic

pemetrexed products entered the market beginning on or around May 25, 2022.

However, at no point prior to Eagle's publication of its Q2 2022 results on August

9, 2022 did Defendants "provide an update" regarding expected Q2 revenue and

earnings as Defendant Tarriff had stated they would in his March 7, 2022 remarks.

As such, prior to August 9, 2022, Tarriff's statement that "Q2 revenue and earnings

should be around the same as Q1" remained Defendants' most recent public

statement about expected levels of Q2 2022 revenue and earnings.

186.    In notes published on August 9, 2022, reporting on Eagle's Q2 2022

results, analysts from both Piper Sandler and William Blair noted that Eagle's $74.1

million of revenue and $1.56 per share of non-GAAP diluted earnings per share for

Q2 2022 fell far short of analyst consensus estimates of $117.0 million in revenue

and $3.36 non-GAAP diluted earnings per share (which were roughly in line with

Eagle's Q1 2022 reported results). Following Eagle's publication of its Q2 2022 results, the Company's stock price fell by 14.5%, showing the market's negative reaction to the earnings miss, which would have been substantially worse without the revenue fraudulently reported from the Pemfexy channel stuffing scheme.

187. As explained by Eagle's former Chief Commercial Officer, "the artificial 'revenue' created by the channel stuffing 'Buy and Hold' scheme allowed Defendant Eagle to present itself as coming far closer to its own projections and the estimates of analysts who follow the Company than was actually the case." Moran Complaint ¶130.

### F. Defendant Tarriff Was Desperate To Increase Pemfexy Sales, Even Resorting To Illegal And Unethical Conduct

188. According to the Moran Complaint, in addition to the Pemfexy channel stuffing scheme Defendant Tarriff engaged in other forms of unethical and illegal conduct, illustrating the extreme lengths he was willing to go to in a desperate effort to increase Pemfexy sales.

189. First, with Defendant Tarriff's direction and approval, Eagle decided to try to increase Pemfexy sales by implementing a program of unnecessary "Medical Focus Groups" where Eagle would pay attendees, despite repeated objections from Moran and others that such conduct was prohibited (by, *inter alia*, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)). Moran Complaint ¶¶43-60. According to the U.S. Department of Health and Human Services, the Anti-Kickback Statute:

is a criminal law that prohibits the knowing and willful payment of "remuneration" to induce or reward patient referrals or the generation of business involving any item or service payable by the Federal health care programs (e.g., drugs, supplies, or health care services for Medicare or Medicaid patients). Remuneration includes anything of value and can take many forms besides cash, such as free rent, expensive hotel stays and meals, and excessive compensation for medical directorships or consultancies. In some industries, it is acceptable to reward those who refer business to you. However, in the Federal health care programs, paying for referrals is a crime.

190.   Second, over Moran's objections, Defendant Tarriff and Eagle's Marketing EVP Kimmet flew around the country by private jet to "wine and dine" "prescribers and other [Health Care Personnel] in the Community Oncology business . . . to convince them to buy PEMFEXY." *Id.* ¶¶87-94. Such conduct also potentially violates the Anti-Kickback Statute, among other laws.

191.   Third, in connection with a June 3, 2022 meeting in Chicago of the American Society of Clinical Oncology attended by Moran, Defendant Tarriff, and members of Eagle's sales team, Eagle co-sponsored a cocktail reception "with no medical education exchange; just free alcohol for HCPs (prospective customers/prescribers of their products, including PEMFEXY)." *Id.* ¶¶107-11. Again, such conduct potentially violates the Anti-Kickback Statute, among other laws. When Moran asked Defendant Tarriff "how did this get approved?", Tarriff dismissed his concerns and "stormed away aggravated that [Moran] had raised yet another compliance issue." *Id.* ¶¶110-11.

### G.    Defendants Tarriff And Cahill Both "Resigned" Under Suspect Circumstances

192.    On November 29, 2023, Eagle abruptly announced Defendant Tarriff's "resignation" effectively immediately, with no permanent successor in place, and stated that "[a]fter consideration of various alternatives, including termination with or without cause, the Board accepted Mr. Tarriff's resignation." As later revealed in the Declaration of Defendant Tarriff's counsel, Jeremiah Williams, filed in the *Tarriff v. Eagle* case, "Eagle had conducted an internal investigation into the PEMFEXY inventory issue, and as a result the Company pressured Mr. Tarriff to resign his roles as Chief Executive Officer . . . , President, and member of the Board of Directors." Williams Decl. ¶3.

193.    Eagle's "internal investigation into the PEMFEXY inventory issue" that led to the Company pressuring Tarriff to resign and considering terminating him with cause, came shortly after: (i) the filing of the Moran Complaint in July 2023 that revealed Tarriff's role masterminding the Pemfexy channel stuffing scheme; (ii) Eagle's receipt of the SEC's October 11, 2023 subpoena requesting information about the same subjects; and (iii) Eagle's own November 9, 2023 disclosure that "the Company is reviewing and expects potential adjustments to reserves for returns and price adjustments of approximately $15.0 million to $20.0 million," which "primarily relate to returns and a price adjustment for PEMFEXY."

194.    Defendant Cahill also "resigned" under suspect circumstances. On

March 8, 2024, Eagle announced his resignation "effective immediately," when no permanent successor had been identified. Like Tarriff, Defendant Cahill's purported resignation came in the midst of an SEC investigation into the Pemfexy channel stuffing scheme. That scheme was carried out while Cahill, as Eagle's CFO and Principal Accounting and Financial Officer, signed off on and was responsible for the accuracy of the Company's financial statements.

### H.    The Allegations In The Moran Complaint Are Highly Reliable

195.   As discussed *supra*, Moran's allegations have been corroborated in substantial part by Eagle's own internal investigation and subsequent public disclosures, as well as by the existence of the SEC investigation into the matters alleged in Moran's complaint.

196.   Further showing the reliability of Moran's allegations, Defendants' own public statements show that Moran was well-positioned to have first-hand knowledge of Defendants' misconduct.

197.   Until his termination, Moran was a high-level executive at Eagle and a member of its management team. Prior to joining Eagle in 2016, Moran served as field vice president, sales, at GlaxoSmithKline, and before that held various positions with increasing responsibility at Reliant Pharmaceuticals, Muro and Astra Zeneca. Moran holds a B.S. in business management from the State University of

New York at Empire and completed the Transformational Leadership for Executives program at the University of Pennsylvania Wharton School of Business.

198.   Defendants touted Eagle's hiring of Moran in a February 4, 2016 press release titled "Eagle Pharmaceuticals Announces Appointment of Michael Moran as U.S. Head of Sales," referring to him as "a seasoned sales executive in the pharmaceuticals industry." The press release quoted Defendant Tarriff stating "Mike is an exceptional sales leader with a lengthy record of success in this industry, and we are very pleased to have him aboard," and that "Eagle will have about 50 people selling our products and Mike will be coordinating this activity on a national scale." From the time Moran joined Eagle he reported directly to Defendant Tarriff. Moran Complaint ¶26.

199.   Moran quickly rose through the ranks at Eagle. The Company's 2015 annual report filed with the SEC on July 12, 2016 listed his title as "Vice President, Sales" under the heading "Executive Officers & Management Team." An Eagle press release dated November 2, 2020, listed Moran as "Executive Vice President, Sales, Business Development and Government Affairs" and a member of its "executive team." On October 1, 2021 Eagle filed a SEC Form 8-K announcing that "[o]n September 27, 2021, the Board appointed Michael Moran as the Company's Executive Vice President, Chief Commercial Officer, effective immediately, in which position he will serve as the Company's principal operating officer." Eagle's

proxy statement filed with the SEC on May 1, 2023 lists Moran as one of only three "named executive officers" for 2022, alongside Defendants Tarriff and Cahill.

200.   Commensurate with his position, Defendants gave Moran significant responsibility at Eagle. For example, Moran is the signatory for Eagle on a License Agreement with Combioxin SA, dated August 19, 2021, under which Eagle was to pay at least $10 million. Moran was entrusted to publicly represent the Company, as one of the presenters at Eagle's March 31, 2022 investor update call. Similarly, Eagle quoted Moran in a March 28, 2022 press release regarding the Company's agreement to acquire Acacia Pharma Group plc.

201.   Moran's position among Eagle's very top executives was likewise reflected in his compensation. In 2021, the last full year of his employment with Eagle, he received a base salary of $397,000, an above-target cash performance bonus of $418,540, and stock awards that Eagle reported valued at $987,362. Eagle reported Moran's total compensation for 2021 as $1,857,933.

202.   Defendants were quick to settle Moran's lawsuit, and never answered his complaint. Moran filed suit on July 13, 2023, and his counsel sent Eagle a service waiver request on July 18, 2023. Eagle, through its counsel, waived service on July 27, 2023. Moran's process server personally served Defendant Tarriff on August 8, 2023. Counsel for Eagle informed the court on December 18, 2023 that "the parties

have fully resolved this matter," and a stipulation of dismissal signed by counsel for all parties was filed on December 26, 2023.

203.   It appears that Eagle and Defendant Tarriff have required Moran to agree to non-disclosure as a condition of their settlement. When counsel for Plaintiffs in the instant action contacted Moran's counsel of record, Moran's counsel stated that she would not speak with Plaintiffs' counsel regarding the matter.

204.   Moran's credibility and aspects of the Moran Complaint's allegations are further supported by interviews with Moran's former colleagues at Eagle.

205.   Former Employee 1 ("FE1") worked at Eagle from March 2016 to June 2023 as a Regional Sales Director, and as a National Sales Director from July 2023 to March 2024. FE1 reported directly to Moran prior to Moran's termination in July 2022. According to FE1, Moran "operates with the utmost integrity."

206.   Former Employee 2 ("FE2") worked at Eagle from April 2017 to April 2024 as a Senior Regional Sales Director. FE2 reported directly to Moran prior to Moran's termination in July 2022. FE2 has known Moran for over 20 years, including in previous roles where they worked at other companies. According to FE2, Moran was "always very professional," and "knows the business very well." FE2 stated that "[i]f there were ever a situation I needed advice on, If I needed to understand the regulations and ethics that corral what we do, he was always helpful."

207.   Dawn Vallone served as a Senior Regional Sales Director at Eagle from

April 2017 until on or about May 2, 2022, in which role she reported directly to Moran. Vallone described Moran as "an absolutely stellar individual" who is "Mensa-level intelligent" and "knows how to run every facet of a business," and stated that she had never worked for anyone else so talented.

208.  Vallone confirmed that, although Moran had generally been the leader of the sales department, that changed in 2Q 2022 when Tarriff and John Kimmet suddenly started to take the lead, which made Vallone uncomfortable.

209.  Vallone confirmed the Microsoft Teams meeting discussed in paragraphs 81-83 of the Moran Complaint, which took place on or about April 21, 2022, and was attended by Defendant Tarriff, John Kimmet, Moran, Vallone, and other members of Moran's team. Vallone remembers thinking that the meeting was highly unusual because she had never been in a meeting where Tarriff and Kimmet talked to her before. The meeting was also unusual because Moran, who was usually a commanding presence, was mostly in the background while Tarriff and Kimmet ran the meeting. Vallone confirmed that Tarriff stated in that meeting that he would sell Pemfexy himself, and further stated that he and Kimmet were going on a "road show," travelling to potential customers to try to sell Pemfexy.

210.  Vallone found the meeting shocking and strange. After this meeting Vallone knew something was very wrong at Eagle, and that is when she decided that she would leave Eagle, quitting approximately 10 days later to take a new job at

86

another company.

211.   Vallone confirmed that while she was at Eagle in 2Q 2022, customers were not ordering Pemfexy, in part because customers like CVS Specialty pharmacy were already full of Pemfexy inventory.

## X.    CLASS ACTION ALLEGATIONS

212.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased the publicly traded common stock of Eagle between August 9, 2022 and October 1, 2024, both dates inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and any trust of which the Individual Defendants are the settler or which is for the benefit of the Individual Defendants and/or member(s) of their immediate family.

213.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Eagle's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.

Millions of Eagle shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Eagle or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

214.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

215.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

216.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Eagle; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

217.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.  LOSS CAUSATION

218.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

219.   During the Class Period, Plaintiffs and the Class purchased Eagle's publicly traded common stock at artificially inflated prices. The price of Eagle's publicly traded common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed and/or materialized, causing investors' losses.

## XII.  APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

220.   The market for Eagle's shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements

and/or failures to disclose, Eagle's shares traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased the Company's shares relying upon the integrity of the market price of Eagle's shares and market information relating to Eagle, and have been damaged thereby.

221.    During the Class Period, the artificial inflation of Eagle's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Eagle's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Eagle and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

222.    At all relevant times, the market for Eagle's shares was an efficient market for the following reasons, among others:

(a)    Eagle shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Eagle filed periodic public reports with the SEC;

(c)    Eagle regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, investor conferences, and other public disclosures; and

(d)    Eagle was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.

223.    As a result of the foregoing, the market for Eagle's shares promptly digested current information regarding Eagle from all publicly available sources and reflected such information in Eagle's share price. Under these circumstances, all purchasers of Eagle's shares during the Class Period suffered similar injury through their purchase of Eagle's shares at artificially inflated prices and a presumption of reliance applies.

## XIII.  NO SAFE HARBOR

224.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Eagle who knew that the statement was false when made.

## XIV.  FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5(b) Promulgated Thereunder
### Against All Defendants

225.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

92

226.   During the Class Period, as set forth herein, Defendants Eagle, Tarriff, and Cahill made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

227.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

## XV.   SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

228.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

229.   Defendants Tarriff and Cahill acted as controlling persons of Eagle within the meaning of Section 20(a) of the Exchange Act as alleged herein.

230.   The Individual Defendants directly or indirectly induced the acts constituting the violations of Section 10(b) of the Exchange Act and Rule 10b-5 by Eagle, and did not act in good faith.

231.   As a direct and proximate result of the wrongful conduct of the Individual Defendants, Plaintiffs and other members of the Class suffered damages

in connection with their respective purchases and sales of the Company's shares during the Class Period.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XVII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: July 11, 2025                    Respectfully submitted,

                                        By:  */s/ James E. Cecchi*
                                        **CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
                                        James E. Cecchi
                                        Donald A. Ecklund
                                        Kevin G. Cooper
                                        5 Becker Farm Road
                                        Roseland, New Jersey 07068
                                        Telephone: (973) 994-1700
                                        decklund@carellabyrne.com
                                        kcooper@carellabyrne.com

                                        *Liaison Counsel for Plaintiffs*

                                        **GLANCY PRONGAY & MURRAY LLP**
                                        Robert V. Prongay (*pro hac vice*)
                                        Garth Spencer (*pro hac vice*)
                                        1925 Century Park East
                                        Suite 2100
                                        Los Angeles, CA 90067
                                        Telephone: (310) 201-9150
                                        Facsimile: (310) 201-9160
                                        rprongay@glancylaw.com
                                        gspencer@glancylaw.com

                                        *Lead Counsel for Plaintiffs*

                                        Jack I. Zwick
                                        225 Broadway, Suite 1440
                                        New York, New York 10007
                                        Telephone: (212) 385-1900
                                        jack@zwickfirm.com

                                        *Additional Counsel for Plaintiffs*