Donald A. Ecklund
Kevin G. Cooper
CARELLA, BYRNE, CECCHI,
   BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
decklund@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NICHOLAS MILLER, Individually and On Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>  v.<br><br>EAGLE PHARMACEUTICALS, INC., SCOTT TARRIFF, and BRIAN CAHILL,<br><br>       Defendants. | Case No. 2:23-CV-23011-JKS-MAH<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ................................................................................. 3

    A.    Shortly After Eagle Launched Its Key Drug Pemfexy In February 2022, Demand Plummeted ..........................................3

    B.    Defendant Tarriff Personally Implemented The "Buy And Hold" Program To Report Fake Pemfexy Revenue ..................4

    C.    Eagle Admits That Its Financial Reporting For Pemfexy Must Be Restated, Causing Its Stock Price To Plummet ..........5

    D.    After Investigating Pemfexy Sales Eagle Forced Tarriff To Resign, Causing Another Precipitous Stock Price Decline .......6

    E.    Eagle Responds To The SEC's Investigation, Fires Its Auditor, Delists Its Stock, And Continues To Hide The Truth ..............................................................................7

LEGAL STANDARDS ......................................................................................... 8

ARGUMENT ......................................................................................................... 9

    I.    The Court Should Reject Eagle's Request To Ignore The Incriminating Facts Revealed By Its Chief Commercial Officer ..........9

        A.    Plaintiffs' Investigation And Defendants' Admissions Show The Moran Complaint Is A Highly Reliable Source .......9

        B.    Courts Routinely Credit Facts Derived From Similarly Corroborated And Reliable Third-Party Complaints ...............12

    II.    Defendants Made Materially False And Misleading Statements ........17

        A.    Eagle's Admission That Its Financials Must Be Restated Means They Were False When Issued .....................................17

        B.    Defendants Misrepresented Facts, Not Opinions .....................20

        C.    Reporting Fake Revenue Despite Moran's Warnings Shows Eagle's Ineffective Internal Controls ..........................22

i

III.    Defendants Acted With Scienter ........................................................24

    A.    Tarriff Personally Conceived And Implemented The Scheme To Create Fictitious Pemfexy Sales ...........................24

    B.    Eagle's Board Conducted An Investigation Into Pemfexy Sales And As A Result Forced Tarriff To Resign ...................27

    C.    Defendant Cahill Acted With Scienter ...................................28

    D.    Additional Facts Further Support The Already Strong Inference Of Scienter ...............................................................30

        1.    Moran's Termination......................................................30

        2.    Restatement & Ineffective Internal Controls.................31

        3.    The SEC Investigation....................................................33

        4.    Tarriff's Motives And Insider Trading...........................34

        5.    Core Operations..............................................................35

    E.    Defendants' Competing Inference Is Not Plausible .................36

IV.    Defendants' Fraud Caused Investors' Losses ....................................37

V.    Tarriff And Cahill Are Also Liable As Eagle's Control Persons .......40

VI.    Plaintiffs Request Leave To Amend, If Necessary ............................40

CONCLUSION .................................................................................................. 40

# TABLE OF AUTHORITIES

<u>**CASES**</u>

*380544 Canada, Inc. v. Aspen Tech., Inc.*,
544 F. Supp. 2d 199 (S.D.N.Y. 2008) ....................................................13

*Amorosa v. Gen. Elec. Co.*,
2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022) ......................................................15

*Anastasio v. Internap Network Services Corp.*,
2011 WL 13124500 (N.D. Ga. Sept. 30, 2011) ....................................................27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................8

*Ass'n of N.J. Chiropractors, Inc. v. Data iSight, Inc.*,
2022 WL 4483596 (D.N.J. Sept. 27, 2022)............................................................15

*Baer v. Shift4 Payments, Inc.*,
2024 WL 3836676 (E.D. Pa. Aug. 14, 2024)................................................. 18, 19

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020)..................................................................14

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) ....................................................... 8, 10, 21

*Collier v. ModusLink Global Solutions, Inc.*,
9 F. Supp. 3d 61 (D. Mass. 2014)........................................................................31

*De Vito v. Liquid Holdings Grp., Inc.*,
2018 WL 6891832 (D.N.J. Dec. 31, 2018) ................................................. 37, 38

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ......................................................................38

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)......................................................... 17, 18

*Gearing v. China Agritech Inc.*,
    2012 WL 13008439 (C.D. Cal. Feb. 17, 2012)......................................................13

*Gimpel v. The Hain Celestial Grp., Inc.*,
    2025 WL 2749562 & n.13 (2d Cir. Sept. 29, 2025)...................................... 20, 33

*Hall v. Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008)....................................................................28

*Hedick v. Kraft Heinz Co.*,
    2021 WL 3566602 (N.D. Ill. Aug. 11, 2021)................................................ 19, 23

*IBT Emp. Grp. Welfare Fund v. Compass Minerals Int'l, Inc.*,
    706 F. Supp. 3d 1225 (D. Kan. 2023) ...................................................................16

*In re Akorn, Inc. Sec. Litig.*,
    240 F. Supp. 3d 802 (N.D. Ill. 2017)....................................................................30

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004) ......................................................... *passim*

*In re Bio-Tech Gen. Corp. Sec. Litig.*,
    380 F. Supp. 2d 574 (D.N.J. 2005)........................................................................31

*In re Bradley Pharms., Inc. Sec. Litig.*,
    421 F. Supp. 2d 822 (D.N.J. 2006).............................................................. 26, 38

*In re Campbell Soup Co. Sec. Litig.*,
    145 F. Supp. 2d 574 (D.N.J. 2001).............................................................. *passim*

*In re Connetics Corp. Sec. Litig.*,
    542 F. Supp. 2d 996 (N.D. Cal. 2008)..................................................................14

*In re Connetics Corp. Sec. Litig.*,
    2008 WL 3842938 (N.D. Cal. Aug. 14, 2008)......................................................15

*In re Eros Int'l PLC Sec. Litig.*,
    2021 WL 1560728 (D.N.J. Apr. 20, 2021)............................................. 21, 38, 39

iv

*In re Galena Biopharma, Inc. Sec. Litig.*,
  2021 WL 50227 (D.N.J. Jan. 5, 2021) ....................................................38

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013)....................................................33

*In re Gilat Satellite Networks, Ltd.*,
  2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005)........................................31

*In re Hertz Glob. Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018) ..................................................................19

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
  2017 WL 1536223 (D.N.J. Apr. 27, 2017)..............................................19

*In re Home Loan Servicing Sols., Ltd. Sec. Litig.*,
  2016 WL 10592320 (S.D. Fla. June 6, 2016).........................................28

*In re Lottery.com, Inc. Sec. Litig.*,
  715 F. Supp. 3d 506 (S.D.N.Y. 2024) ............................................. 20, 21

*In re Maiden Holdings, Ltd. Sec. Litig.*,
  2025 WL 2406864 (3d Cir. Aug. 20, 2025) ..................................... 21, 22

*In re Medicis Pharm. Corp. Sec. Litig.*,
  2010 WL 3154863 (D. Ariz. Aug. 9, 2010) ............................................32

*In re Mylan N.V. Sec. Litig.*,
  379 F. Supp. 3d 198 (S.D.N.Y. 2019)....................................................13

*In re Navient Corp. Sec. Litig.*,
  2019 WL 7288881 (D.N.J. Dec. 30, 2019) .............................................12

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 619 (S.D.N.Y. 2014)......................................................13

*In re Par Pharma. Sec. Litig.*,
  2009 WL 3234273 (D.N.J. Sept. 30, 2009)........................................ 28, 30, 39

*In re Sipex Corp. Sec. Litig.,*
  2005 WL 3096178 (N.D. Cal. Nov. 17, 2005).................................................. 27, 31

*In re Suprema Specialties, Inc. Sec. Litig.,*
  438 F.3d 256 (3d Cir. 2006) ............................................................................. 26, 34

*In re Synchronoss Tech., Inc. Sec. Litig.,*
  2020 WL 2786936 (D.N.J. May 29, 2020) ..............................................................32

*In re Teva Sec. Litig.,*
  671 F. Supp. 3d 147 (D. Conn. 2023) ....................................................................13

*In re Turquoise Hill Resources Ltd. Sec. Litig.,*
  625 F. Supp. 3d 164 (S.D.N.Y. 2022).....................................................................31

*In re UTStarcom, Inc. Sec. Litig.,*
  617 F. Supp. 2d 964 (N.D. Cal. 2009).....................................................................28

*In re: Enzymotec Sec. Litig.,*
  2015 WL 8784065 (D.N.J. Dec. 15, 2015) .............................................................23

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.,*
  620 F. Supp. 3d 167 (D.N.J. 2022).........................................................................11

*Institutional Invs. Grp. v. Avaya, Inc.,*
  564 F.3d 242 (3d Cir. 2009) ....................................................................... 24, 25, 37

*IBT Emp. Grp. Welfare Fund v. Compass Minerals Int'l, Inc.,*
  723 F. Supp. 3d 1053 (D. Kan. 2024) ....................................................................16

*Kanefsky v. Honeywell Int'l Inc.,*
  2020 WL 2520669 n.3 (D.N.J. May 18, 2020) ............................................... 17, 38

*Lako v. Loandepot, Inc.,*
  2023 WL 444151 (C.D. Cal. Jan. 24, 2023).........................................................13

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson,*
  2011 WL 2444675 (D. Del. June 14, 2011) ...........................................................25

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  363 F. Supp. 3d 476 (D. Del. 2019) ......................................................................13

*Lowry v. RTI Surgical Holdings, Inc.*,
  532 F. Supp. 3d 652 (N.D. Ill. 2021).....................................................................33

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) .................................................................................20

*McCabe v. Ernst & Young, LLP*,
  494 F.3d 418 (3d Cir. 2007) ..................................................................................38

*McIntire v. China MediaExpress Holdings, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013)....................................................................30

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ...............................................................................................21

*Payne v. DeLuca*,
  433 F. Supp. 2d 547 (W.D. Pa. 2006) ...................................................................18

*Phillips v. Cnty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ..................................................................................40

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
  631 F.3d 436 (7th Cir. 2011)..................................................................................15

*Plumbers Union Loc. No. 12 Pension Fund v. Ambassador's Grp.*,
  2010 WL 2264962 (E.D. Wash. June 2, 2010) ......................................................33

*S.E.C. v. Kelly*,
  663 F. Supp. 2d 276 (S.D.N.Y. 2009) .............................................................. 18, 19

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
  732 F. Supp. 3d 300 (S.D.N.Y. 2024)....................................................... *passim*

*Schwab Cap. Tr. v. Celgene Corp.*,
  2021 WL 1085474 (D.N.J. Mar. 22, 2021) ...........................................................13

vii

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
  351 F. Supp. 3d 874 (E.D. Pa. 2018)........................................................................36

*Semerenko v. Cendant Corp.*,
  223 F.3d 165 (3d Cir. 2000) ...............................................................................8, 37

*Shah v. Zimmer Biomet Holdings, Inc.*,
  2019 WL 762510 (N.D. Ind. Feb. 20, 2019) ........................................................14

*Sherman v. Abengoa, S.A.*,
  2025 WL 2825369 (2d Cir. Oct. 6, 2025) .............................................................13

*Strougo v. Mallinckrodt PLC*,
  2022 WL 17740482 (D.N.J. Dec. 16, 2022) .........................................................30

*Subramanian v. Lupin Inc.*,
  2020 WL 7029273 (S.D.N.Y. Aug. 21, 2020) .........................................................4

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ...................................................................................... 24, 34

*Touchstone Strategic Tr. v. Gen. Elec. Co.*,
  2022 WL 4536800 (S.D.N.Y. Sept. 28, 2022) ......................................................15

*U.S. Sec. & Exch. Comm'n v. Mintz*,
  723 F. Supp. 3d 386 (D.N.J. 2024)........................................................................24

*United States Sec. & Exch. Comm'n v. Winemaster*,
  529 F. Supp. 3d 880 (N.D. Ill. 2021)................................................. 18, 19, 26, 35

*Urban Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015)....................................................................35

*Utesch v. Lannett Co., Inc.*,
  385 F. Supp. 3d 408 (E.D. Pa. 2019)............................................................. 13, 16

*Vanderhoof v. China Auto Logistics, Inc.*,
  2021 WL 3260849 (D.N.J. July 30, 2021) ..................................................... 27, 40

*Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
   28 F. Supp. 3d 93 (D. Mass. 2014)................................................................. 32, 33

*West Palm Beach Police Pension Fund v. DFC Global Corp.*,
   2015 WL 3755218 (E.D. Pa. June 16, 2015) .......................................................28

*Wu v. GSX Techedu Inc.*,
   738 F. Supp. 3d 527 (D.N.J. 2024).............................................................. 20, 29

*zCap Equity Fund LLC v. LuxUrban Hotels Inc.*,
   2025 WL 2097951 (S.D.N.Y. July 25, 2025).......................................................20

**STATUTES**

15 U.S.C. § 78u-4(b).............................................................................................8

**RULES**

Fed. R. Civ. P. 9(b) ..............................................................................................8

Fed. R. Civ. P. 15(a)...........................................................................................40

**REGULATIONS**

17 C.F.R. § 210.4-01(a)(1)...................................................................................18

17 C.F.R. § 240.10b5-1(c)(A)..............................................................................34

## INTRODUCTION

This securities fraud class action is about Eagle's admittedly false accounting for a sham sale of its branded chemotherapy drug Pemfexy, and the Company's admittedly deficient internal controls over financial reporting.[1] Eagle began selling Pemfexy in the first quarter of 2022, reporting strong results and touting the drug's importance to the Company. Pemfexy was not a novel drug, it was merely derivative of Eli Lilly's Alimta. Nevertheless, Defendants set Pemfexy's price at thousands of dollars per 20 milliliter vial. As such, demand plummeted when cheaper generic drugs entered the market in the second quarter of 2022. Defendants then resorted to fraud in order to report a fake Pemfexy "sale" as millions of dollars in revenue.

As revealed by a former senior executive at Eagle turned whistleblower, the Company's founder and then-CEO, Defendant Tarriff, personally implemented a scheme under which Eagle paid a drug wholesaler to accept Pemfexy that the wholesaler did not want and could not sell to end users before its expiration, and which it could simply return to Eagle free of charge. Eagle then counted this sham "sale" to the wholesaler as revenue. Based on the whistleblower's revelations, the SEC began an investigation that remains ongoing, and Eagle conducted an internal

---

[1] Capitalized terms used but not defined have the same meanings as in the amended complaint (ECF No. 27, "Complaint" or "¶__"). References to the "Ex. __" are to the exhibits to the Declaration of Garth Spencer, filed herewith. "MTD" refers to Defendants' memorandum in support of their motion to dismiss (ECF No. 33-1). Unless noted, all internal quotes and citations are omitted, and all emphasis is added.

1

investigation leading it to force Tarriff to resign in November 2023. Eagle even revealed that when Tarriff resigned it was considering terminating him with cause.

Eagle has since announced that all of its financial statements from the second quarter of 2022 to the second quarter of 2023 did not comply with GAAP, cannot be relied on, and need to be restated, because Eagle improperly recognized revenue upon delivery of Pemfexy to a wholesale customer—*precisely mirroring the whistleblower's revelations*. Now, almost two years after Eagle completed its investigation and forced Tarriff to resign, its former CFO Defendant Cahill has "resigned," and the Company still has not published corrected 2022 financials, has fired its former external auditor Ernst & Young, has stopped filing reports with the SEC, and has delisted its stock from trading on the NASDAQ exchange.

Defendants cannot dispute these highly incriminating facts. Instead, their arguments for dismissal boil down to the quibble that Plaintiffs have not pled certain evidence that they cannot obtain prior to discovery (due to Defendants' ongoing efforts to conceal it). But Plaintiffs need not prove their case at the outset to plausibly allege the falsity of Defendants' statements and plead a strong inference of their scienter. After an extensive investigation based on reliable, mutually corroborating sources, Plaintiffs have pled in detail the "who, what, when, and where" of the fraud—Tarriff artificially inflated Eagle's revenue by millions of dollars via a sham sale of Pemfexy to a wholesaler on the last day of the second quarter of 2022.

2

Defendants' spin on the Complaint's allegations, that Eagle merely provided "good-faith incentives" to a wholesaler and its accounting was innocently mistaken, is belied by the extraordinary facts at issue. It is almost unheard of for a corporation's third highest-ranking officer to publicly accuse the CEO of fraud, and rarer still for the company to admit that its revenue was overstated *in the exact manner described by the whistleblower*. Companies do not investigate their CEOs, force them to resign, and publicly raise termination *with cause*, absent culpable misconduct. Companies with nothing to hide do not silence whistleblowers, cease reporting to the SEC, and withhold restated financials from their investors. Defendants' motion fails to negate the strong inference of their fraud, and should be denied.

## FACTUAL BACKGROUND

### A.    Shortly After Eagle Launched Its Key Drug Pemfexy In February 2022, Demand Plummeted

Pemfexy is a form of pemetrexed, an intravenously-administered cancer agent indicated for locally advanced or metastatic non-small cell lung cancer and mesothelioma. ¶24. Pemfexy is a branded competitor to the original FDA-approved pemetrexed product, Eli Lilly's Alimta. *Id.* Eli Lilly's period of regulatory exclusivity for Alimta, during which no other pemetrexed products could be sold without Eli Lilly's consent, was due to expire on May 24, 2022. ¶25. Pursuant to an agreement with Eli Lilly, Eagle began selling Pemfexy in February 2022. *Id.*

Defendants set prices for Pemfexy at thousands of dollars per 20 milliliter

3

vial, and created high expectations for its commercial success. ¶¶26-29. Pemfexy was Eagle's top-selling product for the first quarter ("1Q") of 2022, with $37.2 million in revenue, accounting for 41.3% of the Company's total product sales. ¶31. However, with the expiration of Alimta's regulatory exclusivity multiple generic pemetrexed products entered the market, and at the same time drug wholesalers who had made large initial stocking purchases of Pemfexy in the first quarter ceased doing so. ¶¶34-41. Beginning in 2Q 2022, demand for Pemfexy plummeted. *Id.*

**B.      Defendant Tarriff Personally Implemented The "Buy And Hold" Program To Report Fake Pemfexy Revenue**

As revealed in a lawsuit filed by Eagle's former Chief Commercial Officer, Michael Moran, Defendants carried out a scheme in the second quarter of 2022 to make fake "sales" of Pemfexy to wholesalers. ¶¶43-55; ECF No. 27-5 ("Moran Complaint"). ¶44. Defendants referred to this as the "Buy and Hold" program. ¶45. Tarriff ignored warnings from Moran and others that Eagle's customers were already fully stocked with Pemfexy inventory, and that his plan constituted illegal channel stuffing. ¶¶46, 48.[2] Tarriff personally led the effort to induce Eagle's wholesalers to accept Pemfexy under the Buy and Hold program. ¶¶49-54.

---

[2] "Channel stuffing is the practice of intentionally oversupplying distributors with products in order to artificially inflate sales and revenue.  In so doing, a company . . . essentially 'robs Peter to pay Paul'—that is, the company inflates revenue for one financial quarter by stealing revenue from a future financial quarter or quarters; and it misrepresents the company's financial status." *Subramanian v. Lupin Inc.*, 2020 WL 7029273, at *1 (S.D.N.Y. Aug. 21, 2020) (cleaned up).

On the very last day of the second quarter of 2022, Eagle entered into a sham Pemfexy "sale" with a wholesaler customer (which was led by a close personal friend of Tarriff) for a large amount of Pemfexy, whereby Eagle would *pay* the wholesaler for accepting the Pemfexy, and the wholesaler could later return the Pemfexy to Eagle *without ever paying for it*. ¶52. The wholesaler "already had a HUGE, non-moving, aging inventory of PEMFEXY because the competing generic products had come into the market," and at its current sales rate the wholesaler's Pemfexy inventory would expire before it could be sold to end users. ¶53.

Eagle reported $16.5 million in 2Q 2022 revenue from Pemfexy sales, artificially inflated by the sham sale. ¶¶75-84. Eagle incorporated these falsified figures into its financial statements for 3Q 2022, the full year ("FY") 2022, 1Q 2023, and 2Q 2023. ¶¶85-119. Although Eagle was scheduled to publish its 3Q 2023 results on November 9, 2023 (¶127), to this day it has never done so.

### C.    Eagle Admits That Its Financial Reporting For Pemfexy Must Be Restated, Causing Its Stock Price To Plummet

On November 9, 2023, instead of publishing 3Q 2023 results as planned, Eagle announced that it "expects potential adjustments to reserves for returns and price adjustments of approximately $15.0 million to $20.0 million," which "primarily relate to returns and a price adjustment for PEMFEXY® substantially stemming from slower-than-anticipated pull-through from one wholesale customer predominantly due to expiry of inventory." ¶56. On this news, Eagle's share price

fell 30.4% to close at $9.54 per share on November 9, 2023. ¶129.

On December 15, 2023, Eagle admitted that its 2Q 2023 financials did not comply with GAAP, cannot be relied on, must be restated, and that reserves "relating to returns and price adjustments for PEMFEXY® did not reflect certain information that should have been considered at the time the Company prepared its financial statements." ¶57. On October 2, 2024, Eagle admitted that its financial statements for 2Q 2022 through 1Q 2023 also did not comply with GAAP, should not be relied on, and must be restated. ¶58. As Eagle explained, "revenue previously recognized related to a sale of PEMFEXY" to a wholesale customer "in the second quarter of 2022 did not meet certain criteria of" GAAP "when originally recorded." *Id.* Eagle's share price fell 39.9% to close at $2.14 per share on October 2, 2024, and continued plummeting for a total loss of 74.7% in only three days. ¶146.

### D.  After Investigating Pemfexy Sales Eagle Forced Tarriff To Resign, Causing Another Precipitous Stock Price Decline

On November 29, 2023, Eagle abruptly announced Tarriff's "resignation" effectively immediately, and stated that "[a]fter consideration of various alternatives, including termination with or without cause, the Board accepted Mr. Tarriff's resignation." ¶192. On this news, Eagle's share price fell 31.0%, to close at $5.68 per share on November 29, 2023. ¶133. As later admitted by Tarriff's counsel, "Eagle had conducted an internal investigation into the PEMFEXY inventory issue, and as a result the Company pressured Mr. Tarriff to resign." ¶192.

6

### E.    Eagle Responds To The SEC's Investigation, Fires Its Auditor, Delists Its Stock, And Continues To Hide The Truth

Since October 2023, shortly after Moran filed his complaint, Eagle and Tarriff have been responding to an SEC investigation "focused on accounting issues similar to those alleged in the [Moran] Whistleblower Action" (¶149), which issues "center around the revenue recognition for PEMFEXY" (¶153).

In February 2024, Eagle announced plans to fire 36% of its employees. ¶136. In March 2024, Eagle abruptly announced Defendant Cahill's "resignation" as CFO, with no permanent successor in place. ¶137. In November 2024 Eagle delisted its stock from trading on the NASDAQ exchange (¶157), and dismissed its external auditor Ernst & Young LLP (¶154). Despite Eagle's repeated claims that it would publish restated financials for 2Q 2022 through 2Q 2023, it has never done so. ¶¶134, 138-43, 144. Instead, Eagle deregistered its securities and ceased SEC reporting as of January 2025, leaving investors in the dark. ¶¶157-59.

On September 17, 2025, Eagle belatedly published to its website financial statements for FY 2023 and FY 2024. Ex. 1. While those financial statements provide limited information about certain restated line items as of year-end 2022, in the process confirming that Pemfexy sales for 2022 were materially overstated, they expressly *do not* provide information concerning "the 2022 consolidated financial statements as a whole," and do not provide restatements of quarterly periods. *Id.* at 2, F-5, F-19 – F-22. Despite admitting that 2Q 2022 and later periods must be

7

restated to correct millions of dollars of inflated Pemfexy revenue, years later Eagle is still withholding the complete truth from its investors.

## LEGAL STANDARDS

On a motion to dismiss, the Court "must accept the allegations of the complaint as true and draw all reasonable inferences in the light most favorable to the plaintiffs." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 180 (3d Cir. 2000). A complaint need only "contain sufficient factual matter . . . to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Securities fraud claims must be pled with particularity, and raise a "strong inference" of defendants' scienter. 15 U.S.C. § 78u-4(b); Fed. R. Civ. P. 9(b). "However, because application of the Rule prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud[,] . . . the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 584 (D.N.J. 2001).

The elements of Plaintiffs' claims under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") are: "(i) a misrepresentation or omission of material fact; (ii) scienter; (iii) a connection with the purchase or sale of a security; (iv) reliance; (v) economic loss; and (vi) loss causation." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 679 (3d Cir. 2023).

8

## **ARGUMENT**

I.     **The Court Should Reject Eagle's Request To Ignore The Incriminating Facts Revealed By Its Chief Commercial Officer**

A.     **Plaintiffs' Investigation And Defendants' Admissions Show The Moran Complaint Is A Highly Reliable Source**

Defendants' attacks on the Moran Complaint's credibility are factually inaccurate. Defendants claim Moran's allegations were "withdrawn" and "abandoned," but that is wrong. MTD 7, 13. After weeks of talks during which Eagle told the court "the parties have reached an agreement in principle to resolve this matter," Eagle then reported the case was "fully resolved," and it was voluntarily dismissed "with each party bearing its own fees and costs." Exs. 4-7. These are the hallmarks of a confidential settlement, not a plaintiff "withdrawing" his claims.

Defendants assert that "Plaintiffs never even spoke to Moran or his counsel" (MTD 6, 12), but Plaintiffs' counsel did contact, and speak with, Moran's counsel, who would not discuss Moran's allegations. ¶203. Plaintiffs' investigator also attempted to contact Moran directly, but he did not respond. As alleged, Moran's counsel's response was most likely due to Eagle requiring non-disclosure as a condition of its settlement with Moran. ¶¶202-03. Defendants do not deny this. They cannot procure Moran's unavailability and then be heard to complain that Plaintiffs' efforts to interview him have been unsuccessful.

Defendants argue Moran's allegations are "hearsay-based" and "speculative,"

9

and that he "admits he had no visibility into wholesaler interactions." MTD 6, 16. But the paragraphs they cite contain no such "admission," instead merely stating that Tarriff took over sales to Community Oncology customers. Moran Complaint ¶¶83, 89. Defendants' argument is belied by Eagle's letter filed in Moran's lawsuit, stating that his "claims center around alleged conduct of which he was aware and which he affirmatively approved." Ex. 2 at 2; *id.* at 4 (Moran "participated in approving the very programs and marketing he now claims are illegal").

Defendants claim Plaintiffs "never investigated" Moran's allegations (MTD 1). That too is false. Plaintiffs conducted an extensive investigation, encompassing all sources available to them prior to discovery that could shed light on Moran's claims and Defendants' fraud. Plaintiffs' investigation included, *inter alia*: Eagle's SEC filings, press releases, and conference calls; court filings in Moran's lawsuit, and in a lawsuit by Tarriff against Eagle; consultation with an accounting expert; and interviews with former employees of Eagle. *See* Complaint at p. 1. Plaintiffs' investigator also reached out to a wholesaler customer of Eagle's, who did not respond. Some of the Eagle former employees contacted by the investigator declined to be interviewed, citing confidentiality agreements. Again, Defendants cannot make witnesses unavailable and then fault Plaintiffs for not being able to interview them.

The strongest corroboration of Moran's allegations comes from Defendants' own admissions. *See Prudential*, 70 F.4th at 692 (crediting allegations from former

10

employee that were corroborated by company's public statements). Closely tracking Moran's claim of a sham Pemfexy sale to a wholesaler on June 30, 2022 (¶¶52-53), Eagle admits that it improperly recognized revenue from a "sale" of Pemfexy to a wholesaler in 2Q 2022 (¶¶56-58). Defendants' brief implicitly admits the need to restate 2Q 2022 relates to Moran's allegations, by baldly asserting that the need to restate 2Q 2023 is not related to Moran (which Plaintiffs dispute), while conspicuously failing to make any similar claim relating to 2Q 2022. MTD 6-7.

As discussed above, Eagle admits that "[Moran]'s claims center around alleged conduct of which he was aware," and that he "participated in approving the very programs and marketing he now claims are illegal." Ex. 2 at 2-4. As such, and given his role as Eagle's Chief Commercial Officer (*i.e.*, head of sales), reporting directly to Tarriff, Moran was no doubt in a position to know about Eagle's sham Pemfexy sale and Tarriff's role in it. ¶¶43, 198-99.[3] *See Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 179 & 193-94 (D.N.J. 2022) (crediting allegations from former employee who was a "senior executive" with relevant knowledge). Strongly supporting Moran's allegation that Tarriff personally led the sham sale (¶52), Tarriff admits that shortly after Moran

---

[3] Defendants argue that Moran is not an accountant, but that is irrelevant. Plaintiffs do not rely on Moran for accounting opinions, but rather for Tarriff's conduct and the facts of the sham Pemfexy sale. Besides, Eagle has already admitted it improperly overstated Pemfexy revenue in violation of GAAP. *See infra* Part II.A.

11

filed his complaint Eagle "conducted an internal investigation into the PEMFEXY inventory issue, and as a result the Company pressured Mr. Tarriff to resign" (¶192).

Further corroborating Moran, Plaintiffs' counsel interviewed former Eagle employees including Senior Regional Sales Director Dawn Vallone, who reported directly to Moran. ¶207. Vallone confirmed the Microsoft Teams meeting with Tarriff, Moran, and his direct reports, which took place around April 21, 2022. ¶209; Moran Complaint ¶80. Like Moran, Vallone recalled Tarriff stating in the meeting that he would begin selling Pemfexy himself. ¶209; Moran Complaint ¶¶82-83. Vallone also confirmed that during 2Q 2022 "customers were not ordering Pemfexy, in part because customers like CVS Specialty pharmacy were already full of Pemfexy inventory" (¶211), echoing Moran's claims (*e.g.*, Moran Complaint ¶76).[4]

Plaintiffs' thorough investigation and the foregoing sources more than suffice to show the reliability of the facts revealed in the Moran Complaint.

### B.    Courts Routinely Credit Facts Derived From Similarly Corroborated And Reliable Third-Party Complaints

Courts often credit facts sourced from complaints in other lawsuits, particularly where plaintiffs have taken reasonable steps to investigate or the complaints bear indicia of reliability. *E.g.*, *In re Navient Corp. Sec. Litig.*, 2019 WL 7288881, at *8 (D.N.J. Dec. 30, 2019) (crediting allegations sourced from

---

[4] Moran's credibility is still further enhanced by the high regard, for both his knowledge and integrity, that his former colleagues hold him in. ¶¶205-07.

governmental complaint); *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 494 (D. Del. 2019) (similar); *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 419 n.7 (E.D. Pa. 2019) (similar); *Schwab Cap. Tr. v. Celgene Corp.*, 2021 WL 1085474, at *10 (D.N.J. Mar. 22, 2021) (approving use of former employee allegations sourced from a different securities class action complaint).[5]

Facts from a complaint in another action are subject to the general rules of pleading, not a heightened standard. *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 224-25 (S.D.N.Y. 2008) ("The Court must accept Plaintiffs' allegations in the Complaint as true, regardless of whether the allegations are taken from a complaint in another case"). There is no rule barring reliance on such facts at the pleading stage. *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214 (S.D.N.Y. 2019) ("the weight of authority holds that plaintiffs may base factual allegations on complaints from other proceedings because neither Circuit precedent nor logic

---

[5] *See also, e.g., Sherman v. Abengoa, S.A.*, --- F.4th ----, 2025 WL 2825369, at *8 (2d Cir. Oct. 6, 2025) ("district courts within this Circuit have regularly permitted plaintiffs to incorporate allegations made in other complaints or proceedings"); *In re Teva Sec. Litig.*, 671 F. Supp. 3d 147, 192 (D. Conn. 2023) (plaintiffs "were permitted to reallege allegations brought in prior complaints drafted by experienced counsel or governmental investigators"); *Lako v. Loandepot, Inc.*, 2023 WL 444151, at *5 (C.D. Cal. Jan. 24, 2023) ("So long as the facts contained in a different complaint are investigated independently by plaintiffs' counsel, it is not improper to rely on such complaints for evidentiary support"); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014) ("While allegations from another lawsuit are not evidence . . . plaintiffs need not provide admissible proof at this stage."); *Gearing v. China Agritech Inc.*, 2012 WL 13008439, at *3 (C.D. Cal. Feb. 17, 2012) (denying motion to strike allegations sourced from other complaint).

13

supports . . . an absolute rule against doing so").

The reasoning behind this majority position is both clear and persuasive: "[i]t makes little sense to say that information . . . which [the complaint] could unquestionably rely on if it were mentioned in a news clipping . . . is immaterial simply because it is conveyed in an unadjudicated complaint." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 414 (S.D.N.Y. 2020); *Shah v. Zimmer Biomet Holdings, Inc.*, 2019 WL 762510, at *8 (N.D. Ind. Feb. 20, 2019) (similar). So too here, the detailed facts revealed in a lawsuit filed by Eagle's third highest-ranking officer are no less reliable than if they were conveyed in a news article or confidential witness interview.

Defendants cite a handful of inapposite cases taking a minority position to discount allegations from other complaints, including cases where, unlike here, the plaintiffs apparently performed no independent investigation whatsoever. *E.g.*, *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (a party cannot "rely *entirely* on another complaint as the *sole* basis for his or her allegations") (emphasis in original). On closer reading *Connetics* supports Plaintiffs. After striking allegations because the plaintiffs "[made] no effort to inform the Court what other sources of information besides the SEC complaint and press release they relied on" (*id.*), the court *denied* a subsequent motion to strike, because the plaintiffs by then had "explained what other sources they rely on to formulate their factual

14

allegations and have explained how these other sources corroborate some, though not all, of the allegations from the SEC complaint." *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *4 (N.D. Cal. Aug. 14, 2008); *id.* (plaintiffs interviewed a former employee, and their unsuccessful attempts to interview other former employees showed that "certain information found only in the SEC complaint may be too difficult or impossible to acquire absent formal discovery").

Defendants similarly rely on other cases that arose in the distinguishable context of individual opt outs from a securities class action simply copying the class complaint as their own, without independent investigation. *E.g. Amorosa v. Gen. Elec. Co.*, 2022 WL 3577838, at *3 (S.D.N.Y. Aug. 19, 2022); *Touchstone Strategic Tr. v. Gen. Elec. Co.*, 2022 WL 4536800, at *1 (S.D.N.Y. Sept. 28, 2022). These cases are further inapposite as they involved credibility concerns relating to the opt out plaintiffs' use of allegations from interviews of anonymous witnesses unknown to them. *Amorosa*, 2022 WL 3577838, at *1. Such concerns do not apply to the Moran Complaint, filed by Eagle's former Chief Commercial Officer in his own name, and corroborated by Plaintiffs' thorough investigation.[6]

---

[6] Defendants' other cases are similarly distinguishable. *E.g.*, *Ass'n of N.J. Chiropractors, Inc. v. Data iSight, Inc.*, 2022 WL 4483596, at *2 (D.N.J. Sept. 27, 2022) (plaintiffs "took *no steps* to independently verify the accuracy of the allegations"); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 444 (7th Cir. 2011) (plaintiff improperly sought to rely on other complaints when data in its own possession should have sufficed to plead its claims).

Two recent decisions in *Compass Minerals* are instructive. The court denied a motion to strike allegations derived from an SEC consent order where plaintiffs' investigation also included "SEC filings, press releases, analyst and media reports, [and] other public reports." *IBT Emp. Grp. Welfare Fund v. Compass Minerals Int'l, Inc.*, 706 F. Supp. 3d 1225, 1244 & 1246 (D. Kan. 2023). Defendants moved for an interlocutory appeal, which the court denied, synthesizing the case law as follows:

> there is no dispute as to the governing law. Indeed, all cases cited by the parties reflect the same three principles: (1) a wholesale failure to investigate violates Rule 11(b), (2) allegations may rely on third-party sources as long as the underlying investigation is reasonable under the circumstances, and (3) plaintiffs may show their investigations were reasonable by including factual allegations separate from those relying on the third-party sources.

*IBT Emp. Grp. Welfare Fund v. Compass Minerals Int'l, Inc.*, 723 F. Supp. 3d 1053, 1060–61 (D. Kan. 2024). Here, Plaintiffs conducted an extensive investigation that corroborated the Moran Complaint using independent sources including Eagle's SEC filings, interviews with former Eagle employees, and Defendants' court filings. *See supra* Part I.A. Nothing more is required. *See Lannett Co.*, 385 F. Supp. 3d at 421 n.7 & n.9 (crediting facts sourced from a state attorneys general complaint where plaintiffs' investigation included former employee interviews, company's SEC filings and press releases, and other public information).

The Moran Complaint is highly detailed and reliable on its face, and is corroborated by Plaintiffs' thorough investigation. The Court should reject

16

Defendants' request to ignore these highly relevant, reliable, and incriminating facts.

## II.    Defendants Made Materially False And Misleading Statements

### A.    Eagle's Admission That Its Financials Must Be Restated Means They Were False When Issued

Defendants misapprehend the nature of a restatement by arguing Eagle's need to restate is due to *new* data only available *after* the financials were issued. *E.g.*, MTD 1, 23. Not so.[7] "Pursuant to [GAAP], previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were originally issued." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004); *accord Kanefsky v. Honeywell Int'l Inc.*, 2020 WL 2520669, at *2 n.3 (D.N.J. May 18, 2020); *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017). Indeed, Eagle's own SEC filings admit the need to restate its financials is due to information that existed when they were issued. ¶134 (Pemfexy reserves "did not reflect certain information that should have been considered *at the time the Company prepared its financial statements*"); ¶144 (Eagle "concluded that revenue previously

---

[7] What Defendants describe is defined by GAAP as a "Change in Accounting Estimate." *See* Ex. 3 at p. 4 ("Changes in accounting estimates result from new information"). Such changed estimates "shall not be accounted for by restating" prior periods. *Id.* at ASC 250-10-45-17. In stark contrast, a "Restatement" of prior periods is required to correct "[a]n error in . . . financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared." *Id.* at p. 5; ASC 250-10-45-23.

recognized related to a sale of PEMFEXY in the second quarter of 2022 did not meet certain criteria of [ASC 606] *when originally recorded*").

Because a restatement corrects material errors that existed when the financial statements were prepared, "the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *Atlas Air,* 324 F. Supp. 2d at 486; *comScore*, 268 F. Supp. 3d at 544.[8] SEC regulations similarly provide that financial statements "which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading." 17 C.F.R. § 210.4-01(a)(1); *see also Campbell Soup*, 145 F. Supp. 2d at 592.

Eagle has repeatedly admitted that, due in large part to its improper recognition of revenue upon delivery of Pemfexy to a wholesale customer in 2Q 2022, its financial statements from 2Q 2022 to 3Q 2022 do not comply with GAAP, must be restated, and cannot be relied on. ¶¶134-35, 138-45; Ex. 1 at F-19 – F-22. Therefore, that Eagle "had to restate its financial statements due to the improper recognition of revenue from the subject transactions sufficiently demonstrates that the financial statements were false when made." *United States Sec. & Exch. Comm'n v. Winemaster*, 529 F. Supp. 3d 880, 908 (N.D. Ill. 2021).

---

[8] *See also Baer v. Shift4 Payments, Inc.*, 2024 WL 3836676, at *8 (E.D. Pa. Aug. 14, 2024) ("the restatement rendered the prior classification of customer acquisition costs misleading."); *Payne v. DeLuca*, 433 F. Supp. 2d 547, 577 (W.D. Pa. 2006) (similar); *S.E.C. v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) (similar).

18

Defendants argue that their false financials should be analyzed as statements of opinion, but only *one* of the cases they cite involved a restatement, and even that case did not analyze falsity as to the restated financial information. *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *8 (D.N.J. Apr. 27, 2017).[9] As such Defendants' cases provide no support for their contention that an opinion analysis is necessary to establish the falsity of restated financial data. Courts have found improper revenue recognition or comparable GAAP violations to show falsity solely on the basis of a restatement, without any opinion analysis. *See, e.g.*, *Winemaster*, 529 F. Supp. 3d at 908-10 (revenue recognition for sale of goods subject to right of return); *Kelly*, 663 F. Supp. 2d at 285 (revenue recognition); *Atlas Air*, 324 F. Supp. 2d at 486 (inventory obsolescence, bad debt allowance, and asset impairment).

At least one court in this Circuit has implicitly rejected the argument that restated financials must be analyzed as opinions, holding that a restatement alone establishes falsity. *See Shift4 Payments*, 2024 WL 3836676, at *8. And the Second Circuit recently held that a company's "restatement of its financial results . . . suffice[s] to establish that these statements were in fact false at the time they were

---

[9] While *Hertz* analyzed statements about the company's GAAP compliance under an opinion framework, such statements are distinct from factual financial data. Further, contrary to *Hertz* many other courts have held similar statements about GAAP compliance to be statements of fact. *E.g.*, *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *9 (N.D. Ill. Aug. 11, 2021) (collecting cases). While *Hertz* was affirmed on appeal, the Third Circuit analyzed only scienter and not falsity. *See generally In re Hertz Glob. Holdings Inc.*, 905 F.3d 106 (3d Cir. 2018).

19

made," while distinguishing such statements from Sarbanes Oxley certifications treated as "statements of opinion." *Gimpel v. The Hain Celestial Grp., Inc.*, --- F.4th ----, 2025 WL 2749562, at *10 & n.13 (2d Cir. Sept. 29, 2025).

## B.    Defendants Misrepresented Facts, Not Opinions

Even if restatement were not sufficient to plead falsity—as shown *supra*, it is sufficient—an opinion analysis would not apply here because Defendants' statements about Pemfexy revenue were statements of fact, not opinion. *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 544 (S.D.N.Y. 2024) ("misreported financial data are false statements of fact"); *zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, 2025 WL 2097951, at *20 (S.D.N.Y. July 25, 2025) (rejecting argument that restated financials reflected opinions).

As Eagle admits, "revenue previously recognized related to a sale of PEMFEXY in the second quarter of 2022 did not meet certain criteria of [ASC 606] when originally recorded." ¶144. This was not merely a debatable judgment call, the "sale" expressly "did not meet" the criteria for revenue recognition. The impropriety of recognizing revenue from such a sham transaction is obvious. *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) (channel stuffing is fraudulent "when it is used . . . to book revenues on the basis of goods shipped but not really sold because the buyer can return them. They are in effect sales on consignment, and such sales cannot be booked as revenue."); *Wu v. GSX Techedu*

20

*Inc.*, 738 F. Supp. 3d 527, 554 (D.N.J. 2024) ("the Company's paying third parties to generate revenue could not count as Company revenue").[10]

Even if the false Pemfexy revenue figures were opinions (they were not), they would be actionable. A statement of opinion "is misleading if it: (i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *Prudential*, 70 F.4th at 686. Under this standard a "statement of opinion is misleadingly incomplete and thus unlawful if the speaker omits known material facts about his basis for holding that view." *In re Maiden Holdings, Ltd. Sec. Litig.*, --- F.4th ----, 2025 WL 2406864, at *1 (3d Cir. Aug. 20, 2025); *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188–89 (2015).

Eagle's financial statements reasonably implied that the Company had made a *bona fide* sale of millions of dollars-worth of Pemfexy in 2Q 2022, while misleadingly omitting that Defendants lacked any reasonable basis for their accounting treatment because Eagle paid its customer to hold unwanted Pemfexy that could be returned free of charge, and that was likely to expire before it could be sold to end users. ¶¶52-53. That is actionably misleading. *See In re Eros Int'l PLC Sec. Litig.*, 2021 WL 1560728, at *8 (D.N.J. Apr. 20, 2021) (intangible asset

---

[10] *See also Lottery.com*, 715 F. Supp. 3d at 546 ("surely any GAAP standard that might be in play would support the position that, for example, claiming to have sold $30 million of a product – when no such sale took place – contravenes GAAP").

21

valuation was misleading under *Omnicare* where it "lacked a reasonable basis").[11]

### C.    Reporting Fake Revenue Despite Moran's Warnings Shows Eagle's Ineffective Internal Controls

Defendants told investors that "management concluded that the Company's internal control over financial reporting was effective as of December 31, 2022," (¶105) and that no changes had materially affected its internal controls over the Class Period (¶¶83, 93, 109, 118). However, when announcing that all periods from 2Q 2022 to 2Q 2023 must be restated, Eagle admitted that it "expects to conclude that one or more material weaknesses related to the foregoing [Pemfexy revenue recognition] matters existed in the Company's internal control over financial reporting and that the Company's disclosure controls and procedures were not effective" for each such period. ¶58; *see also* ¶¶57, 155.

Although Eagle has withheld restated 2022 financials from investors, the belatedly published 2023-24 financial statements reveal that it identified seven "material errors" in its 2022 financials, and seven other purportedly "immaterial errors." Ex. 1 at F-19 – F-22. The sheer volume of such errors, combined with Eagle's other admissions, clearly shows that Eagle's internal controls over financial

---

[11] Defendants also argue that the revenue recognition rules they violated can require complex judgments as to the probability that payment will be collected, but that is not true here because the "sale" lacked economic substance. Regardless, any such complexity would not shield Defendants from liability. *Maiden Holdings*, 2025 WL 2406864, at *9 ("The complexity of Maiden's loss reserve determinations did not give Maiden free rein to omit any known contradictory evidence").

reporting were severely deficient throughout the entire Class Period.

Further showing such deficiencies, Eagle stated in a letter filed in Moran's lawsuit that "[t]wo of the [Company's] internal controls are a Compliance Committee and a Corporate Disclosure Committee," and in his "role as a Senior Executive at Eagle, [Moran] was a member of both." Ex. 2. Moran repeatedly warned against Eagle's illegal channel stuffing scheme,[12] even making an internal complaint to Eagle's head of Human Resources. ¶¶46, 48, 161. However, rather than addressing Moran's valid concerns, Eagle promptly fired him. ¶¶161-62. Firing a member of the compliance and corporate disclosure committees for raising concerns about non-compliance and misleading disclosures shows that Eagle's internal controls were not merely ineffective, but were purposefully thwarted by Defendants.

That Defendants intentionally evaded Eagle's internal controls, which Eagle admits were ineffective, shows their statements were false when made. *See Kraft Heinz*, 2021 WL 3566602, at *7 (falsity of internal control statements pled where the company "admitted that its internal controls were deficient"); *In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015) (internal control statements false where "the internal controls were deficient, such that Defendants

---

[12] While Eagle's letter claims that Moran approved Defendants' misconduct, that is contradicted by Moran's allegations and by Eagle's own letter, which argues that "Plaintiff's alleged disagreements, which were often voiced obliquely at best, do not rise to the level of protected activity," thereby admitting (while attempting to downplay the fact) that Moran raised such disagreements. Ex. 2.

23

were allowed to engage in the allegedly fraudulent behavior").

## III.    Defendants Acted With Scienter

To plead scienter, a complaint must state facts giving rise to a strong inference of "either reckless or conscious behavior." *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 267, 280 (3d Cir. 2009). Recklessness is "an extreme departure from the standards of ordinary care." *Id.* at 267, n.42. Conscious behavior is pled when a plaintiff "allege[s] defendants' knowledge of facts or access to information contradicting their public statements." *Campbell Soup*, 145 F. Supp. 2d at 599.

"The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). The scienter inquiry is holistic: it is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. Scienter may be inferred from indirect and "circumstantial evidence." *Avaya*, 564 F.3d at 276.

The scienter of Eagle's senior executive officers is imputed to the Company. *See U.S. Sec. & Exch. Comm'n v. Mintz*, 723 F. Supp. 3d 386, 408 (D.N.J. 2024).

### A.    Tarriff Personally Conceived And Implemented The Scheme To Create Fictitious Pemfexy Sales

Tarriff's actions directly carrying out Eagle's fraud, as revealed in the Moran Complaint, give rise to a strong inference of scienter. As shown *supra* (*see* Part I),

24

Moran's allegations are highly reliable. Courts in the Third Circuit credit even *anonymous* witness accounts to plead scienter where, as here, they have "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Avaya*, 564 F.3d at 261.[13]

The Moran Complaint reveals that: (i) Tarriff ignored warnings from Moran and others that wholesale customers were already fully stocked with Pemfexy inventory, and that the Buy and Hold program would constitute an illegal form of channel stuffing (¶¶45-49);[14] (ii) Tarriff ordered Moran and his sales team to stuff the channel, but Moran refused (¶48); (iii) Tarriff personally led the effort to induce Eagle's wholesalers to accept Pemfexy shipments under the Buy and Hold program (¶¶48-52); and (iv) on June 30, 2022, the last day of 2Q 2022, Tarriff caused Eagle to enter into a "sale" with Wholesaler A (with whom Tarriff had a close personal relationship), although at its current rate of sales Wholesaler A already had years' worth of Pemfexy inventory that would expire before it could be sold (¶¶52-54).

Furthermore, Tarriff was intimately familiar with Pemfexy inventory levels at

---

[13] As stated above (*see supra* Part I.A), key aspects of Moran's allegations are confirmed by Eagle's own admissions, and by former Senior Regional Sales Director Dawn Vallone. *See* ¶¶207-09; *see also Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *12 (D. Del. June 14, 2011) (scienter inferred where witness accounts corroborated each other).

[14] Moran's complaint also details how he made an internal whistleblower complaint to Tracy Straley, Eagle's Head of HR, who advised Moran that since she already had a meeting scheduled with Tarriff and Eagle's General Counsel, she would report his complaints to them right away. ¶¶160-62; Moran Complaint at ¶¶138-62.

Eagle's customers, the rate at which Pemfexy sold through to end users, and Eagle's contracting and accounting for Pemfexy, displaying his command of such information on conference calls. ¶¶165, 167. Tarriff also signed SEC filings describing in detail the relevant accounting rules and Eagle's related policies. ¶102; ECF No. 33-3 at F-16 – F-17; *see Winemaster*, 529 F. Supp. 3d at 911 ("As CEO . . . it is reasonable to infer that he was familiar with basic GAAP standards regarding revenue recognition."). All of this reinforces Tarriff's knowledge of the true nature of the sham sale, and the impropriety of reporting it as revenue.[15]

Because Tarriff personally carried out the fraud, ignored warnings not to do so, and conveyed falsified financial results to investors, he acted with scienter. ¶¶45-53, 75-100, 102-105; *see In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279 (3d Cir. 2006) ("the allegations concerning the Officers' respective roles in the round-trip sales scheme would be enough to survive a motion to dismiss"); *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 830 (D.N.J. 2006) (scienter

---

[15] Tarriff knew first-hand the importance of following the revenue recognition rules at issue, as he was previously sued for securities fraud and forced out of his role as CEO of Par Pharmaceutical Companies, Inc. ("Par Pharmaceutical") due to strikingly similar GAAP violations. ¶21; Ex. 8 ("at the request of the Board . . . Scott Tarriff [has] stepped down as . . . chief executive officer" of Par Pharmaceutical); Ex. 9 (Par Pharmaceutical "determined that its reserves for future product returns . . . contained errors" and Par's restatement would "reduc[e] product revenues by approximately $84 million"); *see also San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 321 (S.D.N.Y. 2024) (prior securities fraud lawsuit against defendants "bolster[ed] the inference that [defendants] would have been attuned to these issues").

26

alleged for sham transaction "designed solely to boost Third Quarter financials without any expectation that the customer would actually keep the product").[16]

### B.    Eagle's Board Conducted An Investigation Into Pemfexy Sales And As A Result Forced Tarriff To Resign

The circumstances surrounding executive departures can contribute to a strong inference of scienter. *See Vanderhoof v. China Auto Logistics, Inc.*, 2021 WL 3260849, at *5 (D.N.J. July 30, 2021). On November 29, 2023, Eagle abruptly announced Tarriff's "resignation" effective immediately, and stated that "[a]fter consideration of various alternatives, including termination with or without cause, the Board accepted Mr. Tarriff's resignation." ¶192. As later revealed by Tarriff's counsel, "Eagle had conducted an internal investigation into the PEMFEXY inventory issue, and as a result the Company pressured Mr. Tarriff to resign." *Id*.

Notably, Eagle's decision to pressure Tarriff to resign, came shortly after: (i) the filing of the Moran Complaint in July 2023 that revealed Tarriff's role

---

[16] *See also Anastasio v. Internap Network Services Corp.*, 2011 WL 13124500, at *15 (N.D. Ga. Sept. 30, 2011) ("Werle's whistleblower complaint is sufficient to allege a strong inference of scienter as to [defendant] . . . It is clear from Werle's complaint that [defendant] was aware of all the problems Werle discovered and expressed frustration over."); *Dentsply Sirona*, 732 F. Supp. 3d at 318 (strong inference of scienter pled where "Plaintiffs allege that [individual defendants] orchestrated the channel-stuffing scheme"); *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005) ("sham transactions like the one alleged are not done for the fun of it-they are done to cook the books"); *Campbell Soup*, 145 F. Supp. 2d at 599 (finding scienter where "Defendants [] were involved in discussions regarding the Company's sales and shipping practices and . . . reservations were expressed about the propriety of these practices.").

masterminding the Pemfexy channel stuffing scheme; (ii) Eagle's receipt of the SEC's October 11, 2023 subpoena requesting information about the same subjects; and (iii) Eagle's own November 9, 2023 disclosure that "the Company is reviewing and expects potential adjustments to reserves for returns and price adjustments of approximately $15.0 million to $20.0 million," which "primarily relate to returns and a price adjustment for PEMFEXY." ¶193. These facts lead to the strong inference that Eagle forced Tarriff out because he engaged in misconduct with respect to Pemfexy sales, and thus strongly support Tarriff's scienter. *See In re Par Pharma. Sec. Litig.*, 2009 WL 3234273, at *10 (D.N.J. Sept. 30, 2009) (Defendant Tarriff's resignation as Par's CEO at the request of its board, following disclosure of accounting irregularities, contributed to finding of scienter); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (forced resignation "add[s] to the overall pleading of circumstantial evidence of fraud").[17]

## C.    Defendant Cahill Acted With Scienter

Cahill undoubtedly knew of the sham Pemfexy sale in 2Q 2022. On Eagle's

---

[17] *See also In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal. 2009) ("corporate reshuffling . . . in tandem with financial restatements . . . add one more piece to the scienter puzzle"); *In re Home Loan Servicing Sols., Ltd. Sec. Litig.*, 2016 WL 10592320, at *7 (S.D. Fla. June 6, 2016) (defendant "was forced to resign"); *West Palm Beach Police Pension Fund v. DFC Global Corp.*, 2015 WL 3755218, at *17 (E.D. Pa. June 16, 2015) ("the resignation of key executives, including the President and COO responsible for implementing new regulations, bolsters the evidence of conscious or reckless behavior.").

August 9, 2022 earnings call he stated "PEMFEXY sales were $16.5 million in the second quarter of 2022." ¶79. Cahill signed Eagle's SEC filings similarly reporting $16.5 million in Pemfexy revenue, which comprised 33.5% of Eagle's net product sales revenue for the quarter. *See* ¶81. It would strain credulity to argue Eagle's CFO did not know the source of a substantial portion of the Company's revenue, which he personally discussed. *See GSX Techedu*, 738 F. Supp. 3d at 562 ("As for publicly-reported revenue numbers, that was plainly within the CFO's job description."). Indeed, if Cahill made these representations without knowing anything about the source of the claimed revenue, that would demonstrate his severe recklessness as to the truth or falsity of his statements. *See Atlas Air*, 324 F. Supp. 2d at 491 ("The individual defendants were not entitled to make statements concerning the company's financial statements and ignore reasonably available data that would have indicated that those statements were materially false or misleading.").

Furthermore, as an experienced CFO and a CPA (¶22), the glaring red flags surrounding the sham sale would be obvious to Cahill. On the last day of 2Q 2022, Eagle enter into a large "sale" on unusual and customer-favorable terms with Wholesaler A, which was led by a close personal friend of Tarriff's, and a sale agreement was not even signed until months later. ¶¶52-53. The size, timing and circumstances of this transaction were highly suspect. This is especially true in light of Tarriff's unusual personal involvement, and Cahill's prior work experience at Par

Pharmaceuticals where Tarriff was sued for similar accounting fraud. ¶22; *see Par Pharma.*, 2009 WL 3234273, at *12 (denying motion to dismiss).

Cahill's abrupt "resignation" also supports his scienter. On March 8, 2024, Eagle announced Cahill's resignation "effective immediately," when no permanent successor had been identified. ¶137. Like Tarriff, Cahill's purported resignation came amid an SEC investigation and restatement, relating to the Pemfexy scheme carried out while Cahill signed off on and was responsible for Eagle's financial statements. *Id.* at ¶194; *see In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) ("Further reinforcing the case for scienter is the allegation that Dick resigned in the wake of the restatement, before a replacement CFO was selected."); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 126-27 (S.D.N.Y. 2013) (CFO resignation contributed to scienter).[18]

### D.    Additional Facts Further Support The Already Strong Inference Of Scienter

#### 1.    Moran's Termination

Moran was terminated shortly after making his internal whistleblower complaint alleging that Tarriff was spearheading a channel stuffing scheme involving Pemfexy. *See supra*, n.14; *see also* ¶¶160-162; Moran Complaint at

---

[18] Defendants argue that Cahill did not sell stock, but that is insufficient to defeat the strong showing of his scienter. *Strougo v. Mallinckrodt PLC*, 2022 WL 17740482, at *9 (D.N.J. Dec. 16, 2022) ("the mere fact that Defendants generally did not sell stock, for example, is insufficient to render Plaintiff's allegations deficient").

¶¶138-162. The timing of Moran's termination makes it abundantly clear that Defendants understood the significance of the issues that he was raising, and sought to silence him to conceal the fraud, which supports their scienter. *See Collier v. ModusLink Global Solutions, Inc.*, 9 F. Supp. 3d 61, 72 (D. Mass. 2014) (employee's firing three months after identifying "revenue discrepancies" supported the inference that the Company "terminated her employment to prevent CW 4 from raising more questions that could expose the fraud."); *In re Turquoise Hill Resources Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 244 (S.D.N.Y. 2022) ("Bowley's firing shortly after his concerns were reported to [Defendant] creates an inference that the firing was made in retaliation for Bowley's whistleblowing.").

### 2.     Restatement & Ineffective Internal Controls

The circumstances surrounding a restatement can add to a strong inference of scienter. *See In re Bio-Tech Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 588 (D.N.J. 2005) ("a restatement of financial results is probative of scienter"). Factors supporting scienter include the dismissal of employees after announcement of the restatement,[19] the nature of the GAAP violations,[20] the magnitude and delay of the

---

[19] *See Sipex*, 2005 WL 3096178, at *1 (termination of employees following an internal investigation and the announcement of a restatement added to scienter).

[20] *See In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at *20 (E.D.N.Y. Sept. 19, 2005) ("GAAP violations that involve the premature recognition of revenue have been said to suggest a conscious choice . . . because premature revenue recognition, unlike other types of GAAP violations, is less likely to be an inadvertent mistake.").

restatement,[21] and Defendants' knowledge of the GAAP violations.[22]

All of these factors are present here. First, Eagle forced out Tarriff and Cahill "resigned" following an internal investigation and announcement of the need to restate. *See supra* Parts III.B-C. Second, the GAAP violation at issue—recognizing revenue from a sham sale—is obvious. *See supra* Part II.A-B.[23] Third, though it is now almost two years after Eagle completed its investigation and forced Tarriff to resign, the Company still has not published restated 2022 financials.[24] Fourth, Plaintiffs have alleged facts demonstrating Tarriff's knowledge and direct involvement in the sham sale that led to the restatement. *See supra* Part III.A. All of this suggests intentional violations of GAAP, and supports scienter.

---

[21] *See Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 113-14 (D. Mass. 2014) ("the magnitude of the restatement is evinced by the fact that almost one year since it was announced, the restatement is still not complete").

[22] *See In re Synchronoss Tech., Inc. Sec. Litig.*, 2020 WL 2786936, at *15 (D.N.J. May 29, 2020) ("Rosenberger knew that the Company had improperly recognized certain revenue without obtaining signed cont[r]acts.").

[23] *See also In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at *10 (D. Ariz. Aug. 9, 2010) (where defendant company sent "large quantities of short-dated pharmaceutical products to its wholesale distributors, [and] booked revenues on those sales despite knowledge that many of the short-dated products would be returned," it engaged in "precisely the types of specious accounting activities that GAAP . . . [is] intended to prevent.").

[24] While the precise dollar amount of the restatement cannot be determined because Eagle continues to withhold this information from investors, Eagle previously disclosed expected adjustments of "$15.0 million to $20.0 million," and the limited information Eagle has released appears to be consistent with such magnitude, while revealing that Eagle identified seven "material errors" and seven other purportedly "immaterial errors." Ex. 1 at F-19 – F-22; ¶130.

A company's admission that it has ineffective internal controls also supports scienter. *See Hain Celestial*, 2025 WL 2749562, at *16 (admission of inadequate internal controls "suggests recklessness"); *Dentsply Sirona*, 732 F. Supp. 3d at 321 ("poor internal controls support an inference of scienter") (collecting cases). Here, Defendants intentionally thwarted Eagle's internal controls (*see supra* Part II.C), and Eagle admits that its internal controls were ineffective. ¶¶57-58; Ex. 1 at F-19 – F-22. This gives rise to the inference that Defendants maintained ineffective internal controls on purpose, in order to falsify revenue, further supporting their scienter.

### 3.    The SEC Investigation

Scienter can also be supported by governmental investigations. *See also Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 663 (N.D. Ill. 2021) ("that the SEC and RTI's internal audit committee initiated an investigation into RTI's revenue recognition practices and internal controls provides additional support").[25] As Tarriff has admitted, "[t]he ongoing SEC Investigation has focused on accounting issues similar to those alleged in the [Moran] Whistleblower Action, and concerns conduct from 2022 and 2023." ¶149. This too supports scienter.

---

[25] *See also Avid Tech.*, 28 F. Supp. 3d at 114-15 (document preservation request from SEC and subpoena from DOJ add to strong inference of scienter); *Plumbers Union Loc. No. 12 Pension Fund v. Ambassador's Grp.*, 2010 WL 2264962, at *8 (E.D. Wash. June 2, 2010) (SEC investigation contributed to strong inference of scienter); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("[C]ourts have considered a governmental investigation as one piece of the puzzle when taking a holistic view of the purported facts as they relate to scienter.").

### 4.     Tarriff's Motives And Insider Trading

The already strong inference of scienter is further enhanced by Tarriff's motives.[26] Tarriff sold $1.8 million of Eagle stock during the Class Period, more than twice his base salary. ¶¶168-78. *See Suprema Specialties*, 438 F.3d at 278 (executives' stock sales shortly before their resignations relating to round-trip sales alleged motive). While Defendants argue Tarriff's sales are inoculated by a 10b5-1 plan, such plans provide an affirmative defense to claims of insider trading only where multiple strict requirements are met, including that the insider adopt the plan "[b]efore becoming aware of the [material nonpublic] information" at issue. 17 C.F.R. § 240.10b5-1(c)(A). Defendant Tarriff's plan was adopted on June 15, 2023, when he already knew of the Pemfexy sham sale, so the defense is inapplicable.

Tarriff's generous incentive compensation depended in part on Pemfexy sales, earnings targets, and Eagle's stock price, further adding to his motives. ¶¶177-80. And Tarriff had a further motive to reduce the vast deficit to his 2Q 2022 earnings guidance. ¶¶181-87; *see Campbell Soup*, 145 F. Supp. 2d at 598 (motive pled where "management was determined to continue the Company's growth and meet Wall

---

[26] Motive allegations add to a strong inference of scienter, but are not required. *See Tellabs*, 551 U.S. at 325 ("motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference" though "the absence of a motive allegation is not fatal"); *Suprema Specialties*, 438 F.3d 256, 276 (scienter "may be established *either* (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, *or* (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.").

Street's expectations"); *Winemaster*, 529 F. Supp. 3d at 916 (similar).

### 5.    Core Operations

"[U]nder the core operations doctrine, misstatements and omissions made on core matters of central importance to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015); *Campbell Soup*, 145 F. Supp. 2d at 599 ("knowledge may be imputed to individual defendants when the disclosures involve the company's core business") (collecting cases).

Defendants Tarriff and Cahill repeatedly held themselves out as knowledgeable regarding Eagle's Pemfexy sales, customers' Pemfexy inventory levels, and Eagle's financial reporting for Pemfexy sales. *See* ¶¶75-76, 78-79, 81, 85, 87, 89, 91, 95, 98, 102, 103, 108, 111, 115, 163-166. Tarriff directly carried out the channel stuffing scheme, and a "tracker" was even created to monitor the progress of his Pemfexy sales. Moran Complaint at ¶86. Moreover, in 1Q 2022 Eagle reported $37.2 million in Pemfexy revenue, constituting 41.3% of Eagle's total product sales, making Pemfexy Eagle's best-selling product. ¶5.

Because Pemfexy sales were a core matter of central importance to Eagle, Defendants' knowledge is appropriately inferred. *See Campbell Soup*, 145 F. Supp. 2d at 599 ("U.S. soup sales are indisputably the bread and butter of Campbell's

35

business, and, as the Company's CEO and CFO, respectively, Morrison and Anderson are presumed to have had pertinent knowledge."); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 905-06 (E.D. Pa. 2018) (similar).

### E.      Defendants' Competing Inference Is Not Plausible

Based on the foregoing facts showing Defendants' scienter, there are no innocent explanations for their conduct that are more plausible than the obvious inference of fraud. Defendants' proposed inference is that "Eagle offered good-faith incentives to wholesalers to boost PEMFEXY sales, external factors beyond its control slowed pull-through and led to higher-than-expected returns, and Eagle— looking back—determined a restatement was warranted." MTD 20. In support, they cite inapposite cases alleging "fraud by hindsight." But Eagle's admissions that it must restate its financials defeats Defendants' arguments. *See supra* Part II.A; *Atlas Air*, 324 F. Supp. 2d at 494 (rejecting fraud by hindsight argument where "Atlas had to make drastic adjustments to its reported financials for 2000 and 2001 because the company failed to take into account information that was available to it *when those results were issued*."). And *paying* a wholesaler to accept Pemfexy that it cannot sell before its existing inventory expires, and which it can return to Eagle free of charge, is not a "good-faith incentive"—it is fraud.

Defendants' innocent inference does not withstand scrutiny. If Tarriff did nothing wrong, then why did Eagle conduct an internal investigation into Moran's

36

allegations, and then pressure Tarriff to resign and publicly announce that it was considering terminating him *with cause*? On these facts, it is far more likely that Tarriff knowingly created a sham Pemfexy sale to inflate Eagle's revenue. While Defendants may have *hoped* that the wholesaler would somehow sell the excess Pemfexy inventory, this does not insulate them from liability. *See Campbell Soup*, 145 F. Supp. 2d at 598 ("Even if Defendants did not think that their improper behavior would 'catch up with them,' that does not somehow make their failure to disclose material information acceptable or negate their knowledge"). Defendants' failure to offer a credible alternative explanation weighs heavily against them. *See Avaya*, 564 F.3d at 272 ("As the plausibility of these benign explanations shrinks, the cogency of the culpable explanation . . . correspondingly grows.").

## IV.    Defendants' Fraud Caused Investors' Losses

To satisfy loss causation plaintiffs need only plead "that the alleged misrepresentations proximately caused the decline in the security's value." *Cendant Corp.*, 223 F.3d at 185. This inquiry "typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement." *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *38 (D.N.J. Dec. 31, 2018). "[I]t should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in

mind." *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

Loss causation can be pled through corrective disclosures that "relate back to the misrepresentation," though they need not "precisely mirror the earlier misrepresentation." *Liquid Holdings*, 2018 WL 6891832, at *39. Loss causation can also be pled through the "materialization of the risk" approach, under which plaintiffs must plead that "the materialization of the undisclosed risk caused the alleged loss." *Eros Int'l*, 2021 WL 1560728, at *15.[27] "[T]he truth may be revealed through a series of partial disclosures." *Liquid Holdings*, 2018 WL 6891832, at *39.

On November 9, 2023 Eagle announced that it would not release results that day as previously planned, because it "requires more time to review potential adjustments relating to the reporting of sales of PEMFEXY," causing a 30.4% drop in Eagle's stock price that same day. ¶¶127-29. These facts plead loss causation. *See Bradley Pharms.*, 421 F. Supp. 2d at 829 (loss causation pled where stock fell 26.4% "immediately after Bradley disclosed the news of the SEC investigation and announced that the Company would delay the release of its earnings").

---

[27] Defendants claim that the materialization of the risk approach is not viable in the Third Circuit. That is wrong. The Third Circuit has found the materialization of the risk approach "consistent with our loss causation jurisprudence." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 429 (3d Cir. 2007); *Honeywell*, 2020 WL 2520669, at *7 ("While the Third Circuit has not explicitly adopted the theory, it has cited approvingly to authorities endorsing the approach"); *In re Galena Biopharma, Inc. Sec. Litig.*, 2021 WL 50227, at *7 (D.N.J. Jan. 5, 2021) ("Plaintiffs can utilize the materialization of the risk approach").

On November 29, 2023, Eagle disclosed Tarriff's abrupt "resignation," and that the Board had been considering terminating him with cause. ¶¶131-32. That day Eagle's share price fell by another 31.0%. ¶33. As Tarriff's counsel later revealed, "Eagle had conducted an internal investigation into the PEMFEXY inventory issue, and as a result the Company pressured Mr. Tarriff to resign." ¶192. The sham Pemfexy sale was thus the direct cause of Tarriff's "resignation," which was a foreseeable result of his scheme to report fake revenue, which shows loss causation. *See Dentsply Sirona*, 732 F. Supp. 3d at 325 (collecting cases finding loss causation based on announcements of executive departures and internal investigations).

On October 2, 2024, Eagle finally admitted that all of its reported financials since 2Q 2022 were not compliant with GAAP due to Pemfexy revenue recognition, should not be relied on, and need to be restated, and that Eagle had material weaknesses in its internal controls over financial reporting. ¶¶144-45. Eagle's stock fell 39.9% in a single day, and 74.7% over three days. ¶146; *see Par Pharm.*, 2009 WL 3234273, at *10 (loss causation pled where stock fell 27% after the company "announced that, as a result of accounting errors, its financial statements for the periods 2004 to first quarter 2006 should no longer be relied upon").

Defendants argue that these disclosures did not directly admit that Eagle engaged in a sham transaction, but an admission of fraud is not required to plead loss causation. *See Eros Int'l*, 2021 WL 1560728, at *15 (rejecting defendants' argument

that "the corrective press release did not actually reveal any wrongdoing"). Rather, "a plaintiff need only allege that the market was able to infer from the corrective disclosure that the misrepresentation at issue had occurred," and "evidence of such a market inference can be found where a company's stock price drops precipitously following a corrective disclosure." *China Auto Logistics*, 2021 WL 3260849, at *5.[28]

## V.  Tarriff And Cahill Are Also Liable As Eagle's Control Persons

Defendants' sole argument against liability under Exchange Act Section 20(a) is their disproven contention that Plaintiffs have not pled Eagle's primary violation of Section 10(b). Because Eagle violated Section 10(b), that argument fails.

## VI.  Plaintiffs Request Leave To Amend, If Necessary

This is the first time the Court has evaluated Plaintiffs' claims and Defendants' arguments for dismissal. If the Court grants Defendants' motion, Plaintiffs respectfully request that the Court grant leave to amend. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008); Fed. R. Civ. P. 15(a).

**<u>CONCLUSION</u>**

For the foregoing reasons, Defendants' motion should be denied.

---

[28] Defendants' argument that Eagle's 1Q 2023 results did not reveal the fraud fails for similar reasons. Eagle's stock price fell by 13.3% in a single day when Eagle's results revealed dwindling cash, increasing debt, and persistently high uncollected accounts receivable (inflated by the sham Pemfexy sale). ¶¶120-26. This pleads loss causation. *See Dentsply Sirona*, 732 F. Supp. 3d at 325 (S.D.N.Y. 2024) (loss causation alleged for "disappointing earnings report[s]" where "Defendants papered over" declining demand "with channel stuffing, mortgaging the company's future").

Dated: October 9, 2025                    Respectfully submitted,

                                          By: */s/ Donald A. Ecklund*
                                          **CARELLA, BYRNE, CECCHI, BRODY
                                          & AGNELLO, P.C.**
                                          Donald A. Ecklund
                                          Kevin G. Cooper
                                          5 Becker Farm Road
                                          Roseland, New Jersey 07068
                                          Telephone: (973) 994-1700
                                          decklund@carellabyrne.com
                                          kcooper@carellabyrne.com

                                          *Liaison Counsel for Plaintiffs*

                                          **GLANCY PRONGAY & MURRAY LLP**
                                          Robert V. Prongay (*pro hac vice*)
                                          Joseph D. Cohen (*pro hac vice forthcoming*)
                                          Garth Spencer (*pro hac vice*)
                                          1925 Century Park East
                                          Suite 2100
                                          Los Angeles, CA 90067
                                          Telephone: (310) 201-9150
                                          Facsimile: (310) 201-9160
                                          rprongay@glancylaw.com
                                          jcohen@glancylaw.com
                                          gspencer@glancylaw.com

                                          *Lead Counsel for Plaintiffs*

                                          Jack I. Zwick (*pro hac vice forthcoming*)
                                          225 Broadway, Suite 1440
                                          New York, New York 10007
                                          Telephone: (212) 385-1900
                                          jack@zwickfirm.com

                                          *Additional Counsel for Plaintiffs*

41